# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| **LEBANON PLATINUM, LLC,** *et al.,* | ) | Judge Charles M. Walker |
| | ) | |
| Debtors. | ) | Case No. 3:23-bk-03592 |
| | ) | |
| SUBSTANTIVE CONSOLIDATION | ) | (Jointly Administered) |
| REQUESTED | ) | |

---

**THE DEADLINE FOR FILING A TIMELY RESPONSE IS: MARCH 13, 2024**
**IF A RESPONSE IS TIMELY FILED, THE HEARING WILL BE: March 20, 2024 AT**
**11:00 a.m. in Courtroom 2, 701 Broadway, Nashville, TN 37203**
**(Virtual Hearing if allowed; See website for details)**

---

**NOTICE OF MOTION FOR ENTRY OF ORDER (I) APPROVING AUCTION AND
SALE PROCEDURES; (II) APPROVING THE FORM AND MANNER OF NOTICES;
(III) AUTHORIZING AN AUCTION; (IV) APPROVING THE FORM APA; (V)
APPROVING RELATED COMPENSATION; (VI) ESTABLISHING NOTICE AND
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
LEASES; AND (VII) GRANTING RELATED RELIEF**

The above-styled Debtors (the "Debtors") have asked the Court to enter an order (i) approving auction and sale procedures for the Debtors' hotel assets, (ii) approving the form and manner of notices, (iii) authorizing an auction, (iv) approving the form asset purchase agreement, (v) approving related compensation, (vi) establishing notice and procedures for the assumption and assignment of contracts and leases, and (vii) granting related relief.

　　　　**YOUR RIGHTS MAY BE AFFECTED**. If you do not want the Court to grant the attached motion, or if you want the Court to consider your views on the motion, then on or before the date set forth above, you or your attorney must:

1.　　File with the Court your response or objection explaining your position. **PLEASE NOTE: THE BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE REQUIRES ELECTRONIC FILING. ANY RESPONSE OR OBJECTION YOU WISH TO FILE MUST BE SUBMITTED ELECTRONICALLY. TO FILE ELECTRONICALLY, YOU OR YOUR ATTORNEY MUST GO TO THE COURT WEBSITE AND FOLLOW THE INSTRUCTIONS AT: <https://ecf.tnmb.uscourts.gov>.**

If you need assistance with Electronic Filing you may call the Bankruptcy Court at (615) 736-5584. You may also visit the Bankruptcy Court in person at: US Bankruptcy Court, 701 Broadway, 1st Floor, Nashville, TN (Monday - Friday, 8:00 A.M. - 4:00 P.M.).

2.      **Your response must state the deadline and hearing date set forth above, and the motion to which you are responding.**

3.      You must serve your response or objection **by electronic service through the Electronic Filing system** described above.

        If a response is filed before the deadline stated above, the hearing will be held at the time and place indicated above. ***THERE WILL BE NO FURTHER NOTICE OF THE HEARING DATE***. You may check whether a timely response has been filed by calling the Clerk's office at (615) 736-5584 or viewing the case on the Court's website at <u><www.tnmb.uscourts.gov></u>.

        If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.

Dated: February 21, 2024                    Respectfully Submitted,

                                            /s/ Henry E. ("Ned") Hildebrand, IV
                                            Henry E. ("Ned") Hildebrand, IV
                                            Gray Waldron
                                            DUNHAM HILDEBRAND, PLLC
                                            2416 21st Avenue South, Suite 303
                                            Nashville, Tennessee 37212
                                            615.933.5851
                                            ned@dhnashville.com
                                            gray@dhnashville.com
                                            *Counsel for the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| **LEBANON PLATINUM, LLC, *et al.,*** | ) | Judge Charles M. Walker |
| | ) | |
| Debtors. | ) | Case No. 3:23-bk-03592 |
| | ) | |
| SUBSTANTIVE CONSOLIDATION | ) | (Jointly Administered) |
| REQUESTED | ) | |

**MOTION FOR ENTRY OF ORDER (I) APPROVING AUCTION AND SALE
PROCEDURES; (II) APPROVING THE FORM AND MANNER OF NOTICES;
(III) AUTHORIZING AN AUCTION; (IV) APPROVING THE FORM APA; (V)
APPROVING RELATED COMPENSATION; (VI) ESTABLISHING NOTICE AND
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
LEASES; AND (VII) GRANTING RELATED RELIEF**

The above-captioned debtors (the "**Debtors**") are preparing to sell hotels they own and operate. Accordingly, by and through undersigned counsel, and pursuant to 11 U.S.C. §§ 105, 363, and 365, Fed. R. Bank. P. 2002, 6004, 6006, and 9014, Local Rules 2002-1, 6004-1, and 9014-1, the Debtors move the Court for entry of an order (i) approving an auction and certain procedures in connection with the contemplated sale(s); (ii) approving the form and manner of notices of the auction and procedures; (iii) authorizing an auction to be held for qualified bidders to bid on the assets; (iv) approving the form asset purchase agreement (the "**APA**") for the successful bidder(s) from the auction; (v) approving compensation for the broker and auction platform provider; (vi) establishing notice and procedures to establish cure amounts for the potential assumption and assignment of contracts and unexpired leases; and (vii) granting related relief approving and authorizing the sales process following the auction. In support of this motion (the "**Auction Procedures Motion**"), the Debtors state as follows:

# I.   INTRODUCTION

1.      The Debtors filed a *Consolidated Company Profile*, which includes the history of the Debtors, a summary of the Debtors' operations, and Debtors' reasons for filing Chapter 11 (the "**Company Profile**"). The Company Profile is incorporated herein by reference. The Debtors are six separate limited liability companies, each of which operates a single limited-service hotel with less than 100 rooms. These hotels are located in (a) Cookeville, Tennessee, (b) Lebanon, Tennessee, (c) Murfreesboro, Tennessee, (d) Destin, Florida, and (e) Baytown, Texas. Each hotel operates under a franchise "flag" with IHG Hotels and Resorts, Hilton Hotels, or Marriott International Hotels.[1] More specific information as to each Debtor and the respective hotel owned and operated thereby is as follows:

(i)      Debtor Cookeville Platinum, LLC is a Tennessee limited liability company that owns a hotel operating as a Holiday Inn Express & Suites located at 1228 Bunker Hill Road, Cookeville, Tennessee 38506 (the "**Cookeville Property**"; the Cookeville Property and the respective Debtor's personal property situated thereon and/or used in connection with the operation of the hotel shall be referred to collectively hereinafter as the "**Cookeville Assets**").

(ii)      Debtor Lebanon Platinum, LLC is a Tennessee limited liability company that owns a hotel operating as a Hampton Inn & Suites located at 1065 Franklin Road, Lebanon, Tennessee 37087 (the "**Lebanon Property**"; the Lebanon Property and the respective Debtor's personal property situated thereon and/or used in connection with the operation of the hotel shall be referred to collectively hereinafter as the "**Lebanon Assets**").

---

[1] The hotel structure owned and operated by Destin Platinum, LLC is currently operating without a flag as the Evoke Destin, but immediately prior to the Petition Date, it signed a contract with IHG Hotels and Resorts to operate under its "voco Hotel and Suites" brand.

(iii)     Debtor Platinum Gateway II, LLC is a Tennessee limited liability company that owns a hotel operating as a Holiday Inn Express Central located at 165 Chaffin Place, Murfreesboro, Tennessee 37129 (the "**Murfreesboro Gateway Property**"; the Murfreesboro Gateway Property and the respective Debtor's personal property situated thereon and/or used in connection with the operation of the hotel shall be referred to collectively hereinafter as the "**Murfreesboro Gateway Assets**").

(iv)     Debtor Murfreesboro Platinum, LLC is a Tennessee limited liability company that owns a hotel operating as a Fairfield Inn & Suites located at 175 Chaffin Place, Murfreesboro, Tennessee 37129 (the "**Murfreesboro Property**"; the Murfreesboro Property and the respective Debtor's personal property situated thereon and/or used in connection with the operation of the hotel shall be referred to collectively hereinafter as the "**Murfreesboro Assets**").

(v)     Debtor Destin Platinum, LLC is a Florida limited liability company that owns a hotel operating as a Hampton Inn & Suites located at 10861 US-98, Miramar Beach, Florida 32550 (the "**Destin Property**"; the Destin Property and the respective Debtor's personal property situated thereon and/or used in connection with the operation of the hotel shall be referred to collectively hereinafter as the "**Destin Assets**").

(vi)     Debtor VMV, LLC is a Texas limited liability company that owns a hotel operating as a Hampton Inn & Suites located at 721 Garth Road, Baytown, Texas 77521 (the "**Baytown Property**"; the Baytown Property and the respective Debtor's personal property situated thereon and/or used in connection with the operation of the hotel shall be referred to collectively hereinafter as the "**Baytown Assets**").

2.     The assets contemplated to be sold consist of the Cookeville Property, the Cookeville Assets, the Lebanon Property, Lebanon Assets, Murfreesboro Gateway Property,

Murfreesboro Gateway Assets, Murfreesboro Property, Murfreesboro Assets, Destin Property, Destin Assets, Baytown Property, and the Baytown Assets (collectively, the "**Hotel Assets**").

3.     The following are expressly excluded from the Hotel Assets (collectively, the "**Excluded Assets**"):

a.     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of the Debtors and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit;

b.     all documents relating to the above-captioned bankruptcy cases, all minute books, corporate records (such as LLC ledgers) and organizational documents of the Debtors, and Tax Returns, and other tax work papers;

c.     any claims, rights, defenses, or other causes of action arising under Chapter 5 of the Bankruptcy Code, including, without limitation, under Bankruptcy Code Sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553, or under similar or related state or federal statutes and common law, including state fraudulent transfer laws, whether or not prosecution of such actions has commenced, and whether or not standing to bring such claims is held by any representatives of Debtors, any party-in-interest, or any other entity or person  or similar proceedings;

d.     any security deposits or pre-paid expenses whether or not associated with the Hotel Assets;

e.     any personally identifiable information as that term is defined in § 101(41A) of the Bankruptcy Code;

f.  all insurance policies and binders, all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

g.  all membership or other equity interests of any seller or securities convertible into or exchangeable or exercisable for membership or other equity interests;

h.  all accounts receivable;

i.  all intercompany loans and any interest thereon; and

j.  contracts not assumed.

## II.  SUMMARY OF RELIEF REQUESTED

4.  The Debtors seek approval of an auction and related procedures for potential sale(s) of the Hotel Assets, collectively or individually. The contemplated auction will be for sale(s) "as-is," "where is," of the Hotel Assets without any warranties of any kind other than as to title, free and clear of all liens, claims, encumbrances, and interests. Upon obtaining the Court's authority as set forth in this Auction Procedures Motion, or as otherwise ordered by the Court, and following the results of an auction conducted in accordance therewith, the Debtors intend to seek approval of sales to the successful bidder(s) from the auction pursuant to 11 U.S.C. § 363.

5.  The Debtors believe that the procedures for the auction and subsequent sales to the successful bidder(s) described herein establish a process to achieve the highest and best offer for the benefit of stakeholders of the respective estates. The Debtors seek approval of these processes to provide maximum flexibility to the estate to ensure a reasonable outcome for the estate.

## III.  JURISDICTION, VENUE, AND STATUTORY AND PROCEDURAL BASIS

6.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue is proper pursuant to

28 U.S.C. §§ 1408 and 1409. The statutory predicates for the requested relief are §§ 105(a), 363(b), (f), (k), and (m), and 365(a) and (f) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure ("**Fed. R. Bankr. P.**") and Local Rules 2002-1, 6004-1, and 9014-1.

## IV.    STATUS OF CHAPTER 11 CASES

7.      On September 29, 2023, (the "**Petition Date**"), the Debtors commenced these cases by each individually filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

8.      On December 27, 2023, the Debtors filed an *Expedited Motion for Order Authorizing the Debtors to (a) Obtain Postpetition Financing on a Senior Secured Super-Priority Basis Pursuant to 11 U.S.C. § 364, and (b) Consolidate their Use of Cash Collateral Utilizing Consolidated Cash Management* (the "**DIP Financing Motion**") [DE 202].[2] The DIP Financing Motion stated, in relevant part, that the Debtors required short-term post-petition financing due to the nature of the Debtors' business model and continued operations. The Debtors sought $1,000,000.00 of post-petition financing in the DIP Financing Motion.

9.      On January 8, 2024, the Debtors' senior-secured lender, SummitBridge National Investments VIII LLC ("**SummitBridge**") objected to the DIP Financing Motion by [*See* DE 219]. SummitBridge asserted, *inter alia*, that it was not adequately protected in its position with respect to the Debtors and therefore opposed any postpetition financing that sought to prime SummitBridge's lien position.

10.     Ultimately, the Court approved and SummitBridge agreed to fund a debtor-in-possession loan ("**DIP Loan**") in an amount not to exceed $750,000.00, subject to certain additional terms and conditions set by SummitBridge. Among the terms and conditions

---

[2] All references to "DE" are to the docket entry numbers in the lead case of Lebanon Platinum, LLC; Case No. 23-03592.

was a requirement for Destin Platinum, LLC to cross-collateralize SummitBridge's pre-petition claims with the Destin Property and the Destin Assets. Faced with the option of (a) not receiving post-petition financing, which would cause an immediate cessation of hotel operations, or (b) agreeing to SummitBridge's financing conditions, the Debtors chose the latter to keep the Hotel Assets operational.

11.     The original maturity date of the DIP Loan — absent a prior termination or acceleration — is May 31, 2024. Notwithstanding the DIP Loan, in order to continue the Debtors' operations and to pay for capital improvements that are needed to maintain each hotel's franchise flag, the Debtors will need additional funds over-and-above the DIP Loan and beyond its stated maturity date. SummitBridge is neither required nor, at this time, willing to provide the Debtors with the required capital. Without the ability to obtain those funds while in bankruptcy or otherwise have the support of the senior-secured lender to confirmation of a plan with such secured claim satisfied via long-term repayment, the Debtors believe a sale of the Hotel Assets is in the best interest of the bankruptcy estate.[3]

12.     The DIP Loan requires the Debtors to seek a sale of the Hotel Assets to the highest and best buyer identified through an auction process. This auction must occur approximately sixty days from entry of an order granting this Auction Procedures Motion. Concurrently with proposed auction, National Hospital Consulting Group — the Debtors' approved financial and business advisor—is courting a potential purchaser of SummitBridge's loans. Although SummitBridge has full discretion as to whether it is willing to sell its loan documents to a potential buyer, assuming

---

[3] For clarity, the Debtors believe that a plan of reorganization providing for long-term debt satisfaction of SummitBridge's claim, coupled with new money for capital improvements to comply with property improvement plans, would be in the best interest of creditors. Since at this time the Debtors' are not able to refinance SummitBridge's claim and obtain the necessary funds for capital improvements, the Debtor's next best option—a sale of the Hotel Assets—is the only option presently available.

SummitBridge is willing, the potential buyer may be willing to extend additional credit under the DIP Loan and/or the DIP Loan's maturity date, and/or may not desire to have the Hotel Assets sold, but instead would support reorganization through continued operations via a confirmed plan. Therefore, the Debtors hereby reserve the right to withdraw or amend this Auction Procedures Motion.

13.     Contemporaneously with the filing of this Auction Procedures Motion, the Debtors, pursuant to the express terms of the DIP Loan with SummitBridge, filed an *Application for Order Approving Employment and Retention of Berkadia Real Estate Advisors LLC as Exclusive Broker and Listing Agent for Purposes of Selling Hotel Assets* (the "**Broker Retention Application**"), seeking approval of the employment of Berkadia Real Estate Advisors LLC ("**Broker**") to market the Hotel Assets for sale pursuant to the terms of an Exclusive Listing Agreement ("**Listing Agreement**") attached thereto (subject to any necessary further approvals of this Court).

14.     Pursuant to its proposed engagement, and in conjunction with the auction process proposed herein, Broker intends to work alongside CWFS-REDS LLC ("**CW REDS**") to utilize the online sales platform known as RealINSIGHT Marketplace to market the collective Hotel Properties for sale. The marketing efforts will include, without limitation, the following: (i) email marketing campaigns to a proprietary databases of hotel buyers; (ii) handling of confidentiality agreements signed by prospective buyers; (iii) handling of multiple property tours expected; and (iv) handling of any pre-auction offers. Going forward, Broker intends to, *inter alia*, engage in the following additional marketing efforts in advance of the requested auction: (i) continued outreach to databases of prospective buyers; (ii) advertisement in print publications as deemed prudent and effective; (iii) publication of notice of sale on LoopNet and other third party commercial real estate sales websites; (iv) posting notices concerning the auction on LinkedIn; (v) telephone call

campaigns to hotel owners in the regions of Middle Tennessee, the Florida panhandle, and the Houston/Baytown area; (vi) continued marketing of the properties through a professional offering memorandum (upon execution of a confidentiality agreement by the prospective buyers); (vii) email flyers to prospective buyers; and (viii) continued tours of the properties for prospective buyers.

## V.     RELIEF REQUESTED

15.     The Debtors seek approval to sell the Hotel Assets through the sales process described herein, and pursuant to the schedule proposed herein or as directed by the Court, and consistent with: (i) the due process requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure; and (ii) the DIP Loan presently in place with SummitBridge.

16.     The sale of the Hotel Assets is conditioned upon the following: (i) the entry of an order of this Court pursuant to § 363 of the Bankruptcy Code in form and substance reasonably acceptable to the purchaser(s); (ii) a transfer of the respective Hotel Assets free and clear of all liens, claims, encumbrances and interests to the fullest extent permitted by applicable bankruptcy law and specifically including any tax liens or claims, and any successor liability claims; (iii) a finding that the purchaser(s) is/are entitled to the protections given to good faith purchasers pursuant to § 363(m) of the Bankruptcy Code; and (iv) establishing final cure amounts on any executory contracts or unexpired leases to be assigned and assumed by the purchaser(s).

### A.  THE SALES PROCESS

17.     The Debtors seek to foster an auction with a competitive bidding process to attract the highest and best offer for the Hotel Assets. Accordingly, the Debtors seek approval and implementation of a four-step sale process, as follows:

(a)     Entry of an Order granting this Auction Procedures Motion (the "**Auction Procedures Order**"), substantially similar in form to the proposed order submitted herewith, through which the Debtors will obtain approval of: (i) an online auction

for the Hotel Assets, (ii) the form and manner of notice of the auction for the Hotel Assets, (iii) the related compensation to the Broker and the auction platform provider; (iv) the form APA for the successful bidder(s) from the auction; and (v) the process for establishing cure amount amounts for the potential assumption and assignment of contracts and unexpired leases related to the Hotel Assets;

(b) A two-day online auction (the "**Auction**") to be conducted in accordance with the Auction Procedures Order. While the discretion of when the Auction will occur will remain in the Debtors and subject to input by other parties, including the approved Broker, auction platform provider, and SummitBridge, it is expected to occur within approximately 60 days from entry of the Auction Procedures Order at the discretion of the Broker;

(c) Within three (3) business days following conclusion of the Auction, the Debtors would file one or more documents, each styled *Notice of Sale* (the "**Sale Notices**") indicating which of the Hotel Assets are to be sold to which of the Successful Bidder(s) as a result of the Auction. The Sale Notices shall include, at a minimum, (i) the identity of the Successful Bidder(s); (ii) the amount of the successful bid; (iii) the Hotel Assets to be purchased by the Successful Bidder(s); (iv) any other information reasonably required to procure entry of an order approving the sale pursuant to 11 U.S.C. § 363; (v) the deadline to object to entry of an order approving the sale to the Successful Bidder(s); (vi) the hearing to approve the sale to the Successful Bidder(s); (vii) a proposed draft of the order approving the sale to the Successful Bidder(s) pursuant to 11 U.S.C. § 363 in form and substance acceptable to the purchaser(s), SummitBridge, and the Debtors (the "**Sale Order**"); and (viii) the executory contracts or unexpired leases, with the corresponding Cure Payments, to be assumed and assigned to the Successful Bidder(s). The Sales Notices shall further include language providing a ten (10) day period in which parties-in-interest may file an objection to the contemplated sale to the Successful Bidder, and that any objection thereto shall be limited to the failure of the Debtors to follow the process as set forth herein.

(d) The Debtors anticipate the closings on the sales to the Successful Bidder(s) will occur within forty-five (45) days from conclusion of the Auction plus any closing date extensions as reasonably agreed upon by the Debtor and the Successful Bidder(s).

## B.  AUCTION PROCEDURES

18.    The Debtors believe that an auction with bidding procedures will assist in determining the highest and best offer available for the sale of the Hotel Assets. In the circumstances of a required sale, the Debtors believe that the procedures set forth herein are favorable to the Debtors' estates and creditors and create an open and competitive process to

achieve the highest and best offer.

19.     Therefore, the Debtors have elected to proceed with the sale process outlined herein, subject to this Court's approval, and request that the Court approve the procedures, manner, time, and platform (the "**Auction Procedures**"), for bidders to participate in an auction for the Hotel Assets. The Hotel Assets would then be sold to the highest and/or best bidder(s) from the auction (the "**Successful Bidder(s)**") pursuant to Section 363 of the Bankruptcy Code. SummitBridge shall retain its rights to credit bid all amounts owed under its loan documents and/or proofs of claims, in such order, manner, and/or combination as SummitBridge may elect in its sole discretion. SummitBridge shall also retain all of its lien and security interest rights under its loan documents and proofs of claim, including, without limitation, the right not to release any or all of its liens or security interests on the Hotel Assets.

20.     For the Auction to be successful there must be assurances (i) of a competitive process for an auction to achieve the maximum value for the Hotel Assets, and (ii) that the Successful Bidder(s) are parties capable of closing on a sale resulting from the Auction. To accomplish such a result, bidders need to be certain that the process will not be challenged after the Auction, and the Debtors need to be certain that the Successful Bidder(s) are parties pre-screened for the ability to close a sale transaction premised on the winning bid. This Auction Procedures Motion seeks to obtain such certainties. Therefore, any party who fails to object to this Auction Procedures Motion prior to the deadline established by LBR 9013-1 shall be deemed to have consented to the relief requested in this Auction Procedures Motion within the meaning of § 363(f) of the Bankruptcy Code.

### C. TERMS AND CONDITIONS; QUALIFIED BIDDERS; AND RESERVATION OF LOT ALLOCATIONS

21.     As noted above, the Debtors are contemplating a sale of the Hotel Assets and are

seeking approval of procedures for the Auction as part of the sales process. To avoid wasting time and resources, and to increase the likelihood of a successful auction leading to consummation of sale(s) approved under Section 363 of the Bankruptcy Code, the Debtors request that any entity wishing to bid on the Hotel Assets be required to register in advance and reasonably demonstrate its ability to consummate a sale for any bid amount it seeks to make. Therefore, the Debtors request the Auction Procedures Order incorporate the terms and conditions (the "**Terms and Conditions**") available at https://rimarketplace.com/sale-event-terms[4] (copy attached hereto as **Exhibit A**). All bidders at the Auction would be required to comply with the Term and Conditions to become a "**Qualified Bidder**."

22.     The Debtors reserve all rights to offer the Hotel Assets in one or more lots. In other words, depending on the recommendations of the Broker and/or the auction hosting provider, the Hotel Assets may be offered as a collection of hotels to be purchased altogether, separately, or in any combination of one or more of the various Hotel Assets.

### D. SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

23.     The Debtors are proposing to approve the procedures for the Auction to identify purchasers for the Hotel Assets and then to immediately thereafter approve a sale, pursuant to 11 U.S.C. § 363(f), to the Successful Bidder(s) free and clear of all liens, claims, encumbrances, and interests, including, without limitation, any tax claims, the tax liens, and any successor liability claims.

24.     Section 363(f) allows a debtor or trustee to sell assets of a bankruptcy estate free and clear of liens, with secured claims attaching to the proceeds of such sale. The Debtors propose that the Auction and sale process identified herein is the best mechanism to allow creditors to

---

[4] Last visited February 14, 2024.

receive the highest and best recovery on their claims if sales are required in these cases.

25.     Section 363(f) authorizes the sale free and clear of any successor liability claims. "It is the express language of section 363(f) that allows the sale of these assets free and clear of the successor liability claim of [a claimant], something that is not available outside of bankruptcy." *In re Ormet Corp.,* No. 13-10334, 20114 WL 3542133, at *3 (Bankr. D. Del. July 17, 2014). Further, "the term 'any interest' as used in § 363(f) is sufficiently elastic" and "authorize[s] a bankruptcy court to bar any interest that could potentially travel with the property being sold." *PBBPC, Inc. v. OPK Biotech, LLC*, 484 B.R. 860, 869 (B.A.P. 1st Cir. 2013) (internal citations omitted).

26.     Any potential successor liability claim is a claim arising, maturing, and known prepetition. All creditors have received adequate notice of these bankruptcy cases and are subject to the jurisdiction of the Court.

### E.  *COMPENSATION FOR BROKER AND AUCTION PLATFORM PROVIDER*

27.     In conjunction with the *Application for Order Approving Employment and Retention of Berkadia Real Estate Advisors LLC as Exclusive Broker and Listing Agent for Purpose of Selling Hotel Assets* (the "**Broker Retention Application**"), the Debtors request authorization CW REDS to be compensated for hosting and permitting the use of the online sales platform known as RealINSIGHT Marketplace. The compensation to CW REDS would be in the form of a buyer's premium of five percent (5%) added to the aggregate purchase price(s) from the Auction. CW REDS has agreed to share this compensation with the Broker, and therefore, as stated in the Broker Retention Application, the Broker's compensation includes compensation from non-estate sources.

### F. APPROVAL OF FORM APA

28.     In accordance with the Auction and the Sale Motions to the Successful Bidder(s) contemplated thereafter, the Debtors seek approval of the Asset Purchase Agreement (the "**APA**") in the form attached as **Exhibit B** to be used for the sales contract with the Successful Bidder(s) at the conclusion of the Auction.

### G. NOTICE AND PROCEDURES FOR ASSUMPTION AN ASSIGNMENT OF CONTRACTS AND LEASE

29.     The Debtors request the Court to establish notice and procedures for assumption and assignment of executory contracts and unexpired leases to the Successful Bidder(s). Accordingly, the Debtors seek approval of the form *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* (the "**Executory Contract Notice**") attached hereto as **Exhibit C**.

30.     Within seven (7) days following the filing of this Auction Procedures Motion, the Debtors shall file with the Bankruptcy Court and otherwise provide a copy of the Executory Contract Notice to all known parties to executory contracts or unexpired leases that are potentially assumable. The notice would state the amount, if any, the Debtors assert as necessary to bring the respective executory contract or unexpired lease current through February 29, 2024 (the "**Cure Payment**"). If the counterparty to such executory contract or unexpired lease disagrees with the proposed Cure Payment, it would then have a period of twenty-one (21) days from the Executory Contract Notice to object thereto (the "**Cure Objection Deadline**"). As stated in the form notice, any objection would necessarily, *inter alia*, (i) be in writing, (ii) state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; (iii) be filed with the Court and served, and actually received, no later than the Cure Objection Deadline by the Court, counsel for the Debtors and the

United States Trustee.

31.     Establishing the Cure Payments prior to the auction is critical to informing Qualified Bidders and establishing reasonable expectations for closing a sale transaction with the Successful Bidder(s).

<u>**NOTICE**</u>

A copy of this Auction Procedures Motion, including **<u>Exhibits A-C</u>**, is being sent to (i) the Office of the United States Trustee, and (ii) all creditors. The Debtors propose to serve the order approving the Auction Procedures Motion, if and when approved, to the above-named parties as well as (i) all creditors or parties in interest, and (ii) on all known parties that have expressed to the Debtors, or may have an interest, in acquiring the Hotel Assets.

WHEREFORE, the Debtors respectfully request entry of orders granting the relief requested herein, and such other and further relief as is just and proper.

Respectfully submitted:

<u>/s/ Henry E. ("Ned") Hildebrand, IV</u>
Henry E. ("Ned") Hildebrand, IV
Gray Waldron
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
615.933.5851
ned@dhnashville.com
gray@dhnashville.com
*Counsel for the Debtors*

# EXHIBIT A

LOG IN / SIGN UP

(/)

# Sale Event Terms and Conditions

## Scope

These Sale Event Terms and Conditions (these "Terms") apply to each sale event (each, a "Sale Event") conducted for real property, mortgage notes, mezzanine notes or any other type of property (each, a "Property") on RealINSIGHT Marketplace ("RIM"), which are being sold on behalf of the owners of such Properties (each, an "Owner"). "Bidder" means an entity or individual who registers to participate in a Sale Event and "Bid" means the amount a Bidder submits as an offer to purchase a Property. "Buyer" means the Bidder that submits a Bid during a Sale Event that is accepted by Owner in the manner provided in these Terms. Where appropriate, the terms Buyer, Bidder, and Owner also refer to their respective Representatives (as defined herein).

CWFS-REDS LLC ("CW REDS") holds an exclusive license to use and maintain RIM from CWFS Insight LLC ("RI"). CW REDS, together with its retained brokers, auctioneers and auction firms, shall be referred to as "REDS".

In addition to these Terms, the Terms of Use, the Privacy Terms (the "Privacy Terms") and the Frequently Asked Questions (the "RIM FAQs"), together with all other rules, policies and other requirements relating to RIM, any changes to the foregoing, as may be implemented by REDS from time to time, and any other agreement between REDS and Bidder/Buyer with respect to such Bidder's/Buyer's use of RIM (individually and collectively, the "Additional Terms") are incorporated into these Terms by reference and shall apply to any usage of RIM by a Bidder/Buyer. By using RIM and any related services, each Bidder/Buyer agrees to be bound by these Terms (including, without limitation, any Additional Terms). By submitting a Bid on any Property, each Bidder/Buyer further agrees to any additional terms and conditions included on the Property Webpage (as defined herein) at the time of the Bid and such additional terms shall be deemed to be part of these Terms.

CW REDS may update these Terms and any Additional Terms in its sole discretion at any time by posting the updated Terms and/or updated Additional Terms on RIM and any such update shall be effective immediately when posted. The use or continued use of RIM or any related services by Bidder/Buyer at any time after an update is posted on RIM constitutes Bidder's/Buyer's acceptance of any updated Terms and/or updated Additional Terms. In the event that a Bidder/Buyer does not agree with these Terms or any Additional Terms, such Bidder's/Buyer's sole recourse is to cease use of RIM and any related services.

## Eligibility

The services offered on RIM are available only to individuals and entities that have the capacity and authority to form legally binding contracts and that are actively registered on RIM. If Bidder is an individual, by using RIM, Bidder represents and warrants that Bidder (i) is over the age of eighteen (18) and (ii) has the authority and capacity to form legally binding contracts. If Bidder is an entity, by using RIM, the individual placing the Bid on such entity's behalf

represents and warrants that (i) he or she is authorized to place such Bid, (ii) he or she has the authority to execute and deliver the Purchase Agreement (as defined herein) and (iii) such Purchase Agreement will be binding upon (/) Bidder.

## Registration

Only registered Bidders may participate in a Sale Event. To register, each Bidder must provide the following:

Full name;

Address;

Phone number;

Confirmation that the registered Bidder is a natural person and is over the age of eighteen (18);

Certain billing and financial information; and

Current email address

CW REDS reserves the right to accept a registration, waive registration requirements, require additional registration information or the satisfaction of additional conditions or reject or terminate any registration of any party at any time in its sole and absolute discretion or at the request of an Owner. For information regarding the disclosure and use of the information that Bidders provide through registration, please consult the Privacy Terms. The RIM FAQs also provide important information about the registration process.

No registration fee is required to use RIM; however, CW REDS reserves the right to change this policy as it may determine in its sole discretion.

## Bidding and Buying

### (a) Bidding Conduct

By using RIM, Bidder agrees to conduct himself, herself or itself fairly, honestly, and in good faith. If CW REDS determines in its sole discretion that a Bidder is using RIM for such Bidder's own benefit, as a marketing platform, in bad faith or in such a way that would violate any applicable rules, laws, or regulations, such use will constitute a Breach (as defined herein) and CW REDS may revoke Bidder's RIM registration permanently. By using RIM, Bidder agrees to refrain from submitting any harmful, misleading, fraudulent, or otherwise unlawful materials.

Owner may place a Bid on its own Property (an "Owner Bid") directly or through a broker or other authorized person unless making an Owner Bid is prohibited by applicable law. No Owner Bid will be disclosed to Bidders unless required by applicable law, in which case such Owner Bid shall be disclosed in accordance with such law(s). Owner Bids may not exceed the Reserve Price (as defined herein).

Notwithstanding anything contained in these Terms, each of CW REDS and Owner reserves the right, each in his, her or its respective sole and absolute discretion, to accept any Bid, regardless of whether or not such Bid is the highest Bid for the applicable Property.

(E) Review of Sale Event Documents on Property Webpages; Due Diligence

(/)
Each Bidder is responsible for reviewing the form of purchase agreement, any addenda related to such purchase agreement and other related documents (including any linked webpages containing additional information) (such documents, collectively, the "Purchase Agreement") accessible on each Property webpage (each, a "Property Webpage") prior to placing a Bid. If after reviewing the posted form of Purchase Agreement on a Property Webpage, Bidder would like to propose revisions to such Purchase Agreement, then such Bidder must submit in writing to CW REDS a detailed explanation of such Bidder's concern about the Purchase Agreement, together with any proposed revisions thereto. Such explanation and any such proposed revisions must be submitted to CW REDS at least thirty (30) days prior to the start of the Sale Event. Any such proposed revisions that are accepted by Owner will be posted to the Property Webpage prior to the end of the Sale Event. No proposed revisions to the terms of the Purchase Agreement will be considered if submitted less than thirty (30) days before the start of the Sale Event. By placing a Bid on any Property, Bidder agrees that, if Bidder receives a Purchase Agreement, Bidder will execute and deliver the Purchase Agreement without modification. CW REDS and Owner each reserves the right to make changes to the Purchase Agreement prior to the end of the Sale Event.

A Property Webpage may include documents and statements relating to the condition of the Property (collectively, the "Property Information"), such as the environmental and structural conditions of the Property and the type of encumbrances that may exist on the Property. Each Bidder is responsible for reviewing the Property Information and conducting his, her or its own due diligence and inspections of the Property. Any Bidder that wishes to inspect a Property must make the request to Owner through the listing broker provided on the Property Webpage. Bidder must coordinate all inspections with the listing broker for the Property. Bidder acknowledges that, in some instances, Owner may be unable to provide physical access to a Property for inspections. For the avoidance of doubt, each Property listed for sale on RIM is sold as-is and neither REDS nor any Owner makes any representations or warranties with respect to any repairs, improvements, conditions or otherwise with respect to a Property. Each Bidder/Buyer is responsible for (and assumes the risk of) any claim, loss, injury, liability, damage or expense, directly or indirectly arising out of or related to Bidder's/Buyer's inspection of, visit to or other investigation of the Property (whether in-person or otherwise). REDS does not assume any liability or responsibility for any inspections or the outcomes thereof.

If a Property is a mortgage note or mezzanine note, then Bidder shall not (i) contact the owner of the real property securing such mortgage note or mezzanine note (the "Collateral") or any other obligors in connection with such mortgage note or mezzanine note, (ii) visit the Collateral, or (iii) contact any of the parties providing services to the Collateral including, without limitation, any receivers. Bidder shall not contact property managers or any tenants with respect to any Property or any Collateral. All Bids should be based solely on Bidder's independent due diligence as well as Bidder's review of the Purchase Agreement and the Property Information. Any Bid(s) made by a Bidder are submitted at his, her or its own risk.

The Property Information available on RIM has not been verified by REDS in any manner and REDS MAKES NO REPRESENTATIONS WHATSOEVER ABOUT THE ACCURACY OR COMPLETENESS OF ANY PROPERTY INFORMATION OR ANY PROPERTY WEBPAGE. All Bidders are encouraged to seek advice and guidance from independent professionals prior to making any bidding decision with respect to any Property.

Bidder acknowledges and agrees that Bidder will be bidding on the Property pursuant to Bidder's independent examination, study, inspection and knowledge of the Property, and Bidder is relying upon his, her or its own determination of the value and condition of the Property and not on any information provided or to be provided by REDS. Bidder is relying solely upon his, her or its own inspections, investigations, research and analyses in entering into the Purchase Agreement and is not relying in any way upon any representations or warranties, statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines or other information or material furnished by Owner, REDS or any of their respective Representatives to Bidder or his, her or its representatives, whether oral or written, express or implied, or of any nature whatsoever regarding any such matters.

(c) Intent to Purchase

Bidder agrees that, by placing a Bid on any Property, Bidder is confirming his, her or its intention to purchase such Property and his, her or its ability to pay the full amount of the Purchase Price (as defined herein) of such Property, including the Earnest Money Deposit (as defined herein), in the manner set forth in the Purchase Agreement and within the time frames provided herein or otherwise requested by CW REDS and/or Owner. Except as otherwise set forth on the applicable Property Webpage, each placed Bid during a Sale Event is IRREVOCABLE, final upon submission and constitutes a legally binding commitment to purchase such Property in accordance with these Terms in the event that such Bid is chosen by Owner.

By placing a Bid during a Sale Event, each Bidder agrees to be available to be contacted by CW REDS during and after the conclusion of any such Sale Event. Unless the bidding information for a particular Property provides different time frames, or either CW REDS or Owner provides different time frames, a Bidder must (i) respond to any attempt by CW REDS to contact such Bidder during and/or after a Sale Event for which Bidder has placed a Bid within thirty (30) minutes of CW REDS's first such attempt; (ii) to the extent Bidder receives a Purchase Agreement from CW REDS, execute and deliver a Purchase Agreement within two (2) hours after such Bidder receives a copy of the Purchase Agreement for execution; and (iii) pay the amount of the Earnest Money Deposit to the escrow agent in the manner and time frame set forth in the Purchase Agreement.

Owner and CW REDS each reserves the right to require any Bidder/Buyer to provide satisfactory evidence that demonstrates such Bidder's/Buyer's ability to enter into the Purchase Agreement, to pay the amount of any required deposits and to consummate the purchase of a Property and pay the amount of the Bid placed by such Bidder/Buyer (the "Purchase Price") and any associated fees should Owner choose Bidder's Bid. Bidder/Buyer agrees to provide such evidence within the time frame requested by Owner and/or CW REDS. If Bidder/Buyer fails to provide the requested evidence within the required time frame, CW REDS may deem such Bidder/Buyer to be in Breach and Owner and/or CW REDS may reject Bidder's Bid and/or a Purchase Agreement sent to and/or executed by any prospective Buyer.

(d) Sale Event Timing

During a Sale Event, Bidder's screen will display a countdown clock, the current Bid and the amount of the minimum bidding increment (the "Bid Increment"). The countdown clock on RIM constitutes an official "timekeeper" for each Sale Event.

CW REDS reserves the right, exercisable in its sole and absolute discretion, to extend the time period during which bidding is open and to change the amount of the Bid Increment. The countdown clock will automatically reset to three (3) minutes when the countdown clock has two (2) minutes or less remaining before the end of the Sale Event if either (i) a Bid is submitted or (ii) the Bid Increment changes. Bidder understands and acknowledges that such resets may not occur at all or may occur one or more times during the course of a Sale Event.

BIDDER UNDERSTANDS THAT VARYING CONNECTION SPEEDS, LOSS OF CONNECTION, PROCESSOR SPEEDS AND MANY OTHER FACTORS MAY DELAY OR CAUSE THE LOSS OF THE COUNTDOWN CLOCK INTERFACE AS IT APPEARS ON BIDDER'S SCREEN. EACH BIDDER IS SOLELY RESPONSIBLE FOR MAINTAINING ADEQUATE INTERNET CONNECTIVITY AND ADEQUATE TECHNOLOGY RESOURCES TO PARTICIPATE IN THE BIDDING PROCESS AND EACH SALE EVENT AND UNDER NO CIRCUMSTANCES WILL REDS AND/OR ITS REPRESENTATIVES BE RESPONSIBLE FOR PLACING A BID ON BIDDER'S BEHALF OR LEAVING THE BIDDING OPEN BEYOND THE SALE EVENT END TIME.

(e) Conclusion of Bidding; Purchase Agreement

Once the Sale Event has concluded and the potential Buyer has been selected, CW REDS will distribute to such potential Buyer an electronic copy of the Purchase Agreement and instructions for electronic execution thereof (the "Email Instructions") to the email address provided in such potential Buyer's registered account(s). The Email Instructions are part of these Terms and the prospective Buyer must execute the Purchase Agreement in accordance with such Email Instructions and within the time frame provided therein. Failure to execute the Purchase Agreement in accordance with the Email Instructions, to provide requested information or to pay any required Earnest Money Deposit will constitute a "Purchase Failure" and a Breach and may result in the rejection of the prospective Buyer's Bid, in which event Owner may decline to consider the prospective Buyer's executed Purchase Agreement. A PURCHASE FAILURE MAY RESULT IN A CLAIM FOR LIQUIDATED DAMAGES AS SET FORTH HEREIN. Furthermore, nothing contained herein precludes Owner and/or CW REDS from rejecting a Bid either prior to or after distribution of the Purchase Agreement to a prospective Buyer or after execution and delivery of the Purchase Agreement by a prospective Buyer, unless and until Owner accepts the Bid pursuant to paragraph (f), nor does anything contained herein require Owner and/or CW REDS to distribute a copy of the Purchase Agreement to any Bidder or prospective Buyer.

Once the potential Buyer has executed and delivered the Purchase Agreement pursuant to the Email Instructions, the executed Purchase Agreement will be sent to Owner and/or CW REDS for consideration.

(f) Selection of Buyer

A Bidder shall be designated as Buyer and Owner shall be deemed to have accepted a Bid only when Owner executes and delivers the Purchase Agreement to such Bidder at the conclusion of a Sale Event and any required Earnest Money Deposit has been paid by Bidder; provided, however, that if a Sale Event is designated as "Subject to Seller Approval" (as further described in paragraph (i) below), then Owner shall be deemed to have accepted a Bid only at the conclusion of the relevant "Subject To Period".

Each Bidder further understands and agrees that (i) no Owner is under any obligation to enter into a Purchase Agreement with any Bidder, regardless of whether a Bidder submits the highest Bid for a Property, (ii) each Owner and/or CW REDS reserves the right, exercisable in such Owner's and/or CW REDS's (as applicable) sole and absolute discretion, to reject or accept a Bid for any reason (regardless of whether such Bid is the highest Bid), and (iii) Bidder's execution of the Purchase Agreement only entitles such Bidder to have his, her or its Bid considered by Owner, and does not require Owner to sell the relevant Property to such Bidder.

(g) Earnest Money Deposits

The Purchase Agreement may require a prospective Buyer to pay a deposit to the escrow agent designated in such Purchase Agreement (each, an "Earnest Money Deposit"). Such Earnest Money Deposit must be received by the escrow agent designated in the Purchase Agreement, and in the time frame provided for in the Purchase Agreement. Failure to provide such Earnest Money Deposit in the required time frame may result in a Purchase Failure and a Breach of these Terms and/or the Purchase Agreement. In the event that Owner fails to consummate the transaction through no fault of Bidder/Buyer, the Earnest Money Deposit should be returned promptly by the escrow agent or Owner (to the extent the Earnest Money Deposit was released to Owner pursuant to the terms of the Purchase Agreement).

(h) Platform Fee

Certain Property Webpages may specify that a Buyer must pay a "Platform Fee" at closing. Any required Platform Fee is in addition to the Purchase Price and is due at closing along with the amount of the Purchase Price for the Property (as provided in the Purchase Agreement).

(i) Certain Sale Event Terms

Except as provided herein, each Property being sold as part of a Sale Event will have an unpublished minimum selling price that Owner is willing to accept for such Property (a "Reserve Price"). If the highest Bid is below the Reserve Price, then Owner is under no obligation to sell the Property to any Bidder; provided, however, that Owner, in his, her or its sole and absolute discretion, may elect to sell a Property to a Bidder who or which submits a Bid that is below the Reserve Price. Notwithstanding the foregoing, and only where permitted by applicable law, CW REDS and/or Owner may elect for certain Properties to be sold on RIM without a Reserve Price. If a Property is being sold without a Reserve Price, then the Property Webpage will specifically state that the Property is being sold without a Reserve Price and specific provisions may be provided if necessary regarding the conduct of the Sale Event for such Property.

Certain Sale Events may be designated as "Subject to Seller Approval" regardless of whether a particular Bid is below, at or above the Reserve Price. Where a Sale Event is so designated, Owner has the unilateral right to terminate the Purchase Agreement in accordance with the terms and conditions contained therein, and any Bidder should closely review the form of Purchase Agreement for any such Sale Events before placing a Bid. If Owner elects to terminate the Purchase Agreement through no fault of the relevant prospective Buyer, then such prospective Buyer shall be entitled to the return of any fees or deposits paid in connection with the pending purchase of the Property.

## Residential Sale Event Terms and Conditions

(v) Without limiting any other provisions of these Terms or any additional disclaimers which may be provided on the relevant Property Webpage, the following additional terms and conditions shall apply solely with respect to any Property described as a residential Property on the relevant Property Webpage (each, a "Residential Property").

(a) Proxy Bidding

Except where prohibited by applicable law, and solely with respect to a Residential Property, proxy Bids may be placed on behalf of a Bidder by an independent and duly licensed real estate agent or broker engaged by such Bidder.

(b) Property Status

Each Bidder/Buyer acknowledges and agrees that, unless required by applicable law, each Residential Property listed for sale on RIM is listed without any express or implied guarantees, representations, warranties, promises, covenants or agreements of any kind from any party. With respect to any Residential Property listed for sale on RIM, each of REDS, RI, Owners, the brokers, the auctioneers and/or their respective Representatives specifically disclaim any representations or warranties with respect to any of the following: (i) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Residential Property; (ii) the Residential Property's value, nature, quality or condition, and the potential for any income to be derived from the Residential Property; (iii) any matter affecting the stability or integrity of the land or any buildings, structures or improvements situated on the Residential Property; (iv) the suitability of the Residential Property for any and all purposes, activities and uses; (v) the Residential Property's compliance with any laws, rules, codes or ordinances applicable thereto (including, without limitation, any zoning, land use, environmental, health or building laws, rules, codes or ordinances); (vi) the quality and state of repair of the Residential Property or the quality of any materials used on or incorporated into the Residential Property; (vii) the conformity of the improvements to any plans or specifications for the Residential Property that may be provided to any Bidder/Buyer; (viii) whether the Residential Property is located in any hazard zones or special studies zones; (ix) whether the Residential Property is occupied other than by a tenant pursuant to a valid written lease; and/or (x) any other matter with respect to the Residential Property. Each Bidder/Buyer understands and agrees that, by placing a Bid on a Residential Property, he, she or it is confirming his, her or its intention to purchase such Residential Property in its current state, including with respect to all defects (whether patent or latent).

## Other Terms and Conditions

(a) Disclaimer; Release

NONE OF CW REDS, RI, OWNERS, THE BROKERS, THE AUCTIONEERS AND/OR THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, PRINCIPALS, AFFILIATES, DIRECTORS, MANAGERS, ATTORNEYS, ADVISORS AND SUBSIDIARIES ("REPRESENTATIVES") MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, REGARDING ANY PROPERTY, INFORMATION RELATED TO ANY PROPERTY, OR THE SUFFICIENCY OF ANY INFORMATION AND/OR DOCUMENTS ON RIM OR AFFILIATED WITH ANY SALE EVENT. EACH BIDDER/BUYER RELEASES CW REDS, RI,

OWNERS, THE BROKERS, THE AUCTIONEERS AND/OR THEIR RESPECTIVE REPRESENTATIVES FROM ANY AND ALL CLAIMS, WHETHER CURRENT OR FUTURE, AGAINST CW REDS, RI, ANY OWNER, ANY BROKER, ANY AUCTIONEER AND/OR ANY OF THEIR RESPECTIVE REPRESENTATIVES. THIS WAIVER IS INCLUSIVE OF ANY AND ALL CLAIMS OF WHICH BIDDER/BUYER IS CURRENTLY UNAWARE, REGARDLESS OF WHETHER SUCH CLAIMS WOULD AFFECT BIDDER'S/BUYER'S RELEASE OF CW REDS, RI, ANY OWNER, ANY BROKER, ANY AUCTIONEER OR ANY OF THEIR RESPECTIVE REPRESENTATIVES.

EACH BIDDER/BUYER WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 (AND ANY OTHER SUBSTANTIALLY SIMILAR STATE STATUTES IN OTHER JURISDICTIONS), WHICH PROVIDES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(b) Additional Bidder/Buyer Representations and Warranties

Any Bidder placing a Bid on any Property hereby represents and warrants that Bidder (i) is a sophisticated purchaser with knowledge and experience in financial and business matters, particularly with respect to matters relating to the purchase, financing, sale, origination, or ownership of real property, (ii) can evaluate the merits and risks of investment in such Property and can bear the risks of purchasing such Property, whether economic or otherwise, (iii) has reviewed the Purchase Agreement and the Property Information and will independently make his, her or its own investment analysis of such Property and decision about whether to submit a Bid for such Property based on Bidder's own findings and conclusions, with such other due diligence and investigations as Bidder may choose to perform (subject to the terms hereof), (iv) if such Bidder's Bid is chosen by Owner, is able to execute and deliver the Purchase Agreement, deliver the Earnest Money Deposit and provide any additional requested or required information within the time frame(s) requested by CW REDS and/or Owner, or otherwise provided herein, and (v) will be available to be contacted by CW REDS during and after the conclusion of any Sale Event for which Bidder placed one or more Bids.

If bidding on a Property that is a mortgage note or mezzanine note, Bidder further represents and warrants that Bidder is an "accredited investor", a representative of an institution that qualifies as an "accredited investor", or a "qualified institutional buyer", as each of those terms are defined by the Securities Act of 1933.

(c) Bidder/Buyer Breach, Indemnification, Liquidated Damages

In the event that any Bidder/Buyer breaches or fails to comply with any of the representations, warranties, covenants or agreements set forth in these Terms or in any Additional Terms (each, a "Breach"), each such Bidder/Buyer hereby covenants and agrees to indemnify, defend and hold harmless CW REDS, RI, each Owner, each broker, each auctioneer and/or their respective Representatives (collectively, the "Indemnitees") for, from and against any losses of any nature whatsoever incurred by such Indemnitees (including, without limitation, any attorneys' fees and costs) ("Losses"), with respect to each and every such Breach. Further, each Bidder/Buyer agrees to indemnify, defend and hold harmless each and every Indemnitee for any Losses incurred by such Indemnitee with respect to any claim brought by any such Bidder/Buyer and any of such Bidder/Buyer's agents, brokers, or representatives which arises from these Terms, the Additional Terms, the Purchase Agreement and/or the conduct of any Sale Event.

In the event that any claims are brought by any Indemnitee against any Bidder/Buyer, which arise from these Terms, the Additional Terms, the Purchase Agreement and/or the conduct of any Sale Event, each such Bidder/Buyer agrees to reimburse the Indemnitees for any Losses incurred by such Indemnitees with respect to any such claims.

CW REDS, AT ITS SOLE OPTION, MAY REQUIRE A BIDDER/BUYER IN BREACH OF THESE TERMS BY REASON OF A PURCHASE FAILURE TO PAY TO CW REDS LIQUIDATED DAMAGES IN THE AMOUNT EQUAL TO THE AMOUNT OF ANY EARNEST MONEY DEPOSIT OR IF NO EARNEST MONEY DEPOSIT WAS REQUIRED OR PAID, AN AMOUNT EQUAL TO TWO PERCENT (2%) OF BIDDER/BUYER'S BID FOR THE PROPERTY IN QUESTION. IF BIDDER/BUYER PAID ANY EARNEST MONEY DEPOSIT BY CREDIT CARD, CW REDS RESERVES THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO CHARGE SUCH CREDIT CARD IN THE AMOUNT EQUAL TO THE REQUISITE LIQUIDATED DAMAGES AS SET FORTH HEREIN. BIDDER/BUYER RECOGNIZES THE DIFFICULTY OF ESTIMATING THE ACTUAL LIQUIDATED DAMAGES TO WHICH CW REDS WOULD BE ENTITLED IN THE EVENT OF A BREACH, AND THEREFORE AGREES THAT THE PRE-DETERMINED VALUE OF LIQUIDATED DAMAGES SET FORTH HEREIN DOES NOT REPRESENT A FORFEITURE OR PENALTY.

(d) Online Venue

RIM is a website used by real estate brokers, auctioneers, and auction firms to host the bidding on, and transfer of, Properties during Sale Events and to list Properties for sale (each, a "Listing"). RIM itself does not function as an Owner, real estate broker, auctioneer, auction firm or agent of any of the foregoing.

(e) Refusal of Service; Cancellation of Sale Events or Listings

CW REDS reserves the right in its sole and absolute discretion to (i) terminate and/or reject a Bid, revoke any registration or approval to Bid and/or refuse service to any individual or entity, at any time; (ii) impose conditions on submitting Bids or accessing RIM; (iii) combine, group together or separate any Properties for sale within a Sale Event, at any time; (iv) cancel or postpone any Sale Event or the sale of any Property within a Sale Event at any time, whether or not such Sale Event is already in progress and whether or not bidding on any Property has started or has been completed; or (v) prohibit any Listing or terminate any existing Listing.

(f) Forum; Choice of Law

These Terms shall be governed and construed in accordance with the laws of the State of Delaware and any disputes arising under these Terms shall be adjudicated in the state and federal courts located in Maryland with the exception of disputes arising from, or in relation to, Properties located in the State of California, in which case such disputes shall be governed and construed in accordance with the laws of the State of California.

(g) Marketing; No Offer to Solicit or Sell

From time to time, REDS may provide marketing materials, including digital advertisements, emails, flyers, and postcards. These materials, and any information posted on websites, shall not constitute an offer to sell any Property, nor shall they constitute a solicitation of Bids.

(h) Waiver of Class Action

(/)

Any suit brought by an individual and/or entity against CW REDS, RI, any Owner, any broker, any auctioneer and/or any of their respective Representatives must be brought in that individual's or entity's sole capacity. Use of RIM and any associated services with respect to RIM constitutes a waiver of any class action proceedings.

(i) Intellectual Property

Any and all logos, images and other marks displayed on RIM are the sole property of CW REDS or RI and may not be transferred to, or used or displayed by, any person without the prior written consent of CW REDS and RI.

(j) Compliance with Laws and Regulations

Bidder/Buyer and any of his, her or its associated broker(s) are responsible for compliance with all applicable laws and regulations. Bids submitted during a Sale Event are void where such Bids are prohibited by law. In the event that any Sale Event or sale of Property requires registration under any state securities law, such registration must be completed and verified by the applicable Owner in such Owner's sole and absolute discretion prior to consummating any sale.

By using RIM, Bidder/Buyer represents it has knowledge of, and is in compliance with: (1) any applicable anti-bribery, anti-money laundering, or anti-corruption laws or regulations whether of the United States ("U.S.") or of any other jurisdiction where Bidder/Buyer conducts business or has a legal presence; (2) the export control laws of the U.S. administered by the U.S. government (including, but not limited to, the Departments of Commerce, State, Energy and Agriculture); (3) the economic sanctions laws of the U.S. administered by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and by the Department of State, and in this regard, Bidder/Buyer represents that it is neither 50% or more owned (directly or indirectly) by an individual or entity on OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List"), nor owns 50% or more of an entity on the SDN List; (4) the laws governing foreign investment in the U.S. administered by the Committee on Foreign Investment in the U.S. ("CFIUS"), Department of the Treasury, particularly as they apply to real estate transactions; (5) the anti-boycott laws administered by the U.S. Departments of Commerce and Treasury; and, (6) all material laws in each jurisdiction where it conducts business or has a legal presence.

(k) Licensure

Any brokers or Owners that add any Property to RIM or sell any such Property/Properties shall indemnify the Indemnitees for all damages and costs directly or indirectly arising out of or related to the advertisement and marketing of such Property/Properties on RIM.

(l) Cooperating Broker Fees

Certain Sale Events may offer a commission for cooperating brokers, so long as (i) the cooperating broker has registered on RIM as a broker, (ii) the cooperating broker is identified by the Bidder with whom or which it is associated, and (iii) the Bidder represented by such cooperating broker actually purchases the Property if Owner

accepts the Bid from such Bidder in accordance with the terms hereof. A cooperating broker may only be entitled to a commission if such broker meets the following conditions: (i) the broker agrees to these Terms and all other terms and conditions posted on the applicable Property Webpage(s); (ii) the broker is not a family member or an affiliate of the Bidder such broker represents; (iii) the broker is properly licensed in the state(s) in which the applicable Property or Properties is or are located; (iv) the broker identifies the Bidder such broker is representing prior to the start of the Sale Event (the timing of which shall be determined in CW REDS' sole and absolute discretion); and (v) the broker is identified by the Bidder at the time that such Bidder registers on RIM.

Each Bidder/Buyer agrees to indemnify, defend and hold each of the Indemnitees, free and harmless from any claims of any broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Owner, Buyer and/or Bidder, respectively, or otherwise to be entitled to compensation, including a cooperating broker fee, directly or indirectly arising out of or relating to the Purchase Agreement or the sale of the Property. This indemnity shall survive both the closing and any termination of the applicable Purchase Agreement.

<u>(m) Bidder Privacy Terms and Conditions</u>

Use of RIM and participation in any Sale Event may require that Bidder register and disclose certain Personally Identifiable Information ("PII"), including financial information, credit card data, and other payment information, through RIM. CW REDS will only store Bidders' PII to the extent necessary for each Bidder's participation in the Sale Event(s). Once such Sale Event(s) has/have concluded and the Buyer has been selected, CW REDS will only retain sufficient PII from each Buyer as is necessary to associate each Buyer with such Buyer's purchase.

Updated: October 13, 2023



(/)

800.915.7015 (tel:800.915.7015)

info@rimarketplace.com (mailto:info@rimarketplace.com)

## FOLLOW US

[facebook] (https://www.facebook.com/rimarketplace) [X]
(http://twitter.com/rimarketplace) [linkedin]
(http://linkedin.com/company/rimarketplace/) [instagram]
(http://instagram.com/rimarketplace) [threads]

:ttps://www.threads.net/@rimarketplace)

(https://www.youtube.com/@rimarketplace)

## QUICK LINKS

Contact Us

2024 Auction Calendar

Terms of Use

Privacy Terms

Sale Event Terms & Conditions

Listing Terms & Conditions

ReallNSIGHT Technology

## LEARN MORE

Buyers

Brokers

Sell With Us

Insights

News

About Us

FAQ

© 2023 CWFS INSIGHT LLC - All Rights Reserved

# EXHIBIT B

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") dated as of the date last signed (the "**Effective Date**"), is made by and between **[SUCCESSFUL BIDDER]**, a _____ _____, having an address of _____ (hereinafter "**Purchaser**" or "**Buyer**") and **[CORRESPONDING PLATINUM DEBTOR]**, a [TENNESSEE/FLORIDA/TEXAS] limited liability company, having an address of _____ ("**Seller**").

## RECITALS:

**R-1.** Seller desires to sell certain improved real property known and commonly referred to as the "_____" located at _____, along with certain related property described below, and Purchaser desires to purchase such real and other property from Seller.

**R-2.** Seller and Purchaser, intending to be bound by this Agreement, desire to set forth herein the terms, conditions and agreements under and by which Seller shall sell and Purchaser shall purchase the property described below.

**R-3.** Seller and Purchaser acknowledge that the Seller is a debtor in a chapter 11 bankruptcy proceeding pending in the United States Bankruptcy Court for the Middle District of Tennessee (the "**Court**"), and this Agreement remains subject to the Court's authority and approval.

## AGREEMENTS:

**NOW, THEREFORE**, in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

**1.    THE PROPERTY.**

1.1    <u>Description</u>. Subject to the terms and conditions of this Agreement, and for the consideration set forth herein, Seller hereby agrees to sell, assign and convey, and Purchaser hereby agrees to purchase, acquire and assume, all of Seller's respective right, title and interest in and to the following (the "**Property**"):

1.1.1    That certain parcel of land located in _____ County, _____, having a street address of _____, and being more specifically described on **Schedule 1.1.1**, attached hereto (the "**Land**"), along with all buildings (the "**Buildings**") together with all other improvements, parking facilities and fixtures located on the Land (the Buildings and any and all other improvements located on the Land are hereinafter referred to collectively as the "**Improvements**") and all easements, hereditaments, appurtenances, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "**Easements**"). The Land, Buildings, Improvements and Easements are hereinafter collectively referred to as the "**Real Property**";

1.1.2    All furniture, furnishings, fixtures, equipment and other tangible personal property affixed to and/or located at the Real Property and used in connection with the Real Property, or replacements of those items permitted pursuant to this Agreement (the "**Personal Property**");

53546002 v3
53546002 v4

1.1.3    Any and all written leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof) (collectively, "**Leases**"), any and all Contracts (defined in Section 3.7, below), any and all permits and any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications and development rights that exist as of the Date of Closing and relate to the Real Property or the Personal Property (collectively, the "**Intangible Property**").

1.2    Agreement to Convey. Subject to the conditions set forth in Article 6, Seller agrees to sell and convey, and Purchaser agrees to purchase and accept, on the Date of Closing (defined in Section 2.4, below): (a) fee simple title to the Real Property by way of a _____ Deed (defined in Section 8.1.1, below), to be executed and delivered by Seller in respect to the Property, and which shall be subject to the Permitted Exceptions (defined in Section 3.6, below) affecting or encumbering the Real Property; and (b) the remainder of the Property, by way of the assignment and assumption agreements, a quitclaim bill of sale and other instruments of conveyance described in this Agreement.

## 2.    PURCHASE PRICE AND PAYMENT.

2.1    Purchase Price. The purchase price for the Property (the "**Purchase Price**") is the Winning Buyer's Offer (defined below). In addition to the Purchase Price, and in consideration of the use of the online auction platform, RealINSIGHT Marketplace, which is operated by CWFS-REDS LLC, a Delaware limited liability company ("REDS"), Purchaser agrees to pay the Platform Fee at Closing.

2.1.1    Winning Buyer's Offer. The winning buyer's offer for the Property (the "**Winning Buyer's Offer**" or "**WBO**") is _____ and No/100 U.S. Dollars ($_____.00).

2.1.2    Platform Fee. The platform fee for the Property (the "**Platform Fee**") is the greater of Five Percent (5%) of the WBO or $25,000.00. The Platform Fee is _____ and No/100 U.S. Dollars ($_____.00).

2.2    Earnest Money Deposit.

2.2.1    Deposit. As the initial deposit (the "**Earnest Money Deposit**"), Purchaser shall be required to pay ten percent (10%) of the Purchase Price, but not less than Twenty Thousand and No/100 Dollars ($20,000.00) and not to exceed One Million and No/100 Dollars ($1,000,000.00) per individual hotel asset owned by an individual Seller, to Title Company. The total amount of the Earnest Money Deposit due must be deposited with [Insert Title company name, address and contact/escrow officer] _____ ("**Title Company**"), no later than one (1) business day following Purchaser being declared the winning bidder (even if the sale is subject to confirmation). Regardless of the amount financed, if any, the Earnest Money Deposit will not be altered. The Earnest Money Deposit will be non-refundable (except upon a default by Seller or as specifically provided herein). If Purchaser shall fail to timely make the Earnest Money Deposit by 5:00 p.m. Eastern Time, as set forth herein, this Agreement shall automatically terminate and neither party shall thereafter have any further rights, obligations or liability hereunder, except as otherwise expressly set forth herein. Purchaser acknowledges that once posted, the Earnest Money Deposit shall be non-refundable to Purchaser, except as otherwise described herein. Provided that Title Company has received (a) the Earnest Money Deposit in good funds, (b) a fully executed copy of this Agreement and (c) to the extent applicable, a copy of the required notice from Seller to Purchaser indicating Seller's acceptance of this Agreement in accordance with the terms of any "subject to" addendum or other similar addendum, Purchaser and Seller agree that Title Company shall release the Earnest Money Deposit to Seller within one (1) business day of the satisfaction of all the foregoing conditions via wire transfer without any additional instructions or

authorizations from Purchaser or Seller, with the exception of wire transfer instructions to be delivered to Title Company by Seller.

2.2.2    Maintenance of Deposit. The Earnest Money Deposit received by Title Company in good funds shall be applied to the Purchase Price at Closing (hereinafter defined) and shall be released to Seller pursuant to Section 2.2.1 of this Agreement. Notwithstanding the release of the Earnest Money Deposit to Seller pursuant to Section 2.2.1, the Deposit (hereinafter defined) shall otherwise be treated in accordance with the terms of this Agreement. The term "**Deposit**" as used herein shall mean the Earnest Money Deposit and any additional deposits as are described herein and all interest earned thereon (if any). Interest earned on the Deposit (if any) shall be deemed earned by Purchaser.

2.2.3    Purchaser agrees that the retention of the Deposit by Seller represents a reasonable estimation as of the Effective Date of Seller's damages in the event of Purchaser's Default hereunder, that actual damages would be impracticable or extremely difficult to ascertain, and that the provision for liquidated damages hereunder does not constitute a penalty. The parties acknowledge that these damages have been specifically negotiated between themselves and are, among other things, to compensate Seller for taking the Property off the market, for Seller's costs and expenses associated with this Agreement and for Seller's lost opportunity costs. Purchaser hereby waives the rights and benefits of any law, rule, regulation, or order now or hereafter existing that would allow Purchaser to claim a refund of the Deposit as unearned earnest money, a penalty, or for any other reason.

2.3    Payment. Purchaser shall pay to Seller the Purchase Price and shall pay the Platform Fee to REDS on or before 3:00 p.m. Eastern Time, on the Date of Closing (as defined below), by causing Title Company to wire the Adjusted Purchase Price (as defined in Section 8.7) to Seller and Platform Fee to REDS in immediately available funds to such bank account(s) as Seller and REDS may designate. The Deposit shall be paid by Title Company to Seller at Closing (to the extent any portion thereof has not already been released to Seller in accordance with the terms of this Agreement) and credited against the Purchase Price. The Purchase Price shall also be subject to further adjustments for prorations and credits required to be made in accordance with Article 7, below.

2.4    Closing. The purchase and sale of the Property shall be consummated at closing (the "**Closing**") in escrow through Title Company on the date which is the latest of (i) forty-five (45) days following the entry of an Order authorizing the sale in the Seller's chapter 11 bankruptcy case; (ii) the expiration of any appeal period of such Order; or (iii) forty-five (45) days after the Effective Date (the "**Date of Closing**"). Closing shall occur on the Date of Closing at Title Company, or at such other time and place as may be agreed to in writing by Seller and Purchaser.

2.4.1    [reserved]

## 3.    INSPECTIONS, APPROVALS AND AUCTION TERMS.

3.1    Inspections. Purchaser acknowledges, understands and agrees that it has had reasonable opportunity to access the Property and conduct inspections of the Property and further agrees that it waives any and all rights to any additional access to or inspections of the Property.

3.2    Access to the Property and Indemnification by Purchaser. Prior to the Effective Date, Seller shall permit Purchaser and Purchaser's agents and representatives access to the Land and Improvements for the purpose of conducting such physical and environmental inspections of the Land and Improvements (collectively, the "**Inspections**") as Purchaser shall deem necessary prior to the commencement of bidding at the auction. Before Purchaser enters the Land and Improvements to perform Inspections, Purchaser shall give Seller reasonable advance written notice and, at Seller's option, a representative of Seller may accompany Purchaser and/or Purchaser's representative. Purchaser agrees to be solely responsible for the conduct of Purchaser's representatives on and adjacent to the Land and Improvements and shall assume and pay for all expenses incurred in connection with the Inspections. At

all times during the presence of Purchaser or Purchaser's representatives on the Land and Improvements, Purchaser agrees that Purchaser will not allow, and Purchaser's representatives will not conduct, any physically invasive testing of, on, or under the Land or Improvements without first obtaining Seller's written consent. Purchaser agrees to return the Land and Improvements to substantially the same condition and cleanliness existing before entry and/or occupation by Purchaser's representatives, including, but not limited to, sealing wells or other similar subsurface investigations. Purchaser shall use reasonable efforts to minimize interference with Seller's and any tenants' use and occupancy of the Building. Purchaser shall not at any time, either prior to or after the Effective Date, contact any tenants of the Property. Purchaser shall keep confidential the information resulting from the Inspections. Purchaser may disclose confidential information to Purchaser's representatives to the extent each needs to know confidential information for the sole purpose of evaluating the Land and Improvements, provided Purchaser takes all reasonable measures to assure that Purchaser's representatives keep such information confidential. Purchaser shall indemnify and hold Seller harmless from any loss, injury, liability, damage or expense, including reasonable attorneys' fees and costs, directly caused by Purchaser, which Seller may incur as a result of (a) any act or omission of Purchaser or its agents or representatives arising in connection with any tests or inspections conducted by Purchaser or its agents or representatives, or (b) the failure of Purchaser to restore the Property in accordance with this Section 3.2; provided, however, that Purchaser shall not be required to indemnify Seller if and to the extent that any such loss, injury, liability, damage or expense was caused by the negligence or misconduct of Seller, its employees or its agents. The foregoing shall survive termination of this Agreement or the Closing, as applicable. Furthermore, Purchaser shall, at its sole expense, keep and maintain a policy of comprehensive public liability insurance with a contractual liability endorsement that covers Purchaser's indemnity obligation set forth above. This insurance policy shall name Seller and SummitBridge National Investments VIII LLC ("SummitBridge") as an additional insured and afford protection in limits of not less than One Million and No/100 Dollars ($1,000,000.00) for bodily injury or death in any one accident, and not less than One Million and No/100 Dollars ($1,000,000.00) for property damage. All insurance shall be effected under standard form policies, issued by insurers of recognized responsibility authorized to do business in the state in which the Property is located and having a national rating of A-XI or better. Within two (2) days after the Effective Date, Purchaser shall deliver to Seller certificates of such insurance coverage and, not less than thirty (30) days before the expiration of the policy, a certificate of the renewal of such coverage accompanied by evidence reasonably satisfactory to Seller of payment of premiums therefore. In addition, the insurance shall be primary, non-contributing, and contain a waiver of subrogation in favor of Seller and SummitBridge.

       3.3     Inspection of Documents. Purchaser acknowledges receipt of the materials relating to the Land and Improvements ("**Property Documents**").

       3.3.1    Purchaser acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents. Purchaser specifically releases Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including without limitation attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "**Claims**") asserted against or incurred by Purchaser by reason of the information contained in, or that should have been contained in, the Property Documents. The provisions of this Section 3.3.1 shall survive Closing, or the early termination of this Agreement.

       3.4     Survey. As part of the Property Documents, Purchaser acknowledges that Seller has delivered or made available for inspection, the most recent survey, if any, in its possession to Purchaser (the "**Existing Survey**"). Purchaser may, prior to the Effective Date, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) (the Existing Survey, as updated, or a new survey, the "**Survey**").

3.4.1    Purchaser acknowledges that Seller will not execute an affidavit or other documentation regarding whether there have been any changes at the Property since the date of the applicable Existing Survey.

3.5    Title Commitment. Within five (5) days after the Effective Date, Purchaser, at its sole cost and expense, shall order from Title Company, a Commitment for Title Insurance (the "**Title Commitment**"), setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance, specifying Purchaser as the named insured and showing the Purchase Price as the policy amount.

3.6    Permitted Exceptions. Purchaser shall accept title to the Property, subject to the following exceptions (the "**Permitted Exceptions**"):

3.6.1    Those matters affecting or relating to the title to, or the survey of, the Property which are of record on the date of the Title Commitment or as shown on the Survey.

3.6.2    The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located.

3.6.3    All matters disclosed by the Property Documents and Leases and Contracts not prohibited hereunder.

3.6.4    All building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property.

3.7    Contracts. Purchaser shall perform the requirements of any Contracts identified as assumed and assigned pursuant the governing procedures in the Seller's chapter 11 bankruptcy case at Closing (such Contracts being herein referred to as the "**Assumed Contracts**"). As used herein, the term "**Contracts**" shall mean all service, maintenance, supply, or other contracts relating to the operation of the Property, and all other such assignable contracts or agreements in effect as of the Date of Closing.

3.7.1    Consents to Transfer. Seller shall be responsible for securing any consent from third parties who have the right to consent to the transfer of any Contract, Permit, Intangible Property and/or Lease and Purchaser shall be responsible for paying any fee in connection therewith, including but not limited to, any termination fee. The consents shall provide that if the transaction contemplated by this Agreement is not consummated, the consent will not be effective. It is understood that a failure to obtain such consents is not a condition precedent to Purchaser's obligation to close. Purchaser will assume all liability which arises as a result of failing to obtain any such consent and shall indemnify and hold harmless Seller from any liability, claims, actions, expenses, or damages incurred by Seller as a result of such failure, should Seller elect to waive the issuance of such consents as a precondition to Closing under Article 6; such indemnification shall survive Closing of this transaction.

**4.    SELLER'S OBLIGATIONS PRIOR TO CLOSING.** Until Closing, Seller and/or Seller's agents or representatives shall:

4.1    Insurance. Keep the Property insured, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

4.2    Operation. Maintain the Property in good condition and make repairs and/or replacements in the ordinary course of business in connection with any damage to the Property, and deliver

the Property to Purchaser at Closing in the condition existing as of the Effective Date, normal wear and tear and damage by casualty excepted.

4.3  Notices. Provide to Purchaser, immediately upon the receipt thereof, any and all written notices relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor or other party under any of the Contracts, or from any other entity or party, which notices are of a type not normally received in the ordinary course of Seller's business, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by Seller hereunder.

4.4  Compliance with Agreements. Take all actions necessary to comply with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof. Seller shall pay all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due, except as otherwise expressly provided herein.

4.5  New Contracts. Seller may, without the prior consent of Purchaser, enter into any Contracts provided that Seller shall provide Purchaser written notice of such actions and such Contracts shall be terminable with thirty (30) days' notice.

4.6  Leases. Seller may (a) amend or terminate any Leases; (b) consent to the assignment of any Leases or subleasing of any of the Property; or (c) enter into any new Lease of the Property or any portion thereof, provided that Seller provides Purchaser with written notice and obtains Purchaser's prior written consent for such actions, which consent shall not be unreasonably withheld, conditioned or delayed.

4.7  Personal Property Substitutions. Seller may remove any item included in the Personal Property provided that Seller substitutes therefor an item of like kind and comparable fair market value.

5.  **REPRESENTATIONS AND WARRANTIES.**

5.1  By Seller. Seller represents and warrants to Purchaser, as of the Effective Date, that:

5.1.1  Seller has the power, right and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

5.1.2  This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be duly authorized, executed and delivered by Seller. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be valid and legally binding upon Seller and enforceable in accordance with their respective terms.

5.1.3  Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound.

5.1.4  Survival. The representations and warranties set forth in this Article 5 shall not survive Closing of this transaction, and no action or claim may be brought against Seller by Purchaser or any affiliate of Purchaser with respect to a breach of such representations or warranties or any action,

suit or other proceedings commenced or pursued, for or in respect of any breach of any representation or warranty made by Seller in this Agreement from and after the Closing.

5.1.5    Limitation on Remedies. Notwithstanding anything herein to the contrary, if Purchaser discovers prior to Closing that one or more of the representations and warranties under the provisions of this Article 5 are false or untrue as of the Date of Closing, Purchaser's sole remedy will be to exercise its rights under the provisions of Section 10.4 hereof.

5.2    By Purchaser. Purchaser represents and warrants to Seller as of the Effective Date that:

5.2.1    Purchaser is a corporation, partnership, limited liability company, trust or other type of business organization that is duly organized, validly existing and in good standing under the laws of the state in which it was organized and Purchaser is qualified to do business in the jurisdiction in which the Property is located.

5.2.2    Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

5.2.3    This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by Purchaser. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, valid and legally binding upon Purchaser and enforceable in accordance with their respective terms.

5.2.4    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Purchaser is a party or by which Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Purchaser or to the Property.

5.2.5    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Purchaser's knowledge, contemplated by Purchaser.

5.2.6    There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser that could affect Purchaser.

5.3    Broker. Seller and Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with the sale of the Property, except that Purchaser has retained the services of Berkadia Real Estate Advisors LLC, Attn: Kyle Stevenson (the "**Purchaser's Broker**") and Seller has retained the services of _____, Attn: _____(the "**Seller's Broker**"). Purchaser shall be solely responsible for paying the fees and commissions owed to Purchaser's Broker, pursuant to a separate written agreement between Purchaser and Purchaser's Broker and Seller shall be solely responsible for paying the fees and commissions owed to Seller's Broker, pursuant to a separate written agreement between Seller and Seller's Broker. Seller and Purchaser agree that each will indemnify, defend and hold the other, as well as Seller's Broker, free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale

7

of the Property. This mutual indemnity shall survive Closing and any termination of this Agreement.

5.4     Property Condition.

5.4.1     Disclaimer. PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN AS SET FORTH IN THIS AGREEMENT), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS OR SUBSTANCES. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND ACCEPTS THE PROPERTY AND WAIVES ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS OTHER THAN AS SET FORTH IN THIS AGREEMENT, AND IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE FOR THE PROPERTY REFLECTS THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.

5.4.2     Release of Claims. Without limiting the provisions of Section 5.4.1, Purchaser releases Seller from any and all Claims (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects, errors or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions) affecting the Property, whether the same are a result of negligence or otherwise. The release set forth in this Section specifically includes any Claims under any Environmental Laws, under

8

the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., or with respect to any environmental risk. "**Environmental Laws**" includes, but is not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Clean Water Act (33 U.S.C. §§1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Hazardous Materials Transportation Act ( 49 U.S.C. §§ 1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§ 136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement.

5.4.3 <u>Acknowledgment of Inspection</u>. Purchaser acknowledges and agrees that (a) Purchaser had an opportunity to inspect the Property and its operation prior to the Effective Date, (b) if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property, and (c) Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by Seller. Purchaser is relying solely upon its own inspections, investigations, research and analyses in entering into this Agreement and is not relying in any way upon any representations or warranties (except those expressly provided in Article 5), statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives to Purchaser or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters. With respect to any Personal Property being conveyed hereunder, Purchaser shall not rely on any list of such property compiled by Seller, but rather, Purchaser shall compile its own list for review by Seller.

5.4.4 <u>RELEASE</u>. PURCHASER HEREBY RELEASES SELLER AND ANY SERVICER, AGENT, REPRESENTATIVE, MANAGER, AFFILIATE, OFFICER, PARTNER, SHAREHOLDER OR EMPLOYEE OF SELLER (A "**SELLER RELATED PARTY**") FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES WHICH PURCHASER OR ANY PARTY RELATED TO OR AFFILIATED WITH PURCHASER (A "**PURCHASER RELATED PARTY**") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS AT, IN, ON OR UNDER THE PROPERTY, AND PURCHASER WILL NOT LOOK TO SELLER OR ANY SELLER RELATED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF.

5.4.5 <u>ASSUMPTION</u>. EFFECTIVE AS OF THE DATE OF CLOSING, PURCHASER WILL ASSUME ALL OF SELLER'S LIABILITIES AND OBLIGATIONS WITH RESPECT TO THE LEASES, HOTEL CONTRACTS, BOOKINGS AND PERMITS (TO THE EXTENT SUCH PERMITS ARE ASSIGNED OR TRANSFERRED) ARISING AND ACCRUING FROM AND AFTER THE DATE OF CLOSING.

5.4.6 <u>SURVIVAL</u>. THE ACKNOWLEDGMENTS AND AGREEMENTS OF PURCHASER SET FORTH IN THIS ARTICLE 5 WILL SURVIVE THE CLOSING.

5.4.7 <u>PERSONAL PROPERTY; INTANGIBLE PROPERTY</u>. SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO SELLER'S TITLE TO THE PERSONAL PROPERTY OR THE INTANGIBLE PROPERTY.

6.     **CONDITIONS PRECEDENT TO CLOSING.**

    6.1    <u>Conditions for the Benefit of Purchaser</u>. The obligation of Purchaser to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of the following condition precedent:

    6.1.1    The representations and warranties of Seller contained in this Agreement shall be true, complete and accurate in all material respects, as of the Effective Date; and

    6.1.2    The Title Company shall, upon payment of the Title Company's premium, issue to Purchaser an ALTA 2006 form owner's policy of title insurance (the "**Purchaser's Title Policy**") in the amount of the Purchase Price showing fee title to the Real Property vested solely in Purchaser and subject only to (a) the standard, preprinted exclusions to Purchaser's Title Policy; (b) liens to secure payment of real estate taxes and assessments not yet due and payable; (c) matters affecting the Real Property created by or consented to by Purchaser; and (d) Permitted Exceptions. Purchaser may request that the Title Company provide endorsements to the Purchaser's Title Policy, provided that (i) such endorsements shall be at no cost to, and shall impose no additional liability on, Seller, (ii) Purchaser's obligations under this Agreement shall not be conditioned upon Purchaser's ability to obtain such endorsements, and (iii) Closing shall not be delayed as a result of Purchaser's request.

    6.2    <u>Waiver of Conditions</u>. Purchaser shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Purchaser unless it is in writing and executed by an authorized officer of Purchaser.

    6.3    <u>Conditions for the Benefit of Seller.</u> The obligation of Seller to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

    6.3.1    Receipt by Seller of all requisite approvals and consents, including, but not limited to, consents to the transfer of any Assumed Contract, permit and/or Lease to be assigned to Purchaser at Closing; and

    6.3.3    Receipt by Seller of a release of all obligations under the Operating Agreement (as defined in <u>Section 8.4</u>) affecting the Property and Licensor's (as defined in Section 8.4) consent to the sale of the Property pursuant to the terms of the Operating Agreement, in a form acceptable to Seller in its sole discretion.

    6.4    <u>Waiver of Conditions</u>. Seller shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Seller unless it is in writing and executed by an authorized officer of Seller.

    6.5    <u>Failure of a Condition</u>. In the event any of the conditions set forth in this Article are not fulfilled or waived, this Agreement shall terminate and all rights and obligations hereunder of each party shall be at an end and the Deposit shall be returned to Purchaser, as Purchaser's sole remedy and neither party shall have any obligations to the other.

7.     **CLOSING COSTS AND PRORATIONS.**

    7.1    <u>Purchaser's Costs</u>. Purchaser will pay the following costs of closing this transaction:

    7.1.1    All recording fees and any and all state and county recordation, documentary or transfer taxes, which shall be based on the Purchase Price defined in Section 2.1 above;

7.1.2    All premiums, fees and costs associated with the issuance of any title policy as well as for all premiums, fees and costs associated with the issuance of a mortgagee title insurance policy, and all of the settlement fees and other charges of Title Company due in connection with the closing of this transaction;

7.1.3    The cost of the Survey;

7.1.4    The fees and disbursements of Purchaser's counsel and any other expense(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing this transaction;

7.1.5    Any and all costs and expenses in connection with obtaining financing for the purchase of the Property, including without limitation any recordation or transfer taxes required to be paid upon the recordation of any deed of trust, mortgage or other security agreement executed and recorded in connection with such financing;

7.1.6    Any sales taxes payable with respect to any personal property included within the Property; and

7.1.7    All of the fees of Purchaser's Broker referred to in Section 5.3 above, and the Platform Fee.

7.2    Seller's Costs. Seller will pay the following costs of closing this transaction:

7.2.1    The fees and disbursements of Seller's counsel;

7.2.2    A cooperating broker fee to Purchaser's Broker and the fees of Seller's Broker, subject to and in accordance with Section 5.3 above; and

7.2.3    All release fees and other charges required to be paid in order to release from the Property the lien of any mortgage or other security interest which Seller is obligated to remove pursuant to the terms of this Agreement.

7.3    Prorations. Guest, convention, room, food, beverage, and all other charges and revenues for services rendered and the operation of all departments of the Property as follows: all food and beverage revenue (if any) as of 11:59 p.m., Central Time, on the day before the Date of Closing (the "Cut-off Time") and the guest ledger for guests staying at the Property on the night before the Date of Closing, for that night only, shall be counted and shall be retained by Seller. All revenues for days and nights preceding or commencing prior to the Date of Closing shall be allocated to and retained by Seller and all revenues for the night commencing on the Date of Closing and days following the Date of Closing shall accrue to the benefit of Purchaser and Purchaser shall purchase, for cash, at Closing the guest ledger allocated to Seller for hotel guests staying through the day of Closing. Purchaser shall purchase all cash in petty cash accounts and cash registers at the Property on the Date of Closing, but all checks, notes, security and other evidence of indebtedness located at the Property on the Date of Closing and balances on deposit to the credit of the Seller with banking institutions (specifically including, but not limited to, reserves held by or for the benefit of the Seller) are and shall remain the property of the Seller and are not included in this sale. Purchaser shall forward to Seller, promptly upon receipt (but without recourse or warranty of any kind with respect to any endorsement by Purchaser on checks therefor), any and all revenues due to Seller hereunder and collected by Purchaser following Closing. Seller and Purchaser acknowledge and agree that no re-proration shall occur post-Closing for any reason, known or unknown at the time of Closing or thereafter, and all proration figures included in the Settlement Statement (as defined in Section 8.1.7 below) shall be final upon execution by the parties.

7.3.1   <u>Addendum</u>. Seller and Purchaser may agree to allocate responsibility for specific Property charges and amounts as evidenced by an Addendum to Purchase and Sale Agreement "Closing Costs and Prorations" executed by Seller and Purchaser.

7.4   <u>Taxes</u>. General real estate taxes and special assessments, personal property taxes, and other governmental charges relating to the Property payable during the year in which Closing occurs shall be prorated with respect to the Property as of the day before the Date of Closing. If Closing shall occur before the actual taxes and special assessments payable during such year are known, the apportionment of taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year. If, as the result of an appeal of the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing, there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is reduced, and a real estate tax refund issued, Seller shall be entitled to all such refunds relating to the period prior to Closing. If Seller engaged the tax appeal agent then the tax appeal agent shall remain responsible solely to Seller for such appeal. If the appeal is successfully culminated either prior to or after the proposed sale transaction, and Purchaser would benefit from such appeal for the current or subsequent tax year, then Purchaser shall pay a pro-rata share portion of the costs and expenses incurred by Seller in connection with the appeal.

7.5   <u>In General</u>. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.

7.6   <u>Purpose and Intent</u>. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Article 7 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

## 8.   CLOSING AND ESCROW.

8.1   <u>Seller's Deliveries</u>. Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents, each executed and, if required, acknowledged:

8.1.1   A _____ Deed, in the form attached hereto as **Schedule 8.1.1** (the "**Deed**"), conveying title to Purchaser of the Property, subject only to the Permitted Exceptions.

8.1.2   (a) Originals (to the extent in Seller's possession) of all of the Assumed Contracts relating to the Property which Purchaser has elected to assume pursuant to the terms hereof; and (b) an assignment of the Intangible Property to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as **Schedule 8.1.2** (the "**Assignment and Assumption Agreement**"), conveying to Purchaser Seller's rights, title and interest in and to the Intangible Property attributable to the Property.

8.1.3   (a) Originals (to the extent in Seller's possession) of all warranties then in effect, if any, with respect to the Property or to the Improvements or any repairs or renovations to such Improvements and (b) an assignment of all such warranties being conveyed hereunder, conveying to Purchaser Seller's rights, title and interests in and to the warranties attributable to the Property.

8.1.4   An affidavit pursuant to the Foreign Investment and Real Property Tax Act.

8.1.5    Appropriate evidence of authority, capacity and status of Seller as reasonably required by Title Company.

8.1.6    An "**Owner's Affidavit**", in a form sufficient for Title Company to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder, (b) parties in possession, other than tenants as tenants only, and, (c) matters not shown in the public records.

8.1.7    A joint settlement statement (the "**Settlement Statement**"), prepared by Title Company.

8.1.8    A quitclaim bill of sale in the form attached hereto as **Schedule 8.1.8** (the "**Bill of Sale**"), transferring to Purchaser all of Seller's right, title and interest in the Personal Property.

8.1.9    A tax proration agreement in the form attached hereto as **Schedule 8.1.9** (the "**Tax Proration Agreement**").

8.1.10    Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.2    <u>Purchaser's Deliveries</u>. At the Closing, Purchaser shall (a) pay Seller the Purchase Price as required by, and in the manner described in, Article 2 hereof, (b) pay Seller's Broker the Platform Fee as required by, and in the manner described in, Article 2 hereof, and (c) execute and deliver the following documents:

8.2.1    The Assignment and Assumption Agreement and Bill of Sale.

8.2.2    Evidence of Purchaser's authority, and the authority of the person executing any documents at Closing on behalf of Purchaser, acceptable to Seller and Title Company, to enter into the transactions contemplated by this Agreement.

8.2.3    The Settlement Statement.

8.2.4    The Tax Proration Agreement.

8.2.5    Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.3    <u>Employees</u>. Purchaser acknowledges that all employees at the Property ("**Existing Employees**") are employed by the management company currently at the Property. Purchaser or its manager agree to make employment opportunities available to a sufficient number of the Existing Employees in order that the actions of the parties pursuant to this Agreement will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (collectively, the "**WARN ACT**"). Purchaser shall assume all risk and liability for any complaint filed by an employee of the Property under the WARN Act due to his/her failure to receive sixty (60) days' notice of termination, and Purchaser shall indemnify and hold Seller harmless for same; however, this assumption and indemnification shall only apply to such a complaint (a) brought by an employee of Seller or Seller's agent actively employed on the Effective Date and (b) brought only in connection with Purchaser's failure to rehire, within six (6) months of the Date of Closing, a sufficient number of such active employees such that a "mass layoff" does not occur within the meaning of the WARN Act. The terms and provisions of this Section will survive the Closing.

Case 3:23-bk-03592    Doc 313    Filed 02/21/24    Entered 02/21/24 16:33:19    Desc Main
Document    Page 45 of 77

8.4    Temporary Operator's Agreement. Purchaser acknowledges that the Property is operating as the _____, whose "**Licensor**" is _____ (the "**Operating Agreement**"). Purchaser may, at its sole cost and expense, make application for approval to continue to operate the Property as the _____ ("**Franchise Approval**"), pursuant to an agreement with the Licensor thereof (the "**New Franchise Agreement**"). If Purchaser elects to obtain Franchise Approval, Purchaser further covenants and agrees to timely submit, and in no event later than five (5) days after the Approval Date, all applications, documents, fees and charges requested by Licensor in order for Licensor to approve the New Franchise Agreement. Seller, at Purchaser's expense, agrees to reasonably cooperate with Purchaser in connection with Purchaser's obtaining Franchise Approval. Purchaser obtaining Franchise Approval is not a condition precedent to Closing.

8.4.1    Termination Fees. Seller shall terminate the Operating Agreement as of Closing. If Licensor charges any amount to Seller in connection with the termination of the Operating Agreement, then upon Closing, Purchaser shall pay, or if Purchaser has not obtained Franchise Approval prior to the Date of Closing, then at Closing Purchaser shall pay or escrow with the Title Company such damages, liquidated damages, termination fees or other costs and fees payable and satisfactory to the Licensor to execute a termination and release of Seller's Operating Agreement in an amount not to exceed _____ ($_____) (collectively the "**Termination Fees**"). If, subsequent to Closing, Purchaser fails to obtain Franchise Approval, such escrowed funds shall be released to Licensor. Should Purchaser not continue operations with Licensor subsequent to Closing, Purchaser agrees to notify Seller of same on or before the Effective Date and shall be liable for Seller's de-identification costs and liquidated damages due to Licensor upon demand, if any.

8.4.2    De-Identification. At Closing, Seller shall, at Purchaser's cost, perform all de-identification obligations under the Operating Agreement, if Purchaser chooses not to operate the hotel as the _____, if Purchaser fails to execute a New Franchise Agreement prior to the Date of Closing or if the Purchaser's Franchise Approval is denied (the "**De-Identification Obligations**"). If the De-Identification Obligations are not completed on or before the Date of Closing, Purchaser shall pay an amount equal to the estimated costs of the De-Identification Obligations, which amount shall be held in escrow by the Title Company in accordance with an escrow agreement to be executed by Seller, Purchaser and the Title Company on or before the Date of Closing. Purchaser shall allow Seller and its successors, assigns and agents reasonable access to the Property after the Closing in order for Seller to fulfill all of its De-Identification Obligations under the Operating Agreement and Purchaser shall be solely responsible for all expenses incurred by Seller in connection with such De-Identification Obligations.

8.4.3    Survival. The provisions of this Section 8.4 shall survive Closing.

8.5    Liquor License. Seller makes no representations regarding the sale or service of alcoholic beverages at the Property, or the existence of any liquor license affecting the Property. If such a license exists, it shall not be transferred to Purchaser. Purchaser shall be solely responsible for applying for and obtaining any liquor license it desires.

8.6    Possession. Purchaser shall be entitled to possession of the Property at the conclusion of the Closing.

8.7    Escrow Closing. Purchaser and Seller (or their respective counsel on behalf of Purchaser and Seller) shall execute letters of escrow closing instructions (the "**Closing Instructions**") which will provide that, on the Date of Closing: (a) Seller and Purchaser shall each deposit with Title Company all of the documents and instruments described in Sections 8.1 and 8.2, above (the "**Closing Documents**"); and (b) Purchaser shall deposit with Title Company the balance of the Purchase Price required to be paid after application of the Deposit thereto and all prorations, adjustments and credits required to be made under this Agreement, (the "**Adjusted Purchase Price**") and the Platform Fee, all of which shall be set forth on, and mutually agreeable pursuant to, a settlement statement executed by both Purchaser and Seller at Closing. Upon receipt of the Adjusted Purchase Price and the Platform Fee, and the

satisfaction of all other conditions set forth in the Closing Instructions, Title Company shall be authorized and directed to disburse the Adjusted Purchase Price to Seller or its designee(s) and the Platform Fee to Seller's Broker, record the Deed among the real property records of _____ County, _____, and release the remaining Closing Documents to the appropriate parties, all in strict accordance with the Closing Instructions.

## 9. DAMAGE, DESTRUCTION AND CONDEMNATION.

9.1 <u>Casualty</u>. Except as provided herein, Seller assumes all risk of loss or damage to the Property by fire or other casualty until consummation of Closing, at which time all risk of loss or damage to the Property by fire or other casualty shall be transferred to Purchaser. If at any time after the Effective Date but on or prior to the Date of Closing any portion of the Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall promptly give written notice thereof to Purchaser. If the estimated cost to repair the damage or destruction exceeds $250,000 as reasonably estimated by Seller, Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of the destruction or damage, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, or if the cost of repair is equal to or less than $250,000, this Agreement shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all insurance proceeds will be assigned to Purchaser and Seller will pay to Purchaser any deductible under Seller's insurance policy.

9.2 <u>Condemnation</u>. In the event, at any time on or prior to the Date of Closing, any action or proceeding is filed, under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to Purchaser. If the taking would substantially prevent Purchaser from continuing the existing use of the Property, then Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of such action or proceeding, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be assigned to Purchaser.

## 10. FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES.

10.1 <u>Failure of Conditions Precedent</u>. If any of the conditions precedent stated in Article 6 have not occurred or been satisfied on or before the Date of Closing, Purchaser or Seller may: (a) terminate this Agreement by written notice to the appropriate party on or before the Date of Closing, in which event the appropriate party shall be entitled to receive disbursement of the Deposit or (b) to waive such conditions precedent and proceed to Closing.

10.2 <u>Purchaser Default</u>. If Purchaser is in default of one or more of Purchaser's obligations under this Agreement other than a failure to timely close, then Seller may give notice to Purchaser (with a copy to Title Company) specifying the nature of the default. Purchaser shall have five (5) business days after receiving that notice, but in no event beyond the Date of Closing, within which to cure that default. If Purchaser fails to cure that default within that period, then Seller's sole remedy for such default shall be to terminate this Agreement by giving notice of such termination to Purchaser (with a copy to Title Company) and receive the Deposit as liquidated damages. If Seller does so terminate this Agreement, then Title Company shall pay the Deposit to Seller.

15

10.3    Liquidated Damages. SELLER AND PURCHASER AGREE THAT PAYMENT OF THE DEPOSIT TO SELLER UNDER THIS ARTICLE 10 SHALL BE AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.

10.4    Seller Default. If Seller is in default of one or more of Seller's material obligations under this Agreement other than a failure to timely close (for which there shall be no notice and cure period), then Purchaser shall give notice to Seller (with a copy to Title Company) specifying the nature of the default. Seller shall have five (5) business days after receiving such notice, but in no event beyond the Date of Closing within which to cure the default. In the event Seller shall: (a) fail to sell, transfer and assign the Property to Purchaser in violation of the terms of this Agreement, and/or (b) fail to perform any other material obligation of Seller hereunder beyond any applicable notice and cure period, and/or (c) intentionally breach any warranty made or granted by Seller under this Agreement, which breach is not cured by the Date of Closing and/or (d) have breached any representations of Seller contained herein in any material respect, Purchaser shall be entitled to: 1) declare this Agreement to be null and void and demand and receive the return of the Deposit whereupon, neither party shall have any further rights, duties or obligations hereunder except as otherwise provided herein and 2) pursue all other remedies available at law or in equity, save and except consequential or punitive damages, which rights are hereby waived by Purchaser.

10.4.1    Waiver of Default. If Purchaser does not duly notify Seller of the default and does not give Seller a notice of termination hereunder, then (i) the default shall be treated as waived by Purchaser and (ii) at Closing, Purchaser shall accept the Property subject to the default without any reduction in the Purchase Price and without any Claims against Seller on account of the default.

10.5    Termination. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by Purchaser and Seller into escrow shall be returned by Title Company to the party depositing the same, and (c) all copies of all Property Documents provided to Purchaser by Seller shall be returned to Seller, whereupon the parties will have no continuing liability to each other unless otherwise expressly stated in any provision of this Agreement.

10.6    Attorneys' Fees. Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

**11.    NOTICES.** Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing and shall be deemed to be given (a) when hand delivered, (b) one (1) business day after pickup by Emery Air Freight, United Parcel Service (Overnight) or Federal Express, or another similar overnight express service, (c) when transmitted by telecopy or facsimile, provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy machine, or (d) when transmitted by electronic correspondence, in any case addressed or sent to the parties at their respective addresses set forth below:

If to Seller:    _____

_____

_____

Attn: _____

Phone: _____

Fax: _____

Case 3:23-bk-03592    Doc 313    Filed 02/21/24    Entered 02/21/24 16:33:19    Desc Main
Document    Page 48 of 77

Email: _____

With a copy to:    Dunham Hildebrand, PLLC
2416 21st Ave. S., Suite 303
Nashville, TN 37212
Attn: Henry E. ("Ned") Hildebrand, III, and
Denis G. ("Gray") Waldron
Phone: 615.933.5851
Email: ned@dhnashville.com; gray@dhnashville.com

<u>If to Purchaser</u>:    _____

_____

_____

Attn: _____

Phone: _____

Fax: _____

Email: _____

With a copy to:    _____

_____

_____

Attn: _____

Phone: _____

Fax: _____

Email: _____

    or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Article 11 to the other party. Telephone numbers are for informational purposes only. Any and all notices to Seller shall be given to Seller's attorney. Effective notice will be deemed given only as provided above, except as otherwise expressly provided in this Agreement.

    **12.**    **MISCELLANEOUS.**

    12.1    <u>Entire Agreement</u>. This Agreement, together with the Schedules attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

    12.2    <u>Severability</u>. If any provision of this Agreement or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

12.3     Applicable Law. This Agreement shall be construed and enforced in accordance with the internal laws of the State of _____. Purchaser irrevocably consents and submits to the nonexclusive jurisdiction of the courts of the state and federal district in which the Real Property is located and waives any objection based on venue of *forum non conveniens* with respect to any action instituted in those courts arising under this Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Agreement or any related transactions, in each case whether now existing or later arising, and whether in contract, tort, equity or otherwise, and agrees that any dispute with respect to any of those matters will be heard only in the courts described above.

12.4     Assignability. Purchaser may assign or transfer any of Purchaser's rights, obligations and interests under this Agreement, to any person or entity upon providing Seller with written notice not less than five (5) business days prior to the Date of Closing. Upon any such assignment or other transfer, Purchaser and such assignee or transferee shall be jointly and severally liable for the obligations of Purchaser under this Agreement, which liability shall survive the assignment or transfer and the Closing.

12.5     Successors Bound. This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their respective successors and permitted assigns.

12.6     No Public Disclosure. Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior written consent of Purchaser and Seller.

12.7     Captions; Interpretation. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Whenever the context may require, words used in this Agreement shall include the corresponding feminine, masculine, or neuter forms, and the singular shall include the plural and vice versa. Unless the context expressly indicates otherwise, all references to "Article" or "Section" are to sections of this Agreement.

12.8     No Partnership. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest or permitted assigns.

12.9     Time of Essence. Time is of the essence with respect to the performance of the obligations of Seller and Purchaser under this Agreement.

12.10     Counterparts and Electronic Signatures. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument. Facsimile, documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. Seller and Purchaser agree that this Agreement, any Addendum thereto or any other document necessary for the consummation of the transaction contemplated by this Agreement may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act ("UETA") and any applicable state law. Any document accepted, executed or agreed to in conformity with such laws will be binding on both Seller and Purchaser the same as if it were physically executed and Purchaser hereby consents to the use of any third party electronic signature capture service providers as may be chosen by Seller.

12.11   Recordation. Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

12.12   Proper Execution. This Agreement shall have no binding force and effect on either party unless and until both Purchaser and Seller shall have executed and delivered this Agreement.

12.13   Waiver. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.14   Business Days. If any date herein set forth for the performance of any obligations by Seller or Purchaser or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any local or federal holiday on which post offices are closed in the state in which the Property is located.

12.15   Limitation of Liability. No present or future partner, director, officer, member, shareholder, employee, advisor, affiliate, servicer or agent of or in Seller, Purchaser or any affiliate of any of the foregoing will have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter. The limitations of liability contained in this paragraph will survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to either party provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument. In no event will Seller or Purchaser be liable for any consequential, exemplary or punitive damages under any circumstances in connection with this Agreement or the transaction contemplated hereby.

12.16   Back-Up Contracts. Notwithstanding anything herein to the contrary, Seller reserves the right to continue marketing the Property for sale and to entertain letters of intent regarding the sale of the Property while this Agreement is outstanding, provided Seller shall not enter into any binding back-up agreements with respect to the sale of the Property for so long as this Agreement is in force.

12.17   WAIVER OF JURY TRIAL. PURCHASER WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF PURCHASER AND SELLER IN RESPECT OF THIS AGREEMENT OR RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR LATER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. PURCHASER AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT SELLER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF PURCHASER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.18   No Third Party Beneficiary. This Agreement is solely for the benefit of Purchaser and Seller and Purchaser's permitted assigns. No other person or entity is entitled to the benefit or may enforce any of the provisions of this Agreement, except where expressly provided herein to the contrary.

12.19   Purchaser Representation and Consent. Purchaser acknowledges and confirms that

it has had every opportunity to obtain legal representation in this matter and, if the name of Purchaser's counsel is not set forth in Article 11 hereof, then Purchaser has either intentionally declined to obtain representation, or not advised Seller of its representation; further, Purchaser confirms that he is a sophisticated purchaser of similar commercial properties, is familiar with all rights and remedies of _____ law, and specifically waives any right to further representation. Purchaser confirms and acknowledges that he is not relying on any legal advice from Seller, Seller's counsel, the Broker, or any other party in this matter.

12.20   Auction Sale/Process. Seller may select the winning bid in its sole and absolute discretion. No obligation to sell shall be binding on Seller unless and until this Agreement is counter-signed by Seller. Seller may rescind any oral acceptance of a winning bid prior to the execution and delivery of this Agreement to Purchaser for any reason, including but not limited to, the receipt of a subsequent higher bid or offer to purchase whether such higher bid or offer to purchase was received pursuant to the Terms and Conditions (defined in Section 12.21, below) or otherwise.

12.21   Auction Terms and Conditions. Purchaser represents and warrants that Purchaser has received, read and accepts all terms and conditions pertaining to the sale of the Property (the "**Terms and Conditions**"), which have been made available on the auction website, *marketplace.realinsight.com* (the "**Website**")*,* and which Terms and Conditions are incorporated herein by reference. In the event of any conflict or inconsistency between the Terms and Conditions and this Agreement, this Agreement shall control and prevail in all respects.

12.22   Purchaser and Buyer. When used in this Agreement or any document concerning the parties to this Agreement, the terms "Purchaser" and "Buyer" shall have the same meaning and be used interchangeably.

12.23   Section 1031 Like-Kind Exchange. Either Seller or Purchaser may consummate the purchase of the Property as part of a so-called like kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provided that: (a) the Closing shall not be delayed or adversely affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition to Purchaser's or Seller's obligations under this Agreement; (b) either Seller or Purchaser may effectuate the Exchange through a qualified intermediary so long as neither of their respective rights and obligations under this Agreement are adversely affected thereby; and (c) neither Seller nor Purchaser shall be required to make an assignment of the purchase agreement for the exchange property or be required to acquire or hold title to any real property for the purposes of consummating the Exchange. Neither Seller nor Purchaser shall, by this agreement or acquiescence to the Exchange, (i) have their rights under this Agreement adversely affected or diminished in any manner, or (ii) be responsible for compliance with or be deemed to have warranted to the other that the Exchange in fact complies with Section 1031 of the Code.

12.24   Prohibited Persons and Transactions. Purchaser represents and warrants to Purchaser's knowledge: (i) Purchaser is not a Prohibited Person (defined below); (ii) none of its investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person; (iii) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and (iv) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7). "**Prohibited Person**" means any of the following: (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target

of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c) and/or (d) above. The foregoing representations shall survive Closing and any termination of this Agreement.

### 13. ESCROW AGREEMENT

13.1     Deposit. Title Company agrees to deposit the Deposit in a non-interest bearing account and to hold and disburse said funds as hereinafter provided. Upon written notification from Seller or Purchaser in accordance with the terms of this Agreement, Title Company shall release the funds in accordance with and pursuant to the written instructions.  In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Title Company to justify its doing so, Title Company shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

13.2     Title Company. Seller and Purchaser covenant and agree that in performing any of its duties under this Agreement, Title Company shall not be liable for any loss, costs or damage which it may incur as a result of serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. Accordingly, Title Company shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which Title Company shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

13.3     Indemnity. Seller and Purchaser hereby agree to indemnify and hold harmless Title Company against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Title Company in connection with its serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. The provisions of this Section 13.3 shall survive a termination of this Agreement.

13.4     Court Approval. Notwithstanding anything to the contrary stated herein,  Purchaser and Seller hereby acknowledge and agree that both parties' rights and obligations under this Agreement are subject to (a) entry of an order by the Court authorizing Seller to close the on the sale of the Property on the terms and conditions set forth in this Agreement, including any amendment and/or modification of this Agreement (the "**Sale Authorization Order**"), and (b) expiration of any time for appeal of the Sale Authorization Order. Seller, with the cooperation and approval of Purchaser, shall file, or cause to be filed, with the Court a motion for an order confirming the sale within seven (7 business days after the Effective Date. Notwithstanding anything contained in this Agreement to the contrary, in the event Seller does not obtain the Sale Authorization Order within one hundred twenty (120) days after the Effective Date, then Seller shall have the unilateral right to extend the time for Court approval for two (2) separate thirty (30) day periods. If the Court still does not enter the Sale Authorization Order within the extension approval periods, then this Agreement may be terminated by Seller or by Purchaser. In the event of a termination under this section, the Earnest Money shall be returned to Purchaser, except with respect to additional Earnest Money deposited by Purchaser in order to obtain an extension of the Closing Date, as provided in this Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, Purchaser and Seller have executed this Agreement on the dates set forth below, effective as of the date first set forth above.

**SELLER:**

_____,

_____

By: _____

Name: _____

Title: _____

Date: _____

**PURCHASER:**

_____,

a _____

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGEMENT BY TITLE COMPANY**

IN WITNESS WHEREOF, Title Company has signed this Agreement for the limited purposes set forth herein.

TITLE COMPANY:

[TITLE COMPANY NAME]

By: _____

Name: _____

Title: _____

Date: _____


Address for Notices to Title Company:

**[INSERT TITLE CO / ESCROW AGENT address/ contact info]**

## SCHEDULE 1.1.1

### Real Property Description

[See Attached]

**<u>SCHEDULE 8.1.1</u>**

**Form of _____ Deed**

[See Attached]

<u>**SCHEDULE 8.1.2**</u>

**Form of Assignment and Assumption Agreement**

---

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

---

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** is made by and between _____, a _____, having an address _____ ("**Assignor**"), and _____, a _____, having an address of _____ ("**Assignee**").

**WHEREAS**, Assignor and Assignee entered into that certain Purchase and Sale Agreement ("**Agreement**") dated _____, 20\_\_, for the sale and purchase of certain "Property", consisting of certain "Real Property" (as more particularly described in **_Exhibit A_**), "Personal Property", and "Intangible Property" (as more particularly described in this Assignment and Assumption Agreement), as said terms are defined in the Agreement;

**WHEREAS**, Assignor desires to quitclaim unto Assignee all of Assignor's right, title and interest in and to the Intangible Property as hereinafter provided; and

**WHEREAS**, Assignee desires to assume the duties and obligations of Assignor with respect to the Intangible Property.

**NOW, THEREFORE**, in accordance with the Agreement and in consideration of the sum of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the parties do hereby covenant and agree as follows and take the following actions:

1.      Assignor does hereby quitclaim unto Assignee all of the Assignor's right, title and interest in and to the following property to the extent the same is transferable by Assignor (collectively, "**Intangible Property**"):

(a)      any and all leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof), in effect as of the date of this Assignment and Assumption Agreement (collectively, "**Leases**");

(b)      any and all contracts and agreements of any kind for the maintenance, repair or operation of the Property (other than Leases) in effect as of the date of this Assignment and Assumption Agreement (collectively, "**Contracts**");

(c)      any and all licenses, permits, authorizations, certificates of occupancy and other approvals that are in effect as of the date of this Assignment and Assumption Agreement and necessary for the current use and operation of the Property (collectively, "**Permits**"); and

(d)      any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications, and development rights that exist as of the date of this Assignment and Assumption Agreement and relate to the Real Property or the Personal Property (collectively, "**General Intangibles**");

(e) those matters affecting or relating to the title to, or the survey of, the Property which are of record as of the date of this Assignment and Assumption Agreement (collectively, the "**Permitted Exceptions**"); and

(f) the name of the Property, if any.

In addition, if and to the extent required by applicable law, Assignor does hereby quitclaim unto Assignee all of Assignor's right, title, and interest in and to any and all refundable tenant deposits (and required interest thereon, if any) in Assignor's possession with respect to the Leases and Contracts as of the date of this Assignment and Assumption Agreement (collectively, the "**Tenants' Deposits**"). "Intangible Property" means the Leases, Contracts, Permitted Exceptions, Permits, General Intangibles, and, if and to the extent quitclaimed hereunder, Tenants' Deposits.

2. THE INTANGIBLE PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE INTANGIBLE PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE INTANGIBLE PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS.

3. Assignor hereby assigns and transfers to Assignee all claims, demands and causes of action arising from or related to any environmental injury to the Property that may have occurred or originated prior to the date of this instrument. Environmental injury means any injury, damage or loss in value to the Property arising from any spill, leak or release of any hazardous waste, pollutant, oil or petroleum product, or other solid, liquid or gaseous substance that is currently or hereinafter listed, regulated or designated by any state or federal governmental agency as toxic, hazardous or harmful. Assignor makes no representations or warranties to Assignee as to the existence or viability of any such claims, demands or causes of action. Assignee indemnifies and holds Assignor harmless for such claims.

4. Assignee hereby accepts the foregoing assignment of the Intangible Property and hereby assumes all duties and obligations of Assignor with respect to (a) the Intangible Property for the period on and after the date of this Assignment and Assumption Agreement, save and except those relating to reconciliation of expenses of any kind required under the Intangible Property, which shall be for any time period, including time periods prior to the date of this Assignment and Assumption Agreement, and (b) any and all refundable deposits paid by tenants and contractors (and required interest on those deposits, if any) under the Leases and Contracts as of the date hereof, whether Assignee has received those deposits or interest or a credit therefore at Closing or not. Assignee shall defend, indemnify and hold harmless Assignor from and against any and all "Claims" asserted against or incurred by Assignor in connection with (a) any acts or omissions, on or after the date of this Assignment and Assumption Agreement, with respect to the Intangible Property, save and except those relating to reconciliation of expenses of any kind required under the Intangible Property, which shall be for any time period including time periods prior to the date of this Assignment and Assumption Agreement, and/or (b) the deposits and interest assumed by Assignee hereunder. "**Claims**" means claims, demands, causes of action, losses, damages, liabilities, judgments, costs and expenses (including attorneys' fees, whether suit is instituted or not).

5. This Assignment and Assumption Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption Agreement and their respective heirs, legal

Schedule 8.1.1
Case 3:23-bk-03592 Doc 313 Filed 02/21/24 Entered 02/21/24 16:33:19 Desc Main
Document Page 59 of 77

representatives, successors and assigns, and (b) construed in accordance with the laws of the jurisdiction in which the Real Property is located, without regard to the application of choice of law principles, except to the extent such laws are superseded by federal law.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor has signed and delivered this Assignment and Assumption Agreement as of the _____ day of _____, _____.

ASSIGNOR:

_____

By:_____

Print Name:_____

Title:_____

**IN WITNESS WHEREOF**, Assignee has signed and delivered this Assignment and Assumption Agreement as of the _____ day of _____, _____.

ASSIGNEE:

_____

By:_____

Print Name:_____

Title:_____

## SCHEDULE 8.1.8

### Form of Bill of Sale

---

### BILL OF SALE

---

_____, a _____, having an address _____ ("**Assignor**"), in accordance with the Purchase and Sale Agreement dated effective _____, _____, and in consideration of the sum of Ten Dollars ($10.00) (the sufficiency and receipt of which are hereby acknowledged), does hereby quitclaim unto _____ a _____, having an address of _____ ("**Assignee**"), all of Assignor's right, title and interest in and to all of the furniture, furnishings, fixtures, equipment and other tangible personal property that is now affixed to and/or located at the Real Property described in *__Exhibit A__* and used in connection with the management, operation, or repair of that Real Property (collectively, "**Personal Property**"). This Bill of Sale does not convey any interest in any liquor license.

**TO HAVE AND TO HOLD** the Personal Property unto Assignee and Assignee's heirs, legal representatives, successors and assigns forever.

THE PERSONAL PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS BILL OF SALE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PERSONAL PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE PERSONAL PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS. ASSIGNOR HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE ANY OF THE PERSONAL PROPERTY.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor has signed and delivered this Bill of Sale as of the \_\_\_\_\_ day of _____, \_\_\_\_.

ASSIGNOR:

_____

By:_____
Print Name:_____
Title:_____

**IN WITNESS WHEREOF**, Assignee has signed and delivered this Bill of Sale as of the _____ day of _____, ____.

ASSIGNEE:

_____

By: _____

Print Name: _____

Title: _____

<u>**SCHEDULE 8.1.9**</u>

**Form of Tax Proration Agreement**

---

**TAX PRORATION AGREEMENT**

---

DATE OF CLOSING:      _____

GF. NO.                         _____

PURCHASER:              _____
                                   _____
                                   _____

SELLER:                       _____
                                   _____
                                   _____

TITLE COMPANY:      _____
                                   _____
                                   _____

PROPERTY:                 <u>**EXHIBIT A**</u>
                                   _____
                                   _____
                                   _____

     In connection with the closing of the above-captioned property, the undersigned hereby acknowledge and agree (the "**Agreement**") to the following facts regarding the real estate taxes and assessments, personal property taxes, water or sewer charges not based upon consumption, and other governmental charges based upon the Property (collectively, the "<u>**Taxes**</u>"):

    (1)    The proration of Taxes on the Date of Closing was based on the following annual amounts:

    a.    Real Property Taxes
        __/__/__ − __/__/__           <u>$</u>

    b.    Personal Property Taxes
        __/__/__ − __/__/__           <u>$</u>

**TOTAL TAX PRORATION (Credit to Purchaser/Seller):**    <u>$</u>

    (2)    We hereby consent to the Taxes being prorated on the above amounts and we understand and agree that, Purchaser and Seller shall make no further adjustments or re-prorations of taxes post-Closing, including but not limited to, personal property taxes, if any, and any taxes related to Seller's ownership of the Property, which shall be the liability of the Purchaser unless prorated herein.

Schedule 8.1.9

(3)    The Purchaser agrees to notify all taxing authorities of the change in ownership of the Property to assure proper receipt of future tax notices.

(4)    All of the provisions of this Agreement shall be binding upon, and inure to the benefit of, the applicable parties and their respective heirs, legal representatives, successors and assigns.

(5)    If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable, at any time or to any extent, then the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

(6)    This Agreement contains the entire agreement between the parties with respect to the proration of Taxes at the Property. There are no promises, agreements, conditions, undertakings, understandings, warranties, covenants or representations, oral or written, express or implied, between them with respect to the proration of Taxes at the Property, this Agreement, or the transaction described in this Agreement, except as set forth in this Agreement.

(7)    This Agreement may not be modified orally or in any manner, except by an agreement in writing signed by Seller and Purchaser (or their respective successors in interest) and, if and to the extent Title Company is to be bound thereby, by Title Company.

*[SIGNATURE PAGES FOLLOW]*

**IN WITNESS WHEREOF**, this Tax Proration Agreement has been signed and delivered as of the _____ day of _____, 20__.

**SELLER:**

_____

_____

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, this Tax Proration Agreement has been signed and delivered as of the _____ day of _____, 20__.

**PURCHASER:**

_____

_____

By: _____

Name: _____

Title: _____

# EXHIBIT C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| **LEBANON PLATINUM, LLC, *et al.,*** | ) | Judge Charles M. Walker |
| | ) | |
| Debtors. | ) | Case No. 3:23-bk-03592 |
| | ) | |
| SUBSTANTIVE CONSOLIDATION | ) | (Jointly Administered) |
| REQUESTED | ) | |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY ASSUMED
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

      **PLEASE TAKE NOTICE** that on that on March \_\_, 2024, the United States Bankruptcy Court for the Middle District of Tennessee (the "Court") entered the *Order (I) Approving Auction and Sale Procedures, (II) Approving the Form and Manner of Notices, (III) Authorizing an Auction, (IV) Approving the Form APA, (V) Approving Related Compensation, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VII) Granting Related Relief* [Docket No. \_\_] (the "Auction Procedures Order")[1] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Auction Procedures and the terms of any successful bid(s), the Debtor(s) **may** assume and assign to the Successful Bidder(s) the contract or agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the sale transaction. The Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such executory contract or unexpired Lease is as set forth on **Exhibit A**.

      **PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Payments, object to the general assignability of any executory contract or unexpired lease, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than Friday, March \_\_\_\_\_, 2024,** at **5:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") by the Court and the following parties: (i) counsel to the Debtors, Dunham Hildebrand, PLLC, 2416 21st Ave. S., Suite 303, Nashville, TN 37212, Attn: Henry E. ("Ned") Hildebrand, III (ned@dhnashville.com) and Denis G. ("Gray") Waldron (gray@dhnashville.com); and (ii) Office of the United States Trustee, Region 8, Middle District of Tennessee, 701 Broadway, Suite 300, Nashville, TN 37203.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Auction Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Payments, or (b) the general assignability of any executory contract or unexpired lease, is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Payments as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the executory contract or unexpired lease, and (iii) any future objection will be limited solely to the grounds of whether the Successful Bidder can provide adequate assurance of future performance on the proposed assignment as of the closing date of the sale transaction.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an executory contract or unexpired lease or related Cure Payments in connection with the Auction Procedures Order shall be heard on a date and time to be fixed by the Court following the objection.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any executory contract or unexpired lease on the Contract Assumption Notice or any supplemental assumption notice does not require or guarantee that such executory contract or unexpired lease will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder(s) with respect to such executory contracts and/or unexpired leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any executory contract or unexpired lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the executory contracts or unexpired leases or the validity, priority, or amount of any claims of a counterparty to any contract against the Debtors that may arise under such executory contract or unexpired lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any executory contract or unexpired lease against the Debtors that may arise under such executory contract or unexpired lease.

*/s/ Henry E. ("Ned") Hildebrand, IV*
Henry E. ("Ned") Hildebrand, IV
Gray Waldron
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
615.933.5851
ned@dhnashville.com
gray@dhnashville.com
*Counsel for the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| **LEBANON PLATINUM, LLC, _et al.,_** | ) | Judge Charles M. Walker |
| | ) | |
| Debtors. | ) | Case No. 3:23-bk-03592 |
| | ) | |
| SUBSTANTIVE CONSOLIDATION | ) | (Jointly Administered) |
| REQUESTED | ) | |

**ORDER (I) APPROVING AUCTION AND SALE PROCEDURES;
(II) APPROVING THE FORM AND MANNER OF NOTICES;
(III) AUTHORIZING AN AUCTION; (IV) APPROVING THE FORM APA;
(V) APPROVING RELATED COMPENSATION; (VI) ESTABLISHING NOTICE
AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS AND LEASES; AND (VII) GRANTING RELATED RELIEF**

This matter is before the Court upon the _Motion for Order (I) Approving Auction and Sale Procedures, (II) Approving the Form and Manner of Notices, (III) Authorizing an Auction, (IV) Approving the Form APA, (V) Approving Related Compensation, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VII) Granting Related Relief_ (the "**Auction Procedures Motion**") filed by the above-captioned debtors (the "**Debtors**").

In consideration of the Auction Procedures Motion and the record of these jointly administered cases as a whole, the Court finds the motion to be well-taken and, accordingly, the relief requested therein is hereby **GRANTED**. Therefore, **IT IS HEREBY ORDERED** that:

1.      The Debtors shall be, and hereby are, authorized to proceed with an online auction (the "**Auction**") with CWFS-REDS LLC ("**CW REDS**") utilizing the online sales platform known

as RealINSIGHT Marketplace to as part of the collective marketing and sales process for the Hotel Assets.[1]

2.      Compensation to CW REDS shall be, and hereby is, approved for hosting and permitting the use of the online sales platform known as RealINSIGHT Marketplace. Such compensation to CW REDS shall be in the form of a buyer's premium of five percent (5%) added to the aggregate purchase price(s) from the Auction. Any sharing of this compensation with the Debtors' approved Broker shall cause the Broker's compensation approved in any Order related to the *Motion to Employ Broker* shall be a part of, and not be in addition to, the commission paid to the Debtors' approved Broker.

3.      The form of the Asset Purchase Agreement (the "**APA**") attached as **Exhibit B** to the Auction Procedures Motion shall be, and hereby is, approved to be used for the sales contact with the Successful Bidder(s) at the conclusion of the Auction.

4.      The Terms and Conditions available at https://rimarketplace.com/sale-event-terms[2] and attached the Auction Procedures Motion as **Exhibit B** shall be, and hereby is, approved to be used in connection with the Auction. All bidders at the Auction are required to comply with the Term and Conditions to become a "**Qualified Bidder**." SummitBridge National Investments VIII LLC ("**SummitBridge**") is deemed a Qualified Bidder and is not required to take any further action or pay any funds, including, without limitation, paying a buyer's premium, depositing earnest money, or paying a platform fee, in connection with any bid at the Auction. SummitBridge shall retain its rights to credit bid all amounts owed under its loan documents and/or proofs of claims, in such order, manner, and/or combination as SummitBridge may elect in its sole

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Auction Procedures Motion.

[2] Last visited February 14, 2024.

discretion. SummitBridge shall also retain all of its lien and security interest rights under its loan documents and proofs of claim, including, without limitation, the right not to release any or all of its liens or security interests on the Hotel Assets.

5.    The following notice and procedures for assumption and assignment of executory contracts and unexpired leases to the Successful Bidder(s) shall be, and hereby are, approved.

6.    The form *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* (the "**Executory Contract Notice**") attached as **Exhibit C** to the Auction Procedures Motion is approved. The Court hereby ratifies, adopts and approves each of the obligations and deadlines set forth in the Executory Contract Notice.

7.    The following three-step sale process, shall be, and hereby, is approved:

(a)    The Auction shall be conducted as a two-day online auction in accordance with the Auction Procedures set forth herein. The discretion of when the Auction occurs shall remain in the Debtors, subject to input by other parties, including SummitBridge and the approved Broker and auction platform provider, though it is expected to occur within approximately 60 days from entry of this Auction Procedures Order;

(b)    Within three (3) business days following the conclusion of the Auction, the Debtors shall file one or more documents, each styled *Notice of Sale* (the "**Sale Notices**") indicating which of the Hotel Assets are to be sold to which of the Successful Bidder(s) as a result of the Auction. The Sale Notices shall include, at a minimum, (i) the identity of the Successful Bidder(s); (ii) the amount of the successful bid; (iii) the Hotel Assets to be purchased by the Successful Bidder(s); (iv) any other information reasonably required to procure entry of an order approving the sale pursuant to 11 U.S.C. § 363; (v) the deadline to object to entry of an order approving the sale to the Successful Bidder(s); (vi) the hearing to approve the sale to the Successful

Bidder(s); (vii) a proposed draft of the order approving the sale to the Successful Bidder(s) pursuant to 11 U.S.C. § 363 in form and substance acceptable to the purchaser(s), SummitBridge, and the Debtors (the "**Sale Order**"); and (viii) the executory contracts or unexpired leases, with the corresponding Cure Payments, to be assumed and assigned to the Successful Bidder(s). The Sales Notices shall further include language providing a ten (10) day period in which parties-in-interest may file an objection to the contemplated sale to the Successful Bidder, and that any objection thereto shall be limited to the failure of the Debtors to follow the process as set forth herein.

    (c)      Closings on the sales of Hotel Assets to the Successful Bidder(s) shall occur within forty-five (45) days after the Auction (absent a mutually agreeable extension between the Successful Bidder(s), SummitBridge, and the Debtors).

    8.      The sale of the Hotel Assets is conditioned upon the following: (i) the entry of the Sale Order; (ii) a transfer of the respective Hotel Assets free and clear of all liens, claims, encumbrances and interests to the fullest extent permitted by applicable bankruptcy law and specifically including any tax liens or claims, and any successor liability claims; (iii) a finding that the purchaser(s) is/are entitled to the protections given to good faith purchasers pursuant to § 363(m) of the Bankruptcy Code; and (iv) establishing final cure amounts on any executory contracts or unexpired leases to be assigned and assumed by the purchaser(s).

    IT IS SO ORDERED.

> THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY
> AS INDICATED AT THE TOP OF THE FIRST PAGE.

APPROVED FOR ENTRY:


/s/ Henry E. ("Ned") Hildebrand, IV
Henry E. ("Ned") Hildebrand, IV
Gray Waldron
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
615.933.5851
ned@dhnashville.com
gray@dhnashville.com
*Counsel for the Debtors*