

Charles M. Walker
U.S. Bankruptcy Judge
Dated: 3/29/2024

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| **LEBANON PLATINUM, LLC,** *et al.,* | ) | Judge Charles M. Walker |
| | ) | |
| Debtors. | ) | Case No. 3:23-bk-03592 |
| | ) | |
| SUBSTANTIVE CONSOLIDATION | ) | (Jointly Administered) |
| REQUESTED | ) | |

**AGREED ORDER (I) APPROVING AUCTION AND SALE PROCEDURES; (II) APPROVING THE FORM AND MANNER OF NOTICES; (III) AUTHORIZING AN AUCTION; (IV) APPROVING THE FORM APA; (V) APPROVING RELATED COMPENSATION; (VI) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF <u>CONTRACTS AND LEASES; AND (VII) GRANTING RELATED RELIEF</u>**

This matter is before the Court upon the *Motion for Order (I) Approving Auction and Sale Procedures, (II) Approving the Form and Manner of Notices, (III) Authorizing an Auction, (IV) Approving the Form APA, (V) Approving Related Compensation, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VII) Granting Related Relief* (the "**Auction Procedures Motion**") filed by the above-captioned debtors (the "**Debtors**").

In consideration of the Auction Procedures Motion and the record of these jointly administered cases as a whole, and based on the agreement of all parties objecting to the Auction Procedures Order as evidenced by the signatures of their counsel below, the Court finds the motion to be well-taken and, accordingly, the relief requested therein is hereby **GRANTED**. Therefore, **IT IS HEREBY ORDERED** that:

1.     The Debtors shall be, and hereby are, authorized to proceed with an online auction (the "**Auction**") with CWFS-REDS LLC ("**CW REDS**") utilizing the online sales platform known

as RealINSIGHT Marketplace to as part of the collective marketing and sales process for the Hotel Assets.[1]

2.      Compensation to CW REDS shall be, and hereby is, approved for hosting and permitting the use of the online sales platform known as RealINSIGHT Marketplace. Such compensation to CW REDS shall be in the form of a buyer's premium of five percent (5%) added to the aggregate purchase price(s) from the Auction. Any sharing of this compensation with the Debtors' approved Broker shall cause the Broker's compensation approved in any Order related to the *Motion to Employ Broker* shall be a part of, and not be in addition to, the commission paid to the Debtors' approved Broker.

3.      The form of the Asset Purchase Agreement (the "**APA**") attached as **Exhibit 1** to this Order shall be, and hereby is, approved to be used for the sales contract with the bidder(s) that submit(s) the highest and best offer to purchase the relevant Property as determined by the Debtors and their professionals (the "**Successful Bidder(s)**") at the conclusion of the Auction as set forth herein.

4.      The Terms and Conditions available at https://rimarketplace.com/sale-event-terms[2] and attached the Auction Procedures Motion as **Exhibit A** shall be, and hereby are, approved to be used in connection with the Auction. All bidders at the Auction are required to comply with the Term and Conditions to become a "**Qualified Bidder**."

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Auction Procedures Motion. For clarity, the Hotel Assets—comprised of the Cookeville Assets, the Lebanon Assets, the Murfreesboro Gateway Assets, the Murfreesboro Assets, the Destin Assets, and the Baytown Assets—shall expressly *exclude* any intellectual property owned by any hotel franchisor/licensor pursuant to any agreement with the Debtors (each a "Franchise Agreement"), including any intellectual property owned by Marriott International Inc. ("**Marriott**") and Holiday Hospitality Franchising, LLC ("**HHF**") .

[2] Last visited February 14, 2024.

5.     The Terms and Conditions expressly provide that CW REDS has the authority to require the satisfaction of additional conditions to become a Qualified Bidder. For clarity and avoidance of doubt, to be a Qualified Bidder and before being eligible to bid at the Auction, in addition to meeting the registration requirements set forth in the Terms and Conditions and such other requirements of CM REDS, each bidder must first (a) sign an APA in the form attached as Exhibit 1 to this Auction Procedures Order and fund a $500,000.00 deposit (the "**Bid Deposit**"), (b) expressly agree that the executed APA shall constitute an irrevocable offer to purchase the particular Property (defined therein) at the purchase price offered at the Auction and subject to the Platform Fee, Earnest Money Deposit (as defined in the APA), and such other amounts as may be due and payable by Purchaser thereunder pursuant to this Order, the APA, or the Terms and Conditions (the "**Contract Fees**"), and (c) expressly agree that, upon the particular Debtor's counter-signing of the APA as Seller after inserting the Purchase Price and such other Contract Fees, the APA shall constitute a valid and enforceable contract. The Bid Deposit shall be held by the Title Company as identified and defined in the APA.

6.     Qualified Bidders will be permitted to bid on multiple Hotel Assets upon signing multiple APAs while posting only one Bid Deposit. However, if a Qualified Bidder is the Successful Bidder or the Backup Bidder (defined below) at any Auction, it shall be required to deposit a separate Bid Deposit with the Title Company (as defined in the APA) before it may bid on additional Hotel Assets. For clarity, if a Qualified Bidder funds a single Bid Deposit, participates in two Auctions, and is not the Successful Bidder or the Backup Bidder on the first Auction, it may bid on the second Auction without having to submit a second Bid Deposit. If, however, the Qualified Bidder is the Successful Bidder or the Backup Bidder at the first Auction, it cannot bid in any subsequent Auction unless it deposits an additional Bid Deposit.

3

7. In the event the Earnest Money Deposit required under the APA exceeds the Bid Deposit following a Qualified Bidder becoming the Successful Bidder following an Auction, such Qualified Bidder shall receive a credit for the Bid Deposit towards the total Earnest Money Deposit, with any additional sums required to be paid by 5:00 p.m. EST following the Effective Date as defined in the APA.[3] In no event, however, shall the Earnest Money Deposit be less than the Bid Deposit.

8. The Bid Deposit shall be fully refundable to all bidders at the conclusion of the Auction other than to (a) the Successful Bidder and (b) the second highest and best bidder as determined by the Debtors and their retained professionals (the "**Backup Bidder**"). The Title Company shall hold the Bid Deposit of both the Successful Bidder and the Backup Bidder for each Hotel Asset sold at the Auction until the closing of the relevant APA. In the event the Successful Bidder closes on the APA, the Title Company shall return to the Backup Bidder its Bid Deposit. In the event the Successful Bidder does not close on the APA and the Debtor declares a default under the APA and exercises its termination rights thereunder, all procedures set forth herein with respect to the Successful Bidder shall apply to the Backup Bidder. The Debtors' rights and remedies in the event of a default or termination of the APA shall be determined by the APA.

9. SummitBridge National Investments VIII LLC ("**SummitBridge**") is deemed a Qualified Bidder and is not required to take any further action or pay any of the Contract Fees or other funds, including, without limitation, a buyer's premium, depositing earnest money, or paying a platform fee, in connection with any bid at the Auction.[4] SummitBridge shall retain its rights to

---

[3] For clarity, if the deposit required under the APA is $600,000.00, the successful bidder would be given a credit for the Bid Deposit and would be required to fund the remaining $100,000.00 on or before 5:00 p.m. EST on the Effective Date of the APA.

[4] Notwithstanding the foregoing, SummitBridge must still register to bid on the RealINSIGHT Marketplace platform for the auction, which includes creating an account and agreeing to the Terms and Conditions.

credit bid all amounts owed under its loan documents and/or proofs of claims, in such order, manner, and/or combination as SummitBridge may elect in its sole discretion. SummitBridge shall also retain all of its lien and security interest rights under its loan documents and proofs of claim, including, without limitation, the right not to release any or all of its liens or security interests on the Hotel Assets. In the event that SummitBridge submits a credit bid for the assets of Destin Platinum, LLC that is selected as the Successful Bid, and the Court approves such bid, SummitBridge shall post a dollar-for-dollar amount up to $325,000.00 in cash for the obligations to be paid pursuant to Paragraph 16(e) of the *Agreed Order Granting Expedited Motion for Order Authorizing the Debtors to (A) Obtain Postpetition Financing on a Senior Secured Super-Priority Basis Pursuant to 11 U.S.C. § 364; and (B) Continue their Use of Cash Collateral Utilizing Consolidated Cash Management* (the "**DIP Order**"). [Doc. No. 289].

10.     The following notice and procedures for assumption and assignment of executory contracts and unexpired leases to the Successful Bidder(s) shall be, and hereby are, approved.

11.     The form *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* (the "**Executory Contract Notice**") attached as **Exhibit C** to the Auction Procedures Motion is approved. The Court hereby ratifies, adopts and approves each of the obligations and deadlines set forth in the Executory Contract Notice.[5]

---

[5] For clarity, the *Fairfield Inn & Suites Franchise Agreement*, dated September 22, 2003 between debtor Murfreesboro Platinum LLC and Marriott (the "**Marriott Franchise Agreement**"), the *Holiday Inn Express® Hotel Relicensing License Agreement* dated February 11, 2014 [Loc. #13706] between debtor Platinum Gateway II, LLC and HHF (as may have been amended, the "**Platinum Gateway Franchise Agreement**"), the *Holiday Inn Express® & Suites Hotel Relicensing License Agreement* dated February 11, 2014 [Loc. #9691] between debtor Cookeville Platinum, LLC and HHF (as may have been amended, the "**Cookeville Franchise Agreement**"), the *voco® Conversion License Agreement* dated December 30, 2022 [Loc. #91487] between Destin Platinum, LLC and HHF (as may have been amended, the "**Destin Franchise Agreement**", and together with the Platinum Gateway Franchise Agreement and the Cookeville Franchise Agreement, the "**HHF Franchise Agreements**") will not be included in the Executory Contract Notice, or any amendments or supplements thereto. The Marriott Franchise Agreement and HHF Franchise Agreements cannot be assumed or assumed and assigned in connection with the sales of the Hotel Assets and will be rejected upon the closing of the sale of the Murfreesboro Assets, Murfreesboro Gateway Property Assets, Cookeville Assets, and Destin Assets, respectively.

5

12.     The following three-step sale process, shall be, and hereby, is approved:

(a)     The Auction shall be conducted as a two-day online auction in accordance with the Auction Procedures set forth herein. The discretion of when the Auction occurs shall remain in the Debtors, subject to input by other parties, including SummitBridge and the approved Broker and auction platform provider, though it is expected to occur within approximately 60 days from entry of this Auction Procedures Order;

(b)     Within three (3) business days following the conclusion of the Auction, the Debtors shall file one or more documents, each styled *Notice of Sale* (the "**Sale Notices**") indicating which of the Hotel Assets are to be sold to which of the Successful Bidder(s) as a result of the Auction. The Sale Notices shall include, at a minimum, (i) the identity of the Successful Bidder(s); (ii) the amount of the successful bid; (iii) the Hotel Assets to be purchased by the Successful Bidder(s); (iv) any other information reasonably required to procure entry of an order approving the sale pursuant to 11 U.S.C. § 363; (v) the deadline to object to entry of an order approving the sale to the Successful Bidder(s); (vi) the hearing to approve the sale to the Successful Bidder(s); (vii) a proposed draft of the order approving the sale to the Successful Bidder(s) pursuant to 11 U.S.C. § 363 in form and substance acceptable to the purchaser(s), SummitBridge, and the Debtors (the "**Sale Order**"); and (viii) the executory contracts or unexpired leases, with the corresponding Cure Payments, to be assumed and assigned to the Successful Bidder(s). The Sales Notices shall further include language providing a ten (10) day period in which parties-in-interest may file an objection to the contemplated sale to the Successful Bidder, and that any objection thereto shall be limited to the failure of the Debtors to follow the process as set forth herein.

(c)     Closings on the sales of Hotel Assets to the Successful Bidder(s) shall occur within forty-five (45) days after the Auction (absent a mutually agreeable extension between the Successful Bidder(s), SummitBridge, and the Debtors).

13.     The sale of the Hotel Assets is conditioned upon the following: (i) the entry of the Sale Order; (ii) a transfer of the respective Hotel Assets free and clear of all liens, claims, encumbrances and interests to the fullest extent permitted by applicable bankruptcy law and specifically including any tax liens or claims, and any successor liability claims; (iii) a finding that the purchaser(s) is/are entitled to the protections given to good faith purchasers pursuant to § 363(m) of the Bankruptcy Code; and (iv) establishing final cure amounts on any executory contracts or unexpired leases to be assigned and assumed by the purchaser(s).

14.     Nothing in this Order, the Auction Procedures Motion, or the APA, including Section 5.1.3 thereof, shall waive, impair, or restrict the rights of any of the Debtor's franchisors, including but not limited to Marriott and HHF, to file a proof of claim with respect to rejection damages, to enforce against the Debtors and the Purchasers the obligations under any Franchise Agreement between any such franchisor and the Debtors; provided however that the Debtors reserve the right to object to any such proof of claim, and that this provision shall in no way be deemed an allowance of any proof of claim arising from the rejection of any Franchise Agreement.

15.     Nothing in this Order, the Auction Procedures Motion, or the APA shall waive, limit, impair, or restrict the rights of any of the Debtor's franchisors, including but not limited to Marriott and HHF, to (i) enforce the obligations under any Franchise Agreement or related termination agreement against the Debtors or any non-debtor guarantor, or (ii) seek damages or other relief for improper or unauthorized use of any such franchisor's intellectual property.

7

16.     For avoidance of doubt, none of the Franchise Agreements between any such franchisor and the Debtors shall be assumed or assigned to any Purchaser.  If the Closing Date occurs for the Murfreesboro Gateway Assets, Cookeville Assets, or Destin Assets, the relevant Franchise Agreement with HHF shall be rejected by the Debtor pursuant to 11 U.S.C. § 365(a) and deemed terminated by HHF as of 12:01 a.m. on the Closing Date, and such rejection and termination will occur automatically without the requirement of any further action on the part of HHF.

17.     With regard to the HHF licensed hotels at the Murfreesboro Gateway Property, Cookeville Property, and Destin Property, upon provision by the Debtor to HHF of the End Date (as defined below), which the Debtor shall provide to HHF no later than one business day after entry of Sale Order for the relevant hotel, HHF shall be permitted, but not required, to (a) immediately modify its reservations systems and booking channels so that they will not accept reservations for any stays at the hotel that extend beyond the original estimated Closing Date (the "**End Date**") and (b) notify any guests booked at the hotel for stays extending beyond the End Date that the hotel will be leaving the System (as defined in the applicable Franchise Agreement) on the original estimated Closing Date and provide an opportunity for such guests to transfer their reservations to another HHF licensed hotel. HHF is also authorized to shut down its reservation system for the Hotel as of 3:00 p.m. ET on the last business day before the closing of the Sale. The Debtor shall notify HHF of the first anticipated Closing Date for the hotel no later than one business day after entry of the Sale Order, notify HHF of any revised Closing Date for the hotel no later than one business day after reaching agreement with the Purchaser, and HHF may rely on such notifications with regard to the modification and shut down of the reservation system for the hotel**.**

18.     In order to operate either of the hotels at the Cookeville Property and Destin Property under an HHF flag after closing, any Purchaser will need to apply for a new license agreement with HHF, which may or may not be approved in HHF's sole and absolute discretion.

> Prospective buyers may obtain a new license application by contacting:
> Kevin Winkowski
> Director, Transactions & Asset Management at IHG
> 3 Ravinia Drive, Suite 100, Atlanta, GA 30346
> Telephone: 678-477-3508
> Email: kevin.winkowski@ihg.com.

Prospective buyers are encouraged to contact Mr. Winkowski for the application and to submit a complete application package as early as possible. Neither the Debtors nor HHF guarantees a response to an application within any certain time period. For avoidance of doubt, the Platinum Gateway Franchise Agreement expires on August 1, 2024, and HHF does not expect to enter into a new license agreement with any Purchaser of that property at this time.

19.     Notwithstanding the foregoing, creditor BluSky Restoration Services, LLC ("**BluSky**") expressly reserves the right to (a) object to any Sale Notice that may be filed following the Auction, (b) seek any relief from this Court as BluSky may believe is necessary to preserve BluSky's rights in and to any portion of the Unsecured Creditor Carve-Out as defined in the DIP Order, and (c) seek any other relief from this Court regarding the allocation of proceeds generated from the sale of the Hotel Assets by and between the Debtors; provided that all parties in interest—to specifically include the Debtors and SummitBridge—expressly reserve all rights to object to any such relief sought thereby.

IT IS SO ORDERED.

---

THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY
AS INDICATED AT THE TOP OF THE FIRST PAGE.

---

APPROVED FOR ENTRY:

/s/ Henry E. ("Ned") Hildebrand, IV
Henry E. ("Ned") Hildebrand, IV
Gray Waldron
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
615.933.5851
ned@dhnashville.com
gray@dhnashville.com
*Counsel for the Debtors*

/s/ J. Patrick Warfield
Garry K. Grooms (BPR No. 12647)
David W. Houston IV (BPR No. 20802)
J. Patrick Warfield (BPR No. 30502)
BURR & FORMAN LLP
222 Second Avenue South, Suite 2000
Nashville, Tennessee 37201
(615) 724-3200
ggrooms@burr.com
dhouston@burr.com
pwarfield@burr.com

Hanna Lahr (admitted *pro hac vice*)
BURR & FORMAN LLP
420 20th Street North, Suite 3400
Birmingham, Alabama 35203
(205) 251-3000
hlahr@burr.com
*Counsel for SummitBridge National Investments VIII, LLC*

/s/ Erika R. Barnes
Erika R. Barnes
STITES & HARBISON PLLC
401 Commerce Street, Suite 800
Nashville, TN 37219
615.782.2200
ebarnes@stites.com
*Counsel for BluSky Restoration Contractors, LLC*

/s/ Douglas J. Harris
Leib M. Lerner (admitted *pro hac vice*)
Douglas J. Harris (admitted *pro hac vice*)
ALSTON & BIRD LLP
350 South Grand Avenue, 51st Floor
Los Angeles, California 90071
213.576.1000
leib.lerner@alston.com
douglas.harris@alston.com
*Counsel for Holiday Hospitality Franchising, LLC*

<u>**ASSET PURCHASE AGREEMENT**</u>

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") dated as of the date last signed (the "**Effective Date**"), is made by and between **[SUCCESSFUL BIDDER]**, a _____ _____, having an address of _____ (hereinafter "**Purchaser**" or "**Buyer**") and **[CORRESPONDING PLATINUM DEBTOR]**, a [TENNESSEE/FLORIDA/TEXAS] limited liability company, having an address of _____ ("**Seller**").

## RECITALS:

**R-1.** Seller desires to sell certain improved real property known and commonly referred to as the "_____" located at _____, along with certain related property described below, and Purchaser desires to purchase such real and other property from Seller.

**R-2.** Seller and Purchaser, intending to be bound by this Agreement, desire to set forth herein the terms, conditions and agreements under and by which Seller shall sell and Purchaser shall purchase the property described below.

**R-3.** Seller and Purchaser acknowledge that the Seller is a debtor in a chapter 11 bankruptcy proceeding pending in the United States Bankruptcy Court for the Middle District of Tennessee (the "**Court**"), and this Agreement remains subject to the Court's authority and approval.

## AGREEMENTS:

**NOW, THEREFORE**, in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. **THE PROPERTY.**

   1.1 <u>Description</u>. Subject to the terms and conditions of this Agreement, and for the consideration set forth herein, Seller hereby agrees to sell, assign and convey, and Purchaser hereby agrees to purchase, acquire and assume, all of Seller's respective right, title and interest in and to the following (the "**Property**"):

   1.1.1 That certain parcel of land located in _____ County, _____, having a street address of _____, and being more specifically described on **Schedule 1.1.1**, attached hereto (the "**Land**"), along with all buildings (the "**Buildings**") together with all other improvements, parking facilities and fixtures located on the Land (the Buildings and any and all other improvements located on the Land are hereinafter referred to collectively as the "**Improvements**") and all easements, hereditaments, appurtenances, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "**Easements**"). The Land, Buildings, Improvements and Easements are hereinafter collectively referred to as the "**Real Property**";

   1.1.2 All furniture, furnishings, fixtures, equipment and other tangible personal property affixed to and/or located at the Real Property and used in connection with the Real Property, or replacements of those items permitted pursuant to this Agreement (the "**Personal Property**");

1.1.3    Any and all written leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof) (collectively, "**Leases**"), any and all Contracts (defined in Section 3.7, below), any and all permits and any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications and development rights that exist as of the Date of Closing and relate to the Real Property or the Personal Property (collectively, the "**Intangible Property**").

1.2    Agreement to Convey. Subject to the conditions set forth in Article 6, Seller agrees to sell and convey, and Purchaser agrees to purchase and accept, on the Date of Closing (defined in Section 2.4, below): (a) fee simple title to the Real Property by way of a _____ Deed (defined in Section 8.1.1, below), to be executed and delivered by Seller in respect to the Property, and which shall be subject to the Permitted Exceptions (defined in Section 3.6, below) affecting or encumbering the Real Property; and (b) the remainder of the Property, by way of the assignment and assumption agreements, a quitclaim bill of sale and other instruments of conveyance described in this Agreement.

2.    **PURCHASE PRICE AND PAYMENT.**

2.1    Purchase Price. The purchase price for the Property (the "**Purchase Price**") is the Winning Buyer's Offer (defined below). In addition to the Purchase Price, and in consideration of the use of the online auction platform, RealINSIGHT Marketplace, which is operated by CWFS-REDS LLC, a Delaware limited liability company ("REDS"), Purchaser agrees to pay the Platform Fee at Closing.

2.1.1    Winning Buyer's Offer. The winning buyer's offer for the Property (the "**Winning Buyer's Offer**" or "**WBO**") is _____ and No/100 U.S. Dollars ($_____.00).

2.1.2    Platform Fee. The platform fee for the Property (the "**Platform Fee**") is the greater of Five Percent (5%) of the WBO or $25,000.00. The Platform Fee is _____ and No/100 U.S. Dollars ($_____.00).

2.2    Earnest Money Deposit.

2.2.1    Deposit. As the initial deposit (the "**Earnest Money Deposit**"), Purchaser shall be required to pay ten percent (10%) of the Purchase Price, but in no event shall the Earnest Money Deposit be less than the Bid Deposit (as defined in the Auction Procedures Order (defined below)) entered by the Court of Five Hundred Thousand and No/100 Dollars ($500,000.00), nor shall it exceed One Million and No/100 Dollars ($1,000,000.00), per individual hotel asset owned by an individual Seller. Purchaser shall pay the Earnest Money Deposit to Title Company (defined below). The total amount of the Earnest Money Deposit due must be deposited with [Insert Title company name, address and contact/escrow officer] _____ ("**Title Company**"), no later than one (1) business day following Purchaser being declared the winning bidder (even if the sale is subject to confirmation). For avoidance of doubt, the Earnest Money Deposit shall include the total amount of the Bid Deposit, which Bid Deposit shall be deposited with the Title Company, and Purchaser shall be responsible only for depositing the difference between the Bid Deposit and the Earnest Money Deposit to the extent the Earnest Money Deposit required under this Agreement exceeds the Bid Deposit. Regardless of the amount financed, if any, the Earnest Money Deposit will not be altered. The Earnest Money Deposit will be non-refundable (except upon a default by Seller or as specifically provided herein). If Purchaser shall fail to timely make the Earnest Money Deposit by 5:00 p.m. Eastern Time, as set forth herein, this Agreement shall automatically terminate and neither party shall thereafter have any further rights, obligations or liability hereunder, except as otherwise expressly set forth herein. Purchaser acknowledges that once posted, the Earnest Money Deposit shall be non-refundable to Purchaser, except as otherwise described herein.

LEGAL02/44200516v1

Provided that Title Company has received (a) the Earnest Money Deposit in good funds, (b) a fully executed copy of this Agreement and (c) to the extent applicable, a copy of the required notice from Seller to Purchaser indicating Seller's acceptance of this Agreement in accordance with the terms of any "subject to" addendum or other similar addendum, Purchaser and Seller agree that Title Company shall release the Earnest Money Deposit to Seller within one (1) business day of the satisfaction of all the foregoing conditions via wire transfer without any additional instructions or authorizations from Purchaser or Seller, with the exception of wire transfer instructions to be delivered to Title Company by Seller.

2.2.2    Maintenance of Deposit. The Earnest Money Deposit received by Title Company in good funds shall be applied to the Purchase Price at Closing (hereinafter defined) and shall be released to Seller pursuant to Section 2.2.1 of this Agreement. Notwithstanding the release of the Earnest Money Deposit to Seller pursuant to Section 2.2.1, the Deposit (hereinafter defined) shall otherwise be treated in accordance with the terms of this Agreement. The term "**Deposit**" as used herein shall mean the Earnest Money Deposit and any additional deposits as are described herein and all interest earned thereon (if any). Interest earned on the Deposit (if any) shall be deemed earned by Purchaser.

2.2.3    Purchaser agrees that the retention of the Deposit by Seller represents a reasonable estimation as of the Effective Date of Seller's damages in the event of Purchaser's Default hereunder, that actual damages would be impracticable or extremely difficult to ascertain, and that the provision for liquidated damages hereunder does not constitute a penalty. The parties acknowledge that these damages have been specifically negotiated between themselves and are, among other things, to compensate Seller for taking the Property off the market, for Seller's costs and expenses associated with this Agreement and for Seller's lost opportunity costs. Purchaser hereby waives the rights and benefits of any law, rule, regulation, or order now or hereafter existing that would allow Purchaser to claim a refund of the Deposit as unearned earnest money, a penalty, or for any other reason.

2.3    Payment. Purchaser shall pay to Seller the Purchase Price and shall pay the Platform Fee to REDS on or before 3:00 p.m. Eastern Time, on the Date of Closing (as defined below), by causing Title Company to wire the Adjusted Purchase Price (as defined in Section 8.7) to Seller and Platform Fee to REDS in immediately available funds to such bank account(s) as Seller and REDS may designate. The Deposit shall be paid by Title Company to Seller at Closing (to the extent any portion thereof has not already been released to Seller in accordance with the terms of this Agreement) and credited against the Purchase Price. The Purchase Price shall also be subject to further adjustments for prorations and credits required to be made in accordance with Article 7, below.

2.4    Closing. The purchase and sale of the Property shall be consummated at closing (the "**Closing**") in escrow through Title Company on the date which is the latest of (i) forty-five (45) days following the entry of an Order authorizing the sale in the Seller's chapter 11 bankruptcy case; (ii) the expiration of any appeal period of such Order; or (iii) forty-five (45) days after the Effective Date (the "**Date of Closing**"). Closing shall occur on the Date of Closing at Title Company, or at such other time and place as may be agreed to in writing by Seller and Purchaser.

2.4.1    [reserved]

3.    **INSPECTIONS, APPROVALS AND AUCTION TERMS.**

3.1    Inspections. Purchaser acknowledges, understands and agrees that it has had reasonable opportunity to access the Property and conduct inspections of the Property and further agrees that it waives any and all rights to any additional access to or inspections of the Property.

3.2    Access to the Property and Indemnification by Purchaser. Prior to the Effective Date, Seller shall permit Purchaser and Purchaser's agents and representatives access to the Land and Improvements for the purpose of conducting such physical and environmental inspections of the Land and

Improvements (collectively, the "**Inspections**") as Purchaser shall deem necessary prior to the commencement of bidding at the auction. Before Purchaser enters the Land and Improvements to perform Inspections, Purchaser shall give Seller reasonable advance written notice and, at Seller's option, a representative of Seller may accompany Purchaser and/or Purchaser's representative. Purchaser agrees to be solely responsible for the conduct of Purchaser's representatives on and adjacent to the Land and Improvements and shall assume and pay for all expenses incurred in connection with the Inspections. At all times during the presence of Purchaser or Purchaser's representatives on the Land and Improvements, Purchaser agrees that Purchaser will not allow, and Purchaser's representatives will not conduct, any physically invasive testing of, on, or under the Land or Improvements without first obtaining Seller's written consent. Purchaser agrees to return the Land and Improvements to substantially the same condition and cleanliness existing before entry and/or occupation by Purchaser's representatives, including, but not limited to, sealing wells or other similar subsurface investigations. Purchaser shall use reasonable efforts to minimize interference with Seller's and any tenants' use and occupancy of the Building. Purchaser shall not at any time, either prior to or after the Effective Date, contact any tenants of the Property. Purchaser shall keep confidential the information resulting from the Inspections. Purchaser may disclose confidential information to Purchaser's representatives to the extent each needs to know confidential information for the sole purpose of evaluating the Land and Improvements, provided Purchaser takes all reasonable measures to assure that Purchaser's representatives keep such information confidential. Purchaser shall indemnify and hold Seller harmless from any loss, injury, liability, damage or expense, including reasonable attorneys' fees and costs, directly caused by Purchaser, which Seller may incur as a result of (a) any act or omission of Purchaser or its agents or representatives arising in connection with any tests or inspections conducted by Purchaser or its agents or representatives, or (b) the failure of Purchaser to restore the Property in accordance with this Section 3.2; provided, however, that Purchaser shall not be required to indemnify Seller if and to the extent that any such loss, injury, liability, damage or expense was caused by the negligence or misconduct of Seller, its employees or its agents. The foregoing shall survive termination of this Agreement or the Closing, as applicable. Furthermore, Purchaser shall, at its sole expense, keep and maintain a policy of comprehensive public liability insurance with a contractual liability endorsement that covers Purchaser's indemnity obligation set forth above. This insurance policy shall name Seller and SummitBridge National Investments VIII LLC ("SummitBridge") as an additional insured and afford protection in limits of not less than One Million and No/100 Dollars ($1,000,000.00) for bodily injury or death in any one accident, and not less than One Million and No/100 Dollars ($1,000,000.00) for property damage. All insurance shall be effected under standard form policies, issued by insurers of recognized responsibility authorized to do business in the state in which the Property is located and having a national rating of A-XI or better. Within two (2) days after the Effective Date, Purchaser shall deliver to Seller certificates of such insurance coverage and, not less than thirty (30) days before the expiration of the policy, a certificate of the renewal of such coverage accompanied by evidence reasonably satisfactory to Seller of payment of premiums therefore. In addition, the insurance shall be primary, non-contributing, and contain a waiver of subrogation in favor of Seller and SummitBridge.

      3.3    <u>Inspection of Documents</u>. Purchaser acknowledges receipt of the materials relating to the Land and Improvements ("**Property Documents**").

      3.3.1    Purchaser acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents. Purchaser specifically releases Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including without limitation attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "**Claims**") asserted against or incurred by Purchaser by reason of the information contained in, or that should have been contained in, the Property Documents. The provisions of this Section 3.3.1 shall survive Closing, or the early termination of this Agreement.

LEGAL02/44200516v1

3.4    Survey. As part of the Property Documents, Purchaser acknowledges that Seller has delivered or made available for inspection, the most recent survey, if any, in its possession to Purchaser (the "**Existing Survey**"). Purchaser may, prior to the Effective Date, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) (the Existing Survey, as updated, or a new survey, the "**Survey**").

3.4.1    Purchaser acknowledges that Seller will not execute an affidavit or other documentation regarding whether there have been any changes at the Property since the date of the applicable Existing Survey.

3.5    Title Commitment. Within five (5) days after the Effective Date, Purchaser, at its sole cost and expense, shall order from Title Company, a Commitment for Title Insurance (the "**Title Commitment**"), setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance, specifying Purchaser as the named insured and showing the Purchase Price as the policy amount.

3.6    Permitted Exceptions. Purchaser shall accept title to the Property, subject to the following exceptions (the "**Permitted Exceptions**"):

3.6.1    Those matters affecting or relating to the title to, or the survey of, the Property which are of record on the date of the Title Commitment or as shown on the Survey.

3.6.2    The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located.

3.6.3    All matters disclosed by the Property Documents and Leases and Contracts not prohibited hereunder.

3.6.4    All building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property.

3.7    Contracts. Purchaser shall perform the requirements of any Contracts identified as assumed and assigned pursuant the governing procedures in the Seller's chapter 11 bankruptcy case at Closing (such Contracts being herein referred to as the "**Assumed Contracts**"). As used herein, the term "**Contracts**" shall mean all service, maintenance, supply, or other contracts relating to the operation of the Property, and all other such assignable contracts or agreements in effect as of the Date of Closing.

3.7.1    Consents to Transfer. Seller shall be responsible for securing any consent from third parties who have the right to consent to the transfer of any Contract, Permit, Intangible Property and/or Lease and Purchaser shall be responsible for paying any fee in connection therewith, including but not limited to, any termination fee. The consents shall provide that if the transaction contemplated by this Agreement is not consummated, the consent will not be effective. It is understood that a failure to obtain such consents is not a condition precedent to Purchaser's obligation to close. Purchaser will assume all liability which arises as a result of failing to obtain any such consent and shall indemnify and hold harmless Seller from any liability, claims, actions, expenses, or damages incurred by Seller as a result of such failure, should Seller elect to waive the issuance of such consents as a precondition to Closing under Article 6; such indemnification shall survive Closing of this transaction.

**4.    SELLER'S OBLIGATIONS PRIOR TO CLOSING.** Until Closing, Seller and/or Seller's agents or representatives shall:

4.1     Insurance. Keep the Property insured, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

4.2     Operation. Maintain the Property in good condition and make repairs and/or replacements in the ordinary course of business in connection with any damage to the Property, and deliver the Property to Purchaser at Closing in the condition existing as of the Effective Date, normal wear and tear and damage by casualty excepted.

4.3     Notices. Provide to Purchaser, immediately upon the receipt thereof, any and all written notices relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor or other party under any of the Contracts, or from any other entity or party, which notices are of a type not normally received in the ordinary course of Seller's business, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by Seller hereunder.

4.4     Compliance with Agreements. Take all actions necessary to comply with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof. Seller shall pay all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due, except as otherwise expressly provided herein.

4.5     New Contracts. Seller may, without the prior consent of Purchaser, enter into any Contracts provided that Seller shall provide Purchaser written notice of such actions and such Contracts shall be terminable with thirty (30) days' notice.

4.6     Leases. Seller may (a) amend or terminate any Leases; (b) consent to the assignment of any Leases or subleasing of any of the Property; or (c) enter into any new Lease of the Property or any portion thereof, provided that Seller provides Purchaser with written notice and obtains Purchaser's prior written consent for such actions, which consent shall not be unreasonably withheld, conditioned or delayed.

4.7     Personal Property Substitutions. Seller may remove any item included in the Personal Property provided that Seller substitutes therefor an item of like kind and comparable fair market value.

5.     **REPRESENTATIONS AND WARRANTIES.**

5.1     By Seller. Seller represents and warrants to Purchaser, as of the Effective Date, that:

5.1.1     Seller has the power, right and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

5.1.2     This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be duly authorized, executed and delivered by Seller. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be valid and legally binding upon Seller and enforceable in accordance with their respective terms.

5.1.3     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any

6

agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound.

5.1.4    Survival. The representations and warranties set forth in this Article 5 shall not survive Closing of this transaction, and no action or claim may be brought against Seller by Purchaser or any affiliate of Purchaser with respect to a breach of such representations or warranties or any action, suit or other proceedings commenced or pursued, for or in respect of any breach of any representation or warranty made by Seller in this Agreement from and after the Closing.

5.1.5    Limitation on Remedies. Notwithstanding anything herein to the contrary, if Purchaser discovers prior to Closing that one or more of the representations and warranties under the provisions of this Article 5 are false or untrue as of the Date of Closing, Purchaser's sole remedy will be to exercise its rights under the provisions of Section 10.4 hereof.

5.2    By Purchaser. Purchaser represents and warrants to Seller as of the Effective Date that:

5.2.1    Purchaser is a corporation, partnership, limited liability company, trust or other type of business organization that is duly organized, validly existing and in good standing under the laws of the state in which it was organized and Purchaser is qualified to do business in the jurisdiction in which the Property is located.

5.2.2    Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

5.2.3    This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by Purchaser. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, valid and legally binding upon Purchaser and enforceable in accordance with their respective terms.

5.2.4    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Purchaser is a party or by which Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Purchaser or to the Property.

5.2.5    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Purchaser's knowledge, contemplated by Purchaser.

5.2.6    There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser that could affect Purchaser.

5.3    Broker. Seller and Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with the sale of the Property, except that Seller has retained the services of Berkadia Real Estate Advisors LLC, Attn: Kyle Stevenson (the "**Seller's Broker**") and Purchaser has retained the services of _____, Attn: _____(the "**Purchaser's Broker**"). Purchaser shall be solely responsible for paying the fees and commissions owed to Purchaser's Broker, pursuant to a separate written

7
LEGAL02/44200516v1

agreement between Purchaser and Purchaser's Broker and Seller shall be solely responsible for paying the fees and commissions owed to Seller's Broker, pursuant to a separate written agreement between Seller and Seller's Broker. Seller and Purchaser agree that each will indemnify, defend and hold the other, as well as Seller's Broker, free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property. This mutual indemnity shall survive Closing and any termination of this Agreement.

      5.4    <u>Property Condition</u>.

          5.4.1   <u>Disclaimer</u>. PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN AS SET FORTH IN THIS AGREEMENT), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS OR SUBSTANCES. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND ACCEPTS THE PROPERTY AND WAIVES ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS OTHER THAN AS SET FORTH IN THIS AGREEMENT, AND IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE FOR THE PROPERTY REFLECTS THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.

5.4.2    Release of Claims. Without limiting the provisions of Section 5.4.1, Purchaser releases Seller from any and all Claims (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects, errors or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions) affecting the Property, whether the same are a result of negligence or otherwise. The release set forth in this Section specifically includes any Claims under any Environmental Laws, under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., or with respect to any environmental risk. "**Environmental Laws**" includes, but is not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Clean Water Act (33 U.S.C. §§1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Hazardous Materials Transportation Act ( 49 U.S.C. §§ 1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§ 136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement.

5.4.3    Acknowledgment of Inspection. Purchaser acknowledges and agrees that (a) Purchaser had an opportunity to inspect the Property and its operation prior to the Effective Date, (b) if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property, and (c) Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by Seller. Purchaser is relying solely upon its own inspections, investigations, research and analyses in entering into this Agreement and is not relying in any way upon any representations or warranties (except those expressly provided in Article 5), statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives to Purchaser or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters. With respect to any Personal Property being conveyed hereunder, Purchaser shall not rely on any list of such property compiled by Seller, but rather, Purchaser shall compile its own list for review by Seller.

5.4.4    RELEASE. PURCHASER HEREBY RELEASES SELLER AND ANY SERVICER, AGENT, REPRESENTATIVE, MANAGER, AFFILIATE, OFFICER, PARTNER, SHAREHOLDER OR EMPLOYEE OF SELLER (A "**SELLER RELATED PARTY**") FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES WHICH PURCHASER OR ANY PARTY RELATED TO OR AFFILIATED WITH PURCHASER (A "**PURCHASER RELATED PARTY**") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS AT, IN, ON OR UNDER THE PROPERTY, AND PURCHASER WILL NOT LOOK TO SELLER OR ANY SELLER RELATED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF.

5.4.5    ASSUMPTION. EFFECTIVE AS OF THE DATE OF CLOSING, PURCHASER WILL ASSUME ALL OF SELLER'S LIABILITIES AND OBLIGATIONS WITH RESPECT TO THE LEASES, HOTEL CONTRACTS, BOOKINGS AND PERMITS (TO THE EXTENT SUCH PERMITS ARE ASSIGNED OR TRANSFERRED) ARISING AND ACCRUING FROM AND AFTER THE DATE OF CLOSING.

5.4.6    SURVIVAL. THE ACKNOWLEDGMENTS AND AGREEMENTS OF PURCHASER SET FORTH IN THIS ARTICLE 5 WILL SURVIVE THE CLOSING.

5.4.7  PERSONAL PROPERTY; INTANGIBLE PROPERTY. SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO SELLER'S TITLE TO THE PERSONAL PROPERTY OR THE INTANGIBLE PROPERTY.

6.  **CONDITIONS PRECEDENT TO CLOSING.**

6.1  Conditions for the Benefit of Purchaser. The obligation of Purchaser to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of the following condition precedent:

6.1.1  The representations and warranties of Seller contained in this Agreement shall be true, complete and accurate in all material respects, as of the Effective Date; and

6.1.2  The Title Company shall, upon payment of the Title Company's premium, issue to Purchaser an ALTA 2006 form owner's policy of title insurance (the "**Purchaser's Title Policy**") in the amount of the Purchase Price showing fee title to the Real Property vested solely in Purchaser and subject only to (a) the standard, preprinted exclusions to Purchaser's Title Policy; (b) liens to secure payment of real estate taxes and assessments not yet due and payable; (c) matters affecting the Real Property created by or consented to by Purchaser; and (d) Permitted Exceptions. Purchaser may request that the Title Company provide endorsements to the Purchaser's Title Policy, provided that (i) such endorsements shall be at no cost to, and shall impose no additional liability on, Seller, (ii) Purchaser's obligations under this Agreement shall not be conditioned upon Purchaser's ability to obtain such endorsements, and (iii) Closing shall not be delayed as a result of Purchaser's request.

6.2  Waiver of Conditions. Purchaser shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Purchaser unless it is in writing and executed by an authorized officer of Purchaser.

6.3  Conditions for the Benefit of Seller. The obligation of Seller to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

6.3.1  Receipt by Seller of all requisite approvals and consents, including, but not limited to, consents to the transfer of any Assumed Contract, permit and/or Lease to be assigned to Purchaser at Closing; and

6.3.2.  [Intentionally omitted.]

6.3.3  Receipt by Seller of a release of obligations under the Franchise Agreement (as defined in Section 8.4) affecting the Property, except as set forth herein, in a form acceptable to Seller. At the request of the applicable Licensor, it shall be entitled to approve the form of any release. Regardless of whether or not any such request is made, the release shall not operate to release Seller from (i) any de-identification provisions as set forth in Section 8.4.2 below, (ii) any continuing or surviving obligations of Seller or any continuing or surviving rights of the applicable Licensor under the applicable Franchise Agreement or any termination agreement with the applicable Licensor, including without limitation, all payment obligations, all indemnification and hold harmless obligations, and all confidentiality obligations of Seller, or (iii) any allowed claim for rejection damages arising from the rejection of any Franchise Agreement; provided that (a) Seller retains the right to object to any such rejection claim, and (b) the limitation of such release shall not alter the rights of any secured creditors to the proceeds generated from the sale of the Property. Nothing in this Section 6.3.3 shall limit, impair, or otherwise affect any release(s) provided to a Licensor under either the applicable Franchise Agreement or termination agreement. Moreover, to the extent of any conflicts or inconsistencies between this Section

LEGAL02/44200516v1

6.3.3 and any release provisions in the applicable Franchise Agreement or termination agreement with the applicable Licensor, the terms of the Franchise Agreement or termination agreement, as applicable, shall control and govern.

6.4 <u>Waiver of Conditions</u>. Seller shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Seller unless it is in writing and executed by an authorized officer of Seller.

6.5 <u>Failure of a Condition</u>. In the event any of the conditions set forth in this Article are not fulfilled or waived, this Agreement shall terminate and all rights and obligations hereunder of each party shall be at an end and the Deposit shall be returned to Purchaser, as Purchaser's sole remedy and neither party shall have any obligations to the other.

## 7. CLOSING COSTS AND PRORATIONS.

7.1 <u>Purchaser's Costs</u>. Purchaser will pay the following costs of closing this transaction:

7.1.1 All recording fees and any and all state and county recordation, documentary or transfer taxes, which shall be based on the Purchase Price defined in Section 2.1 above;

7.1.2 All premiums, fees and costs associated with the issuance of any title policy as well as for all premiums, fees and costs associated with the issuance of a mortgagee title insurance policy, and all of the settlement fees and other charges of Title Company due in connection with the closing of this transaction;

7.1.3 The cost of the Survey;

7.1.4 The fees and disbursements of Purchaser's counsel and any other expense(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing this transaction;

7.1.5 Any and all costs and expenses in connection with obtaining financing for the purchase of the Property, including without limitation any recordation or transfer taxes required to be paid upon the recordation of any deed of trust, mortgage or other security agreement executed and recorded in connection with such financing;

7.1.6 Any sales taxes payable with respect to any personal property included within the Property; and

7.1.7 All of the fees of Purchaser's Broker referred to in Section 5.3 above, and the Platform Fee.

7.2 <u>Seller's Costs</u>. Seller will pay the following costs of closing this transaction:

7.2.1 The fees and disbursements of Seller's counsel;

7.2.2 A cooperating broker fee to Purchaser's Broker and the fees of Seller's Broker, subject to and in accordance with Section 5.3 above; and

7.2.3 All release fees and other charges required to be paid in order to release from the Property the lien of any mortgage or other security interest which Seller is obligated to remove pursuant to the terms of this Agreement.

7.3 <u>Prorations</u>. Guest, convention, room, food, beverage, and all other charges and revenues for services rendered and the operation of all departments of the Property as follows: all food and beverage revenue (if any) as of 11:59 p.m., Central Time, on the day before the Date of Closing (the "Cut-off Time") and the guest ledger for guests staying at the Property on the night before the Date of Closing, for that night only, shall be counted and shall be retained by Seller. All revenues for days and nights preceding or commencing prior to the Date of Closing shall be allocated to and retained by Seller and all revenues for the night commencing on the Date of Closing and days following the Date of Closing shall accrue to the benefit of Purchaser and Purchaser shall purchase, for cash, at Closing the guest ledger allocated to Seller for hotel guests staying through the day of Closing. Purchaser shall purchase all cash in petty cash accounts and cash registers at the Property on the Date of Closing, but all checks, notes, security and other evidence of indebtedness located at the Property on the Date of Closing and balances on deposit to the credit of the Seller with banking institutions (specifically including, but not limited to, reserves held by or for the benefit of the Seller) are and shall remain the property of the Seller and are not included in this sale. Purchaser shall forward to Seller, promptly upon receipt (but without recourse or warranty of any kind with respect to any endorsement by Purchaser on checks therefor), any and all revenues due to Seller hereunder and collected by Purchaser following Closing. Seller and Purchaser acknowledge and agree that no re-proration shall occur post-Closing for any reason, known or unknown at the time of Closing or thereafter, and all proration figures included in the Settlement Statement (as defined in Section 8.1.7 below) shall be final upon execution by the parties.

7.3.1 <u>Addendum</u>. Seller and Purchaser may agree to allocate responsibility for specific Property charges and amounts as evidenced by an Addendum to Asset Purchase Agreement "Closing Costs and Prorations" executed by Seller and Purchaser.

7.4 <u>Taxes</u>. General real estate taxes and special assessments, personal property taxes, and other governmental charges relating to the Property payable during the year in which Closing occurs shall be prorated with respect to the Property as of the day before the Date of Closing. If Closing shall occur before the actual taxes and special assessments payable during such year are known, the apportionment of taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year. If, as the result of an appeal of the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing, there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is reduced, and a real estate tax refund issued, Seller shall be entitled to all such refunds relating to the period prior to Closing. If Seller engaged the tax appeal agent then the tax appeal agent shall remain responsible solely to Seller for such appeal. If the appeal is successfully culminated either prior to or after the proposed sale transaction, and Purchaser would benefit from such appeal for the current or subsequent tax year, then Purchaser shall pay a pro-rata share portion of the costs and expenses incurred by Seller in connection with the appeal.

7.5 <u>In General</u>. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.

7.6 <u>Purpose and Intent</u>. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Article 7 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

8. **CLOSING AND ESCROW.**

8.1 <u>Seller's Deliveries</u>. Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents, each executed and, if required,

acknowledged:

8.1.1  A _____ Deed, in the form attached hereto as **Schedule 8.1.1** (the "**Deed**"), conveying title to Purchaser of the Property, subject only to the Permitted Exceptions.

8.1.2  (a) Originals (to the extent in Seller's possession) of all of the Assumed Contracts relating to the Property which Purchaser has elected to assume pursuant to the terms hereof; and (b) an assignment of the Intangible Property to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as **Schedule 8.1.2** (the "**Assignment and Assumption Agreement**"), conveying to Purchaser Seller's rights, title and interest in and to the Intangible Property attributable to the Property.

8.1.3  (a) Originals (to the extent in Seller's possession) of all warranties then in effect, if any, with respect to the Property or to the Improvements or any repairs or renovations to such Improvements and (b) an assignment of all such warranties being conveyed hereunder, conveying to Purchaser Seller's rights, title and interests in and to the warranties attributable to the Property.

8.1.4  An affidavit pursuant to the Foreign Investment and Real Property Tax Act.

8.1.5  Appropriate evidence of authority, capacity and status of Seller as reasonably required by Title Company.

8.1.6  An "**Owner's Affidavit**", in a form sufficient for Title Company to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder, (b) parties in possession, other than tenants as tenants only, and, (c) matters not shown in the public records.

8.1.7  A joint settlement statement (the "**Settlement Statement**"), prepared by Title Company.

8.1.8  A quitclaim bill of sale in the form attached hereto as **Schedule 8.1.8** (the "**Bill of Sale**"), transferring to Purchaser all of Seller's right, title and interest in the Personal Property.

8.1.9  A tax proration agreement in the form attached hereto as **Schedule 8.1.9** (the "**Tax Proration Agreement**").

8.1.10  Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.2  Purchaser's Deliveries. At the Closing, Purchaser shall (a) pay Seller the Purchase Price as required by, and in the manner described in, Article 2 hereof, (b) pay Seller's Broker the Platform Fee as required by, and in the manner described in, Article 2 hereof, and (c) execute and deliver the following documents:

8.2.1  The Assignment and Assumption Agreement and Bill of Sale.

8.2.2  Evidence of Purchaser's authority, and the authority of the person executing any documents at Closing on behalf of Purchaser, acceptable to Seller and Title Company, to enter into the transactions contemplated by this Agreement.

13

8.2.3    The Settlement Statement.

8.2.4    The Tax Proration Agreement.

8.2.5    Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.3    <u>Employees</u>. Purchaser acknowledges that all employees at the Property ("**Existing Employees**") are employed by the management company currently at the Property. Purchaser or its manager agree to make employment opportunities available to a sufficient number of the Existing Employees in order that the actions of the parties pursuant to this Agreement will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (collectively, the "**WARN ACT**"). Purchaser shall assume all risk and liability for any complaint filed by an employee of the Property under the WARN Act due to his/her failure to receive sixty (60) days' notice of termination, and Purchaser shall indemnify and hold Seller harmless for same; however, this assumption and indemnification shall only apply to such a complaint (a) brought by an employee of Seller or Seller's agent actively employed on the Effective Date and (b) brought only in connection with Purchaser's failure to rehire, within six (6) months of the Date of Closing, a sufficient number of such active employees such that a "mass layoff" does not occur within the meaning of the WARN Act. The terms and provisions of this Section will survive the Closing.

8.4    <u>Franchise Agreement</u>. Purchaser acknowledges that the Property is operating as the _____, whose "**Licensor**" is _____ (the "**Franchise Agreement**"). Purchaser may, at its sole cost and expense, make application for approval to continue to operate the Property as the _____ ("**Franchise Approval**"), pursuant to an agreement with the Licensor thereof (the "**New Franchise Agreement**"). If Purchaser elects to obtain Franchise Approval, and the applicable Licensor elects to accept such Franchise Approval, Purchaser further covenants and agrees to timely submit, and in no event later than five (5) days after the Approval Date, all applications, documents, fees and charges requested by Licensor in order for Licensor to approve the New Franchise Agreement. Seller, at Purchaser's expense, agrees to reasonably cooperate with Purchaser in connection with Purchaser's obtaining Franchise Approval. Purchaser obtaining Franchise Approval is not a condition precedent to Closing.

8.4.1    <u>Termination Fees</u>. Seller shall reject pursuant to Section 365(g) of the Bankruptcy Code and terminate the Franchise Agreement as of Closing and, if required by the applicable Licensor, shall enter into a termination agreement with the applicable Licensor in a form mutually acceptable to the applicable Licensor and Seller. Termination of the Franchise Agreement shall be governed by the terms of such termination agreement with the applicable Licensor, if applicable. If Licensor charges any amount to Seller in connection with the termination of the Franchise Agreement, then upon Closing, Purchaser shall pay, or if Purchaser has not obtained Franchise Approval prior to the Date of Closing, then at Closing Purchaser shall pay or escrow with the Title Company such damages, liquidated damages, termination fees or other costs and fees payable and satisfactory to the Licensor to execute a termination and release of Seller's Franchise Agreement in an amount not to exceed _____ ($_____) (collectively the "**Termination Fees**"). If, subsequent to Closing, Purchaser fails to obtain Franchise Approval, such escrowed funds shall be released to Licensor. Should Purchaser not continue operations with Licensor subsequent to Closing, Purchaser agrees to notify Seller of same on or before the Effective Date and shall be liable for Seller's de-identification costs and liquidated damages due to Licensor upon demand, if any; provided however, that nothing herein shall limit, impair, or otherwise affect the applicable Licensor's rights to pursue damages or other relief against Seller, Purchaser, or any other third-party, arising from any improper or unauthorized use of such Licensor's intellectual property related to the Hotel.

LEGAL02/44200516v1

8.4.2    De-Identification. At Closing, Seller shall, at Purchaser's cost, perform all de-identification obligations under the Franchise Agreement, if Purchaser chooses not to operate the hotel as the _____, if Purchaser fails to execute a New Franchise Agreement prior to the Date of Closing, if Licensor elects not to enter into a New Franchise Agreement, if the Franchise Agreement is deemed rejected pursuant to Section 365(g) of the Bankruptcy Code, or if the Purchaser's Franchise Approval is denied (the "**De-Identification Obligations**"). If the De-Identification Obligations are not completed on or before the Date of Closing, Purchaser shall pay an amount equal to the estimated costs of the De-Identification Obligations, which amount shall be held in escrow by the Title Company in accordance with an escrow agreement to be executed by Seller, Purchaser and the Title Company on or before the Date of Closing. Purchaser shall allow Seller and its successors, assigns and agents reasonable access to the Property after the Closing in order for Seller to fulfill all of its De-Identification Obligations under the Franchise Agreement and Purchaser shall be solely responsible for all expenses incurred by Seller in connection with such De-Identification Obligations. For clarity, nothing herein shall prevent or limit any Licensor from enforcing all de-identification obligations of the debtor/seller pursuant to any Franchise Agreement. Moreover, to the extent the terms of this Asset Purchase Agreement and the terms of any Franchise Agreement or termination agreement with any Licensor, including any de-identification provisions, are inconsistent, the terms of the relevant Franchise Agreement or termination agreement, as applicable, shall control and govern.

8.4.3    Survival. The provisions of this Section 8.4 shall survive Closing.

8.5    Liquor License. Seller makes no representations regarding the sale or service of alcoholic beverages at the Property, or the existence of any liquor license affecting the Property. If such a license exists, it shall not be transferred to Purchaser. Purchaser shall be solely responsible for applying for and obtaining any liquor license it desires.

8.6    Possession. Purchaser shall be entitled to possession of the Property at the conclusion of the Closing.

8.7    Escrow Closing. Purchaser and Seller (or their respective counsel on behalf of Purchaser and Seller) shall execute letters of escrow closing instructions (the "**Closing Instructions**") which will provide that, on the Date of Closing: (a) Seller and Purchaser shall each deposit with Title Company all of the documents and instruments described in Sections 8.1 and 8.2, above (the "**Closing Documents**"); and (b) Purchaser shall deposit with Title Company the balance of the Purchase Price required to be paid after application of the Deposit thereto and all prorations, adjustments and credits required to be made under this Agreement, (the "**Adjusted Purchase Price**") and the Platform Fee, all of which shall be set forth on, and mutually agreeable pursuant to, a settlement statement executed by both Purchaser and Seller at Closing. Upon receipt of the Adjusted Purchase Price and the Platform Fee, and the satisfaction of all other conditions set forth in the Closing Instructions, Title Company shall be authorized and directed to disburse the Adjusted Purchase Price to Seller or its designee(s) and the Platform Fee to Seller's Broker, record the Deed among the real property records of _____ County, _____, and release the remaining Closing Documents to the appropriate parties, all in strict accordance with the Closing Instructions.

9.    **DAMAGE, DESTRUCTION AND CONDEMNATION.**

9.1    Casualty. Except as provided herein, Seller assumes all risk of loss or damage to the Property by fire or other casualty until consummation of Closing, at which time all risk of loss or damage to the Property by fire or other casualty shall be transferred to Purchaser. If at any time after the Effective Date but on or prior to the Date of Closing any portion of the Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall promptly give written notice thereof to Purchaser. If the estimated cost to repair the damage or destruction exceeds $250,000 as reasonably estimated by Seller, Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days

LEGAL02/44200516v1

following the date upon which Purchaser receives Seller's written notice of the destruction or damage, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, or if the cost of repair is equal to or less than $250,000, this Agreement shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all insurance proceeds will be assigned to Purchaser and Seller will pay to Purchaser any deductible under Seller's insurance policy.

9.2    Condemnation. In the event, at any time on or prior to the Date of Closing, any action or proceeding is filed, under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to Purchaser. If the taking would substantially prevent Purchaser from continuing the existing use of the Property, then Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of such action or proceeding, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be assigned to Purchaser.

## 10.    FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES.

10.1    Failure of Conditions Precedent. If any of the conditions precedent stated in Article 6 have not occurred or been satisfied on or before the Date of Closing, Purchaser or Seller may: (a) terminate this Agreement by written notice to the appropriate party on or before the Date of Closing, in which event the appropriate party shall be entitled to receive disbursement of the Deposit or (b) to waive such conditions precedent and proceed to Closing.

10.2    Purchaser Default. If Purchaser is in default of one or more of Purchaser's obligations under this Agreement other than a failure to timely close, then Seller may give notice to Purchaser (with a copy to Title Company) specifying the nature of the default. Purchaser shall have five (5) business days after receiving that notice, but in no event beyond the Date of Closing, within which to cure that default. If Purchaser fails to cure that default within that period, then Seller's sole remedy for such default shall be to terminate this Agreement by giving notice of such termination to Purchaser (with a copy to Title Company) and receive the Deposit as liquidated damages. If Seller does so terminate this Agreement, then Title Company shall pay the Deposit to Seller.

10.3    Liquidated Damages. SELLER AND PURCHASER AGREE THAT PAYMENT OF THE DEPOSIT TO SELLER UNDER THIS ARTICLE 10 SHALL BE AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.

10.4    Seller Default. If Seller is in default of one or more of Seller's material obligations under this Agreement other than a failure to timely close (for which there shall be no notice and cure period), then Purchaser shall give notice to Seller (with a copy to Title Company) specifying the nature of the default. Seller shall have five (5) business days after receiving such notice, but in no event beyond the Date of Closing within which to cure the default. In the event Seller shall: (a) fail to sell, transfer and assign the Property to Purchaser in violation of the terms of this Agreement, and/or (b) fail to perform any other material obligation of Seller hereunder beyond any applicable notice and cure period, and/or (c) intentionally breach any warranty made or granted by Seller under this Agreement, which breach is not cured by the Date of Closing and/or (d) have breached any representations of Seller contained herein in any

16

material respect, Purchaser shall be entitled to: 1) declare this Agreement to be null and void and demand and receive the return of the Deposit whereupon, neither party shall have any further rights, duties or obligations hereunder except as otherwise provided herein and 2) pursue all other remedies available at law or in equity, save and except consequential or punitive damages, which rights are hereby waived by Purchaser.

        10.4.1  <u>Waiver of Default</u>. If Purchaser does not duly notify Seller of the default and does not give Seller a notice of termination hereunder, then (i) the default shall be treated as waived by Purchaser and (ii) at Closing, Purchaser shall accept the Property subject to the default without any reduction in the Purchase Price and without any Claims against Seller on account of the default.

        10.5  <u>Termination</u>. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by Purchaser and Seller into escrow shall be returned by Title Company to the party depositing the same, and (c) all copies of all Property Documents provided to Purchaser by Seller shall be returned to Seller, whereupon the parties will have no continuing liability to each other unless otherwise expressly stated in any provision of this Agreement.

        10.6  <u>Attorneys' Fees</u>. Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

        **11.**    **NOTICES.** Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing and shall be deemed to be given (a) when hand delivered, (b) one (1) business day after pickup by Emery Air Freight, United Parcel Service (Overnight) or Federal Express, or another similar overnight express service, (c) when transmitted by telecopy or facsimile, provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy machine, or (d) when transmitted by electronic correspondence, in any case addressed or sent to the parties at their respective addresses set forth below:

If to Seller:         _____

        _____

        _____

        Attn: _____

        Phone: _____

        Fax: _____

        Email: _____

With a copy to:       Dunham Hildebrand, PLLC
        2416 21st Ave. S., Suite 303
        Nashville, TN 37212
        Attn: Henry E. ("Ned") Hildebrand, III, and
        Denis G. ("Gray") Waldron
        Phone: 615.933.5851
        Email: ned@dhnashville.com; gray@dhnashville.com

If to Purchaser:      _____

<pre>
            _____
            _____
Attn: _____
Phone: _____
Fax: _____
Email: _____

With a copy to:     _____
                    _____
                    _____
Attn: _____
Phone: _____
Fax: _____
Email: _____
</pre>

or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Article 11 to the other party. Telephone numbers are for informational purposes only. Any and all notices to Seller shall be given to Seller's attorney. Effective notice will be deemed given only as provided above, except as otherwise expressly provided in this Agreement.

## 12. MISCELLANEOUS.

12.1 <u>Entire Agreement</u>. This Agreement, together with the Schedules attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

12.2 <u>Severability</u>. If any provision of this Agreement or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

12.3 <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the internal laws of the State of _____. Purchaser irrevocably consents and submits to the nonexclusive jurisdiction of the courts of the state and federal district in which the Real Property is located and waives any objection based on venue of *forum non conveniens* with respect to any action instituted in those courts arising under this Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Agreement or any related transactions, in each case whether now existing or later arising, and whether in contract, tort, equity or otherwise, and agrees that any dispute with respect to any of those matters will be heard only in the courts described above.

12.4 <u>Assignability</u>. Purchaser may assign or transfer any of Purchaser's rights, obligations and interests under this Agreement, to any person or entity upon providing Seller with written

18

LEGAL02/44200516v1

notice not less than five (5) business days prior to the Date of Closing. Upon any such assignment or other transfer, Purchaser and such assignee or transferee shall be jointly and severally liable for the obligations of Purchaser under this Agreement, which liability shall survive the assignment or transfer and the Closing.

    12.5    Successors Bound. This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their respective successors and permitted assigns.

    12.6    No Public Disclosure. Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior written consent of Purchaser and Seller.

    12.7    Captions; Interpretation. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Whenever the context may require, words used in this Agreement shall include the corresponding feminine, masculine, or neuter forms, and the singular shall include the plural and vice versa. Unless the context expressly indicates otherwise, all references to "Article" or "Section" are to sections of this Agreement.

    12.8    No Partnership. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest or permitted assigns.

    12.9    Time of Essence. Time is of the essence with respect to the performance of the obligations of Seller and Purchaser under this Agreement.

    12.10    Counterparts and Electronic Signatures. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument. Facsimile, documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. Seller and Purchaser agree that this Agreement, any Addendum thereto or any other document necessary for the consummation of the transaction contemplated by this Agreement may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act ("E-Sign Act"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act ("UETA") and any applicable state law. Any document accepted, executed or agreed to in conformity with such laws will be binding on both Seller and Purchaser the same as if it were physically executed and Purchaser hereby consents to the use of any third party electronic signature capture service providers as may be chosen by Seller.

    12.11    Recordation. Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

    12.12    Proper Execution. This Agreement shall have no binding force and effect on either party unless and until both Purchaser and Seller shall have executed and delivered this Agreement.

    12.13    Waiver. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

LEGAL02/44200516v1

12.14   Business Days. If any date herein set forth for the performance of any obligations by Seller or Purchaser or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any local or federal holiday on which post offices are closed in the state in which the Property is located.

12.15   Limitation of Liability. No present or future partner, director, officer, member, shareholder, employee, advisor, affiliate, servicer or agent of or in Seller, Purchaser or any affiliate of any of the foregoing will have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter. The limitations of liability contained in this paragraph will survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to either party provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument. In no event will Seller or Purchaser be liable for any consequential, exemplary or punitive damages under any circumstances in connection with this Agreement or the transaction contemplated hereby.

12.16   Back-Up Contracts. Notwithstanding anything herein to the contrary, Seller reserves the right to continue marketing the Property for sale and to entertain letters of intent regarding the sale of the Property while this Agreement is outstanding, provided Seller shall not enter into any binding back-up agreements with respect to the sale of the Property for so long as this Agreement is in force.

12.17   WAIVER OF JURY TRIAL. PURCHASER WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF PURCHASER AND SELLER IN RESPECT OF THIS AGREEMENT OR RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR LATER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. PURCHASER AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT SELLER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF PURCHASER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.18   No Third Party Beneficiary. This Agreement is solely for the benefit of Purchaser and Seller and Purchaser's permitted assigns. No other person or entity is entitled to the benefit or may enforce any of the provisions of this Agreement, except where expressly provided herein to the contrary.

12.19   Purchaser Representation and Consent. Purchaser acknowledges and confirms that it has had every opportunity to obtain legal representation in this matter and, if the name of Purchaser's counsel is not set forth in Article 11 hereof, then Purchaser has either intentionally declined to obtain representation, or not advised Seller of its representation; further, Purchaser confirms that he is a sophisticated purchaser of similar commercial properties, is familiar with all rights and remedies of _____ law, and specifically waives any right to further representation. Purchaser confirms and acknowledges that he is not relying on any legal advice from Seller, Seller's counsel, the Broker, or any other party in this matter.

12.20   Auction Sale/Process. Seller may select the winning bid in its sole and absolute discretion. No obligation to sell shall be binding on Seller unless and until this Agreement is counter-signed by Seller. Seller may rescind any oral acceptance of a winning bid prior to the execution and delivery of

20

this Agreement to Purchaser for any reason, including but not limited to, the receipt of a subsequent higher bid or offer to purchase whether such higher bid or offer to purchase was received pursuant to the Terms and Conditions (defined in Section 12.21, below) or otherwise.

12.21   Auction Terms and Conditions. Purchaser represents and warrants that Purchaser has received, read and accepts all terms and conditions pertaining to the sale of the Property (the "**Terms and Conditions**"), which have been made available on the auction website, *marketplace.realinsight.com* (the "**Website**")*,* and which Terms and Conditions are incorporated herein by reference. In the event of any conflict or inconsistency between the Terms and Conditions and this Agreement, this Agreement shall control and prevail in all respects.

12.22   Purchaser and Buyer. When used in this Agreement or any document concerning the parties to this Agreement, the terms "Purchaser" and "Buyer" shall have the same meaning and be used interchangeably.

12.23   Section 1031 Like-Kind Exchange. Either Seller or Purchaser may consummate the purchase of the Property as part of a so-called like kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provided that: (a) the Closing shall not be delayed or adversely affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition to Purchaser's or Seller's obligations under this Agreement; (b) either Seller or Purchaser may effectuate the Exchange through a qualified intermediary so long as neither of their respective rights and obligations under this Agreement are adversely affected thereby; and (c) neither Seller nor Purchaser shall be required to make an assignment of the purchase agreement for the exchange property or be required to acquire or hold title to any real property for the purposes of consummating the Exchange. Neither Seller nor Purchaser shall, by this agreement or acquiescence to the Exchange, (i) have their rights under this Agreement adversely affected or diminished in any manner, or (ii) be responsible for compliance with or be deemed to have warranted to the other that the Exchange in fact complies with Section 1031 of the Code.

12.24   Prohibited Persons and Transactions. Purchaser represents and warrants to Purchaser's knowledge: (i) Purchaser is not a Prohibited Person (defined below); (ii) none of its investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person; (iii) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and (iv) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7). "**Prohibited Person**" means any of the following: (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c) and/or (d) above. The foregoing representations shall survive Closing and any termination of this Agreement.

## 13.   ESCROW AGREEMENT

13.1   Deposit. Title Company agrees to deposit the Deposit in a non-interest bearing account and to hold and disburse said funds as hereinafter provided. Upon written notification from Seller or Purchaser in accordance with the terms of this Agreement, Title Company shall release the funds in

LEGAL02/44200516v1

accordance with and pursuant to the written instructions. In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Title Company to justify its doing so, Title Company shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

13.2    <u>Title Company</u>. Seller and Purchaser covenant and agree that in performing any of its duties under this Agreement, Title Company shall not be liable for any loss, costs or damage which it may incur as a result of serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. Accordingly, Title Company shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which Title Company shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

13.3    <u>Indemnity</u>. Seller and Purchaser hereby agree to indemnify and hold harmless Title Company against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Title Company in connection with its serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. The provisions of this Section 13.3 shall survive a termination of this Agreement.

13.4    <u>Court Approval</u>. Notwithstanding anything to the contrary stated herein, Purchaser and Seller hereby acknowledge and agree that both parties' rights and obligations under this Agreement are subject to (a) entry of an order by the Court authorizing Seller to close the on the sale of the Property on the terms and conditions set forth in this Agreement, including any amendment and/or modification of this Agreement (the "**Sale Authorization Order**"), and (b) expiration of any time for appeal of the Sale Authorization Order. Seller, with the cooperation and approval of Purchaser, shall file, or cause to be filed, with the Court a motion for an order confirming the sale within seven (7 business days after the Effective Date. Notwithstanding anything contained in this Agreement to the contrary, in the event Seller does not obtain the Sale Authorization Order within one hundred twenty (120) days after the Effective Date, then Seller shall have the unilateral right to extend the time for Court approval for two (2) separate thirty (30) day periods. If the Court still does not enter the Sale Authorization Order within the extension approval periods, then this Agreement may be terminated by Seller or by Purchaser. In the event of a termination under this section, the Earnest Money shall be returned to Purchaser, except with respect to additional Earnest Money deposited by Purchaser in order to obtain an extension of the Closing Date, as provided in this Agreement.

13.5    <u>Authorization to Complete and Execute</u>. As set forth in the *Order (I) Approving Auction and Sale Procedures, (II) Approving the Form and Manner of Notices, (III) Authorizing an Auction, (IV) Approving the Form APA, (V) Approving Related Compensation, (VI) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VII) Granting Related Relief* (the "**Auction Procedures Order**"), Purchaser shall sign this Agreement as a condition of its recognition as a Qualified Bidder authorized to participate in the auction contemplated herein prior to any determination of the Purchase Price, Earnest Money Deposit, Platform Fee, and certain other terms. Purchaser agrees that the signing of this Agreement upon the placing of its bid at the auction shall constitute an irrevocable offer to purchase the Property at the Purchase Price that equals or exceeds the amount bid by Purchaser at the auction, plus all other fees contemplated herein and in the Auction Procedures Order. Purchaser hereby expressly grants Seller, for a period not to exceed seven (7) days from conclusion of the auction, the irrevocable authority to insert such terms into this Agreement following completion of the auction

contemplated herein and countersign the Agreement, and upon doing so, the Agreement shall constitute a binding and legally enforceable agreement for the purposes contained herein.

*[Signature Page Follows]*

LEGAL02/44200516v1

**IN WITNESS WHEREOF**, Purchaser and Seller have executed this Agreement on the dates set forth below, effective as of the date first set forth above.

**SELLER:**

_____,
_____

By: _____

Name: _____

Title: _____

Date: _____

**PURCHASER:**

_____,
a _____

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

LEGAL02/44200516v1

## ACKNOWLEDGEMENT BY TITLE COMPANY

**IN WITNESS WHEREOF**, Title Company has signed this Agreement for the limited purposes set forth herein.

**TITLE COMPANY:**

**[TITLE COMPANY NAME]**

By: _____

Name: _____

Title: _____

Date: _____

Address for Notices to Title Company:

<u>**[INSERT TITLE CO / ESCROW AGENT address/ contact info]**</u>

## SCHEDULE 1.1.1

### Real Property Description

[See Attached]

LEGAL02/44200516v1

## <u>SCHEDULE 8.1.1</u>

**Form of _____ Deed**

[See Attached]

## SCHEDULE 8.1.2

### Form of Assignment and Assumption Agreement

---

### ASSIGNMENT AND ASSUMPTION AGREEMENT

---

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** is made by and between _____, a _____, having an address _____ ("**Assignor**"), and _____, a _____, having an address of _____ ("**Assignee**").

**WHEREAS**, Assignor and Assignee entered into that certain Asset Purchase Agreement ("**Agreement**") dated _____, 20__, for the sale and purchase of certain "Property", consisting of certain "Real Property" (as more particularly described in _**Exhibit A**_), "Personal Property", and "Intangible Property" (as more particularly described in this Assignment and Assumption Agreement), as said terms are defined in the Agreement;

**WHEREAS**, Assignor desires to quitclaim unto Assignee all of Assignor's right, title and interest in and to the Intangible Property as hereinafter provided; and

**WHEREAS**, Assignee desires to assume the duties and obligations of Assignor with respect to the Intangible Property.

**NOW, THEREFORE**, in accordance with the Agreement and in consideration of the sum of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the parties do hereby covenant and agree as follows and take the following actions:

1.      Assignor does hereby quitclaim unto Assignee all of the Assignor's right, title and interest in and to the following property to the extent the same is transferable by Assignor (collectively, "**Intangible Property**"):

(a)      any and all leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof), in effect as of the date of this Assignment and Assumption Agreement (collectively, "**Leases**");

(b)      any and all contracts and agreements of any kind for the maintenance, repair or operation of the Property (other than Leases) in effect as of the date of this Assignment and Assumption Agreement (collectively, "**Contracts**");

(c)      any and all licenses, permits, authorizations, certificates of occupancy and other approvals that are in effect as of the date of this Assignment and Assumption Agreement and necessary for the current use and operation of the Property (collectively, "**Permits**"); and

(d)      any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications, and development rights that exist as of the date of this Assignment and Assumption Agreement and relate to the Real Property or the Personal Property (collectively, "**General Intangibles**");

(e) those matters affecting or relating to the title to, or the survey of, the Property which are of record as of the date of this Assignment and Assumption Agreement (collectively, the "**Permitted Exceptions**"); and

(f) the name of the Property, if any.

In addition, if and to the extent required by applicable law, Assignor does hereby quitclaim unto Assignee all of Assignor's right, title, and interest in and to any and all refundable tenant deposits (and required interest thereon, if any) in Assignor's possession with respect to the Leases and Contracts as of the date of this Assignment and Assumption Agreement (collectively, the "**Tenants' Deposits**"). "Intangible Property" means the Leases, Contracts, Permitted Exceptions, Permits, General Intangibles, and, if and to the extent quitclaimed hereunder, Tenants' Deposits.

2. THE INTANGIBLE PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE INTANGIBLE PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE INTANGIBLE PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS.

3. Assignor hereby assigns and transfers to Assignee all claims, demands and causes of action arising from or related to any environmental injury to the Property that may have occurred or originated prior to the date of this instrument. Environmental injury means any injury, damage or loss in value to the Property arising from any spill, leak or release of any hazardous waste, pollutant, oil or petroleum product, or other solid, liquid or gaseous substance that is currently or hereinafter listed, regulated or designated by any state or federal governmental agency as toxic, hazardous or harmful. Assignor makes no representations or warranties to Assignee as to the existence or viability of any such claims, demands or causes of action. Assignee indemnifies and holds Assignor harmless for such claims.

4. Assignee hereby accepts the foregoing assignment of the Intangible Property and hereby assumes all duties and obligations of Assignor with respect to (a) the Intangible Property for the period on and after the date of this Assignment and Assumption Agreement, save and except those relating to reconciliation of expenses of any kind required under the Intangible Property, which shall be for any time period, including time periods prior to the date of this Assignment and Assumption Agreement, and (b) any and all refundable deposits paid by tenants and contractors (and required interest on those deposits, if any) under the Leases and Contracts as of the date hereof, whether Assignee has received those deposits or interest or a credit therefore at Closing or not. Assignee shall defend, indemnify and hold harmless Assignor from and against any and all "Claims" asserted against or incurred by Assignor in connection with (a) any acts or omissions, on or after the date of this Assignment and Assumption Agreement, with respect to the Intangible Property, save and except those relating to reconciliation of expenses of any kind required under the Intangible Property, which shall be for any time period including time periods prior to the date of this Assignment and Assumption Agreement, and/or (b) the deposits and interest assumed by Assignee hereunder. "**Claims**" means claims, demands, causes of action, losses, damages, liabilities, judgments, costs and expenses (including attorneys' fees, whether suit is instituted or not).

Schedule 8.1.1
LEGAL02/44200516v1
Case 3:23-bk-03592 Doc 347 Filed 03/29/24 Entered 03/29/24 12:19:19 Desc Main
Document Page 40 of 50

5.      This Assignment and Assumption Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption Agreement and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the jurisdiction in which the Real Property is located, without regard to the application of choice of law principles, except to the extent such laws are superseded by federal law.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor has signed and delivered this Assignment and Assumption Agreement as of the _____ day of _____, _____.

ASSIGNOR:

_____

By:_____

Print Name:_____

Title:_____

**IN WITNESS WHEREOF**, Assignee has signed and delivered this Assignment and Assumption Agreement as of the _____ day of _____, _____.

ASSIGNEE:

_____

By:_____

Print Name:_____

Title:_____

## SCHEDULE 8.1.8

### Form of Bill of Sale

_____

### BILL OF SALE

_____

_____, a _____, having an address _____ ("**Assignor**"), in accordance with the Asset Purchase Agreement dated effective _____, _____, and in consideration of the sum of Ten Dollars ($10.00) (the sufficiency and receipt of which are hereby acknowledged), does hereby quitclaim unto _____ a _____, having an address of _____ ("**Assignee**"), all of Assignor's right, title and interest in and to all of the furniture, furnishings, fixtures, equipment and other tangible personal property that is now affixed to and/or located at the Real Property described in **_Exhibit A_** and used in connection with the management, operation, or repair of that Real Property (collectively, "**Personal Property**"). This Bill of Sale does not convey any interest in any liquor license.

**TO HAVE AND TO HOLD** the Personal Property unto Assignee and Assignee's heirs, legal representatives, successors and assigns forever.

THE PERSONAL PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS BILL OF SALE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PERSONAL PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE PERSONAL PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS. ASSIGNOR HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE ANY OF THE PERSONAL PROPERTY.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor has signed and delivered this Bill of Sale as of the _____ day of _____, ____.

ASSIGNOR:

_____

By:_____

Print Name:_____

Title:_____

**IN WITNESS WHEREOF**, Assignee has signed and delivered this Bill of Sale as of the _____ day of _____, ____.

ASSIGNEE:

_____

By:_____

Print Name:_____

Title:_____

**Form of Tax Proration Agreement**

---

**TAX PRORATION AGREEMENT**

---

DATE OF CLOSING:     _____

GF. NO.                      _____

PURCHASER:            _____
                             _____
                             _____

SELLER:                   _____
                             _____
                             _____

TITLE COMPANY:      _____
                             _____
                             _____

PROPERTY:              **EXHIBIT A**
                             _____
                             _____
                             _____

   In connection with the closing of the above-captioned property, the undersigned hereby acknowledge and agree (the "**Agreement**") to the following facts regarding the real estate taxes and assessments, personal property taxes, water or sewer charges not based upon consumption, and other governmental charges based upon the Property (collectively, the "**Taxes**"):

   (1)  The proration of Taxes on the Date of Closing was based on the following annual amounts:

   a.  Real Property Taxes
     __/__/__ – __/__/__             <u>$</u>

   b.  Personal Property Taxes
     __/__/__ – __/__/__             <u>$</u>

**TOTAL TAX PRORATION (Credit to Purchaser/Seller):**   <u>$</u>

   (2)  We hereby consent to the Taxes being prorated on the above amounts and we understand and agree that, Purchaser and Seller shall make no further adjustments or re-prorations of taxes post-Closing, including but not limited to, personal property taxes, if any, and any

taxes related to Seller's ownership of the Property, which shall be the liability of the Purchaser unless prorated herein.

(3)     The Purchaser agrees to notify all taxing authorities of the change in ownership of the Property to assure proper receipt of future tax notices.

(4)     All of the provisions of this Agreement shall be binding upon, and inure to the benefit of, the applicable parties and their respective heirs, legal representatives, successors and assigns.

(5)     If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable, at any time or to any extent, then the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

(6)     This Agreement contains the entire agreement between the parties with respect to the proration of Taxes at the Property. There are no promises, agreements, conditions, undertakings, understandings, warranties, covenants or representations, oral or written, express or implied, between them with respect to the proration of Taxes at the Property, this Agreement, or the transaction described in this Agreement, except as set forth in this Agreement.

(7)     This Agreement may not be modified orally or in any manner, except by an agreement in writing signed by Seller and Purchaser (or their respective successors in interest) and, if and to the extent Title Company is to be bound thereby, by Title Company.

*[SIGNATURE PAGES FOLLOW]*

**IN WITNESS WHEREOF**, this Tax Proration Agreement has been signed and delivered as of the _____ day of _____, 20__.

**SELLER:**

_____
_____

By: _____
Name: _____
Title: _____

**IN WITNESS WHEREOF**, this Tax Proration Agreement has been signed and delivered as of the _____ day of _____, 20__.

**PURCHASER:**

_____

_____

By:     _____

Name:   _____

Title:    _____

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.