**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Judge Charles M. Walker |
| | ) | |
| **LEBANON PLATINUM, LLC,** *et al.*, | ) | <u>Case Number</u> |
| | ) | 3:23-bk-03592 |
| Debtors. | ) | |
| | ) | Jointly Administered |

---

**ORDER CONFIRMING DEBTORS'**
**COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN**

---

THIS MATTER CAME BEFORE THE COURT on August 13, 2024 to consider confirmation of the *Debtors' Combined Disclosure Statement and Chapter 11 Plan* (Doc. No. 387) (the "<u>Plan</u>") filed by the Debtors in the above-captioned jointly administered cases (the "<u>Debtors</u>").[1] The Debtors (by and through their authorized representative), counsel for the Debtors, counsel for the United States Trustee (the "UST"), and counsel for creditors Florida Investors G6 LLC ("<u>G6</u>"), BluSky Restoration Contractors, LLC ("<u>BluSky</u>"), TaxCORE Lending, LLC ("<u>TaxCORE</u>"), and certain of the Debtors' hotel licensing partners (the "<u>Franchisors</u>") made appearances at the hearing on confirmation of the Plan (the "<u>Confirmation Hearing</u>").

---

[1] The jointly administered cases are as follows: *In re Cookeville Platinum, LLC*, Case No. 2:23-bk-03589; *In re Destin Platinum, LLC*, Case No. 3:23-bk-03596; *In re Murfreesboro Platinum, LLC*, Case No. 3:23-bk-03599; *In re Platinum Gateway II, LLC*, Case No. 3:23-bk-03597; *In re VMV, LLC*, Case No. 3:23-bk-03598; and *In re Lebanon Platinum, LLC*, Case No. 3:23-bk-03592 (collectively, the "<u>Debtors</u>") with each individually being a "<u>Debtor</u>").

As set forth in the *Confirmation Status Report and Proffer for Plan Confirmation* (Doc. No. 429) (the "Report"), TaxCORE filed a formal objection to confirmation, and the UST, BluSky, and the Franchisors raised informal objections. Each of these objections was resolved prior to the Confirmation Hearing on the terms set forth in the Report. For clarity, the resolution of each of these formal and informal objections is described below and shall be incorporated into the Plan attached to this Order to serve as the confirmed plan in this case.

1.      In response to the objection raised by TaxCORE, Section 4.04 shall be amended to provide that the Class 4 Claim shall be paid in full on the Effective Date, inclusive of all post-petition interest, fees, and charges, and that the Class 4 Claimant shall retain its lien rights against the Debtors' property in the same manner, extent, and priority as it existed prior to the Petition Date pending payment of the Class 4 Claim.

2.      In response to the informal objection raised by the UST, Section 9.06 of the Plan shall be deleted in its entirety. Section 9.14 shall be modified to provide that the injunction referenced therein shall not be permanent, but instead shall be temporary with respect to each Debtor, which injunction shall expire automatically upon the complete liquidation of all property held thereby.

3.      In response to the informal objection raised by the Franchisors, the Plan will be modified as follows:

   a.   Section 3.02 shall be modified to clarify that the post-petition pre-termination fees owed to the Franchisors by each respective Debtor shall be paid in full in the ordinary course of business, and the Franchisors shall not be required to file any application for allowance or payment of administrative claims.

b. Section 7.02(a) shall be modified to clarify that the Franchise Agreements shall terminate at 12:01 a.m. Central Time on the Effective Date, which shall be subject to a separate termination agreement, if so required by the relevant Franchisor, and that the Debtors shall comply with their respective obligations under the Franchise Agreements through termination thereof at 12:01 a.m. Central Time on the Effective Date or such other date as mutually agreed upon by each applicable Franchisor and the Debtors.

c. Section 7.02(b) shall be modified to clarify the procedures related to the temporary license agreements contemplated therein.

d. Section 7.02(c) shall be modified to clarify the de-identification obligations of the Debtors set forth therein.

e. Section 7.02(d) shall be added to authorize each Franchisor—absent any separate temporary or new Franchise Agreement with G6 or its assignee—to (a) stop accepting reservations after entry of the Confirmation Order for any periods after the Effective Date and (b) terminate the reservation system for each Debtor on or after 2:00 p.m. CST on the last business day before the Effective Date.

4. In response to the informal objection of BluSky, in addition to the non-bankruptcy consideration set forth in the Report, this Order shall clarify that confirmation of the Plan shall not impair BluSky's ability to pursue collection of the judgment upon which its claim arises against any other judgment debtor or any person or entity against whom BluSky may have a claim.

5. For clarity, a legal description of the Vacant Lebanon Lots (as defined in the Plan) is attached hereto as Exhibit B. As set forth in the Plan and the DIP Orders (as defined in the Plan),

G6 holds a superpriority first position lien against the Vacant Lebanon Lots for the full balance of the DIP Facility (as defined in the Plan), which totals not less than $560,000.00.

6.      As set forth in the Plan, the Causes of Action transferred to G6 under Section 7.07 of the Plan are deemed transferred to G6 on the Effective Date.

7.      A copy of the Plan that includes these modifications is attached to this Order and shall serve as the confirmed Plan upon entry of this Order.

Counsel for the Debtors proffered that the Plan as modified herein meets the criteria of a plan confirmed under 11 U.S.C. § 1129(b), and the Debtors, by and through their authorized representative, adopted their counsel's proffer made in open court while under oath. The statements of counsel and of the Debtors are incorporated and restated pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      The Plan complies with all applicable provisions of Title 11 in accordance with § 1129(a)(1).

2.      The proponent of the Plan has complied with all applicable provisions of Title 11 in accordance with § 1129(a)(2).

3.      The Plan has been proposed in good faith and not by any means forbidden by law in accordance with § 1129(a)(3).

4.      The Plan provides that any payments for services are reasonable, and either have been approved or are subject to approval by the court in satisfaction of § 1129(a)(4).

5.      The Plan provides that the owners of each respective Debtor will retain their equity interests in the Debtors, though the Debtors shall have no ongoing operations, generate no income, and provide no compensation, whether to insiders or otherwise. Therefore, the Debtors submit that the Plan complies with § 1129(a)(5).

6.      The Plan does not provide for any rate changes required by governmental commissions and therefore § 1129(a)(6) is not applicable.

7.     Each impaired class of claims has accepted the Plan or will receive not less than they would receive if each respective Debtor were liquidated under Chapter 7 in satisfaction of § 1129(a)(7).

8.     The Debtors assert that the Plan satisfies § 1129(a)(8) by contending that each class of claims entitled to vote has accepted the Plan.[2] The Court need not determine whether the Plan complies with § 1129(a)(8) because it is otherwise confirmable under § 1129(b) in either event. Accordingly, the Court declines to find as a matter of law that the Plan complies with § 1129(a)(8).

9.     Priority claims will receive payment in full on the Effective Date in accordance with § 1129(a)(9).

10.    At least one impaired class of claims has accepted the Plan in satisfaction of § 1129(a)(10).

11.    Confirmation is not likely to be followed by liquidation or need for further financial organization of the debtor not otherwise provided for within the Plan (*i.e.,* the Plan is "feasible") and satisfies § 1129(a)(11).

12.    The Plan provides for the payment of all fees due and owing under 28 U.S.C. § 1930 as required by § 1129(a)(12) is not applicable.

13.    The Debtor is not required to provide for retiree benefits under any appliable non-bankruptcy law and therefore § 1129(a)(13) is not applicable.

14.    The Debtor is not required to pay any domestic support obligation by judicial or administrative order or by statute, and therefore § 1129(a)(14) is not applicable.

15.    Based on the resolution set forth above, no holder of an allowed unsecured claim objected to confirmation of the Plan, and therefore § 1129(a)(15) is not applicable. To the extent it were applicable, the Debtors have nonetheless complied with this section by distributing more under the Plan than the Debtors' projected disposable income over five years given that the Debtors will no longer earn income following the Effective Date.

---

[2] The Debtors assert that the Plan is consensual in that it is supported by all non-impaired classes entitled to vote. They contend that Class 1 (priority claims), Class 4 (TaxCORE secured claim), Class 5 (property tax claims), and Class 6 (Growth Capital, LLC's secured claim against Lebanon Platinum, LLC) are unimpaired. They further contend that Class 2, Class 3, Class 7, and Class 10 have accepted the Plan. The only impaired classes that did not vote are Class 8 and 9. Class 8 is the ostensible secured claim of Z-Modular, LLC ("Z-Modular"), against Lebanon Platinum LLC and Cookeville Platinum, LLC. Class 9 is the ostensible secured claim of First National Bank of Tennessee ("FNB") against Platinum Gateway, LLC. As set forth in the Plan, neither Z-Modular nor FNB holds a valid security interest in any estate property, and to the extent they do, their respective secured claims are valued at $0.00 pursuant to 11 U.S.C. § 506(a)(1). Accordingly, each are members of Class 10, which has voted to accept the Plan. Therefore, the Debtors assert that 11 U.S.C. § 1129(a)(8) is satisfied.

16.     All transfers of property under the Plan are to be made in accordance with applicable non-bankruptcy law governing transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust in compliance with § 1129(a)(16).

17.     The Plan satisfies all requirements of § 1129(a) other than § 1129(a)(8), but it is otherwise fair and equitable—and therefore confirmable—under § 1129(b) and shall be confirmed thereunder.

Based on the foregoing, and upon consideration of the sworn testimony of the Debtor and the contents of the confirmation hearing as incorporated by Federal Rule of Bankruptcy Procedure 7052, it is hereby ORDERED that the Plan shall be CONFIRMED pursuant to 11 U.S.C. § 1129(b)(1), subject to the changes addressed at the confirmation hearing and incorporated herein.

A revised copy of the Plan that incorporates the statements above is attached hereto as Exhibit A and shall act as the CONFIRMED PLAN. This Order shall take effect automatically and without further order of this Court upon the absence of any objection to its entry within the time set forth above. In the event an objection is timely filed, the Court shall conduct a hearing on the narrow issue of confirmation of the Plan's provisions as modified herein—but not as to any of the Plan's provisions that are unchanged as a result of this Order—at the date and time set forth above.

As soon as practicable after the entry of this Order, the Debtors' counsel shall serve a copy of this Order by U.S. Mail to each of the Debtor's creditors. Upon service, the Debtors shall file a certificate of service with the Court confirming the service as soon as is practicable thereafter.

---

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
INDICATED AT THE TOP OF THE FIRST PAGE**

---

APPROVED FOR ENTRY:

/s/ Henry E. "Ned" Hildebrand, IV
Henry E. ("Ned") Hildebrand, IV
DUNHAM HILDEBRAND PAYNE WALDRON, PLLC
9020 Overlook Boulevard, Suite 316
Brentwood, TN 37027
615.933.5851
ned@dhnashville.com
*Counsel for the Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Judge Charles M. Walker |
| | ) | |
| **LEBANON PLATINUM, LLC,** *et al.*, | ) | <u>Case Number</u> |
| | ) | 3:23-bk-03592 |
| Debtors. | ) | |
| | ) | Jointly Administered |

---

**DEBTORS' COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN**

---

The above-captioned Debtors (the "Debtors"), pursuant to 11 U.S.C. § 1121, respectfully submit this Combined Disclosure Statement and Plan (the "Plan"). The Plan is designed to liquidate substantially all of the Debtors' bankruptcy estates—other than certain specific encumbered property held by Debtor Lebanon Platinum, LLC—to provide all creditors and parties in interest an amount that is equal to, or in excess of, the amount they would receive or retain if the Debtors were liquidated under Chapter 7 of Title 11. The Plan is intended to provide adequate information pursuant to 11 U.S.C. § 1125, and therefore the Plan shall be considered the disclosure statement in compliance with Federal Rule of Bankruptcy Procedure 3016(b).

**ARTICLE I**
<u>BACKGROUND</u>

A.    <u>Brief History of the Business Operations of the Debtors.</u>

The Debtors are six limited liability companies, each of which operates a single limited-service hotel with less than 100 rooms. The Debtor hotels are part of a larger family of hotels under the umbrella name "Platinum" and operating in Tennessee, Texas, and Florida. These Debtors operate under the following brands in the following locations:

1. **Destin Platinum, LLC**: This Debtor ("Destin Platinum") is currently operating independently as the Evoke Destin Hotel, located at 10861 Highway 98, Destin, FL 32550. However, prior to the Petition Date, this Debtor signed a franchise agreement with Holiday Hospitality Franchising, LLC to open under its new "Voco Hotel and Suites" brand.

2. **Lebanon Platinum, LLC.** This Debtor ("Lebanon Platinum") is a hotel with eighty guest rooms and one meeting room. It operates under a franchise agreement with Hilton Hotels under its "Hampton Inn & Suites" brand. It is located at 1065 Franklin Road, Lebanon, TN 37090.

3. **Cookeville Platinum, LLC.** This Debtor ("Cookeville Platinum") is a hotel with ninety-three guest rooms and one meeting room. It operates under a franchise agreement with Holiday Hospitality Franchising, LLC under its "Holiday Inn Express & Suites" brand. It is located at 1228 Bunker Hill Road, Cookeville, TN 38506.

4. **VMV, LLC.** This Debtor ("VMV") is a hotel with seventy guest rooms. It operates under a franchise agreement with Hilton Hotels under its "Hampton Inn & Suites" brand. It is located at 7211 Garth Road, Baytown, TX 77521.

5. **Murfreesboro Platinum, LLC.** This Debtor ("Murfreesboro Platinum") is a hotel with sixty-nine guest rooms. It operates under a franchise agreement with Marriott International Hotels under its "Fairfield Inn & Suites" Brand. It is located at 175 Chaffin Place, Murfreesboro, TN 37129.

6. **Platinum Gateway, LLC.** This Debtor ("Platinum Gateway") is a hotel with eighty-six guest rooms and one meeting room. It operates under a franchise agreement with IHG Hotels and Resorts under its "Holiday Inn Express" brand. It is located directly adjacent to Murfreesboro Platinum, LLC's hotel at 165 Chaffin Place, Murfreesboro, TN 37129.

Before the Petition Date, the Debtors (like nearly every business in the hospitality space) faced certain operational hurdles arising out of, or exacerbated by, the Covid-19 pandemic. The Debtors struggled to staff the hotels or fill the rooms during this period. They faced layoffs of critical bookkeeping and accounting staff. The Debtors were also unable to access certain government-sponsored funding that they had anticipated receiving. This impacted the Debtors' operations and caused each of the Debtors to fall below the required standards of the franchisor hotel partners. After the initial shutdowns were lifted, Debtors still struggled to hire and retain staff and deal with the effects of inflation.

The Debtors' inability to generate cash operationally had a compounding effect, as Debtors were soon faced with a lack of funds needed for capital maintenance and improvements. The Debtors' franchise agreements generally require significant capital improvements to the hotel properties—both during the term of a franchise agreement and upon conclusion as a condition of extension or renewal—known in the industry as "physical improvements to property," or "PIPs." This jeopardized the Debtors' ongoing relationships with their franchisor partners. Because the franchise relationship is essential to the Debtors' revenue, a termination of a franchise relationship without an alternative plan created a threat to the Debtors' ongoing operations.

The Debtors' day-to-day operational cash constraints eventually cascaded into larger debt issues, leading to the filing of these Chapter 11 cases. Each of the Debtors utilized financing provided by Truist Bank that was cross collateralized across certain of the hotel properties. As the loans approached maturity, the Debtors were not able to negotiate a refinance, either with Truist Bank or another lender. Accordingly, Truist Bank declared a default, then sold the commercial paper to SummitBridge National Investments VIII LLC ("SummitBridge"). SummitBridge then filed a lawsuit and requested appointment of a receiver over the Debtors. This prompted the filing of these cases on an emergency basis.

B.    Post-Petition Operations and Case Progression.

The Debtors filed voluntary Chapter 11 bankruptcy petitions on September 29, 2023. After filing, the Debtors obtained court approval to employ Dunham Hildebrand Payne Waldron PLLC as counsel [Doc. No. 111] and National Hospitality Consulting Group as Restructuring and General Business Advisors (the "CRO") [Doc. No. 137]. The Debtors also continued to work with an independent, third-party hotel management service, Banyan Tree Management, LLC d/b/a Aperture Hotels ("Aperture") to provide day-to-day management and operations at the Debtors' hotels [Doc. No. 138].

On December 27, 2023, after being alerted to the dire cash position by Aperture, the Debtors filed an *Expedited Motion for Order Authorizing the Debtors to (a) Obtain Postpetition Financing on a Senior Secured Super-Priority Basis Pursuant to 11 U.S.C. § 364, and (b) Consolidate their Use of Cash Collateral*

*Utilizing Consolidated Cash Management* (the "DIP Financing Motion") [DE 202]. The DIP Financing Motion stated, in relevant part, that the Debtors required short-term post-petition financing due to the nature of the Debtors' business model and continued operations. The Debtors sought $1,000,000.00 of post-petition financing from a third party, DM Funding, LLC.

On January 8, 2024, the Debtors' senior-secured lender, SummitBridge objected to the DIP Financing Motion, asserting that it was not adequately protected in its position with respect to the Debtors and therefore opposed any postpetition financing that sought to prime its lien position. Recognizing the need for postpetition financing even on potentially harsher terms, the Debtors elected to move forward with the terms proposed by SummitBridge, which offered a line of credit up to $750,000.00 (the "DIP Facility") and which was memorialized by two separate orders authorizing the Debtors to procure postpetition financing through SummitBridge (collectively, the "DIP Orders"). [Doc. Nos. 289, 290]. Among the terms and conditions was a requirement for Destin Platinum, LLC to cross-collateralize SummitBridge's pre-petition Claims with the Destin Property and the Destin Assets. Faced with the option of (a) not receiving post-petition financing, which would cause an immediate cessation of hotel operations, or (b) agreeing to SummitBridge's financing conditions, the Debtors chose the latter to keep the hotels operational. These terms required a rapid repayment of the DIP Facility.

The original maturity date of the DIP Facility — absent a prior termination or acceleration — was May 31, 2024. Even with the DIP Facility, the Debtors require additional cash in order to continue the Debtors' operations and to pay for capital improvements that are needed to maintain each hotel's franchise flag. SummitBridge was unwilling to provide additional financing. Without the ability to obtain those funds while in bankruptcy or otherwise have the support of the senior-secured lender to confirmation of a plan with such Secured Claim satisfied via long-term repayment, the Debtors concluded that a sale of the Hotel Assets was in the best interest of the bankruptcy estate. Accordingly, and in connection with the DIP Facility, the Debtors filed a motion and obtained Court approval for certain auction and sale procedures [Doc. No. 347]. Even while proceeding with the sale process, the Debtors remained steadfast in their position that reorganization would yield a superior return to creditors *if they could procure a lender willing to facilitate such a result* [Doc. No. 313, n. 3].

The Debtors' position changed, however, when their prior proposed lending partner, DM Funding, LLC, pivoted to acquiring the SummitBridge debt. On June 3, 2024, Florida Investors G6 LLC ("G6") filed a notice of *Transfer of Claims Other Than for Security* [Doc. No. 383] in each Debtor's case, evidencing G6's acquisition of the SummitBridge Claims, to include Claim No. 9 (as amended) against Lebanon Platinum, Claim No. 2 (as amended) against VMV, Claim No. 2 (as amended) against Platinum Gateway, Claim No. 2 (as amended) against Murfreesboro Platinum, Claim No. 3 (as amended) against Destin Platinum, Claim No. 2 (as amended) against Cookeville Platinum, and all rights arising under the DIP Facility as against all Debtors [Doc. Nos. 270, 289, 290] (collectively, G6's acquired Claims will be referred to as the "G6 Claims").

Debtors' ability to find long-term takeout financing has effectively evaporated. Since G6's acquisition of the G6 Claims, the Debtors and their professionals have worked diligently with G6 and its professionals to arrive at a resolution and plan that maximizes the value of the estate for unsecured creditors <u>and</u> avoids further protraction of these jointly administered bankruptcy cases. Instead, Debtors' options are either a lengthy, uncertain sale process, or the liquidating mechanisms proposed herein, with a certain recovery for the Debtors' unsecured creditors and payment in full of priority and administrative Claims.

C.    <u>Summary of Plan</u>. As explained in more detail below, the Debtors intend to transfer title to all hotel assets, including the real property, the improvements, and the personalty located thereon upon which the Debtors operate their hotels, as well as any and all causes of action the Debtors may have, including Avoidance Actions, to G6 in full satisfaction of all G6 Claims other than the first position

superpriority lien securing the DIP Facility. The DIP Facility liability shall remain as a cross-collateralized encumbrance against all remaining property of the Debtors, to specifically include the vacant parcels of land owned by Lebanon Platinum. In exchange, the Debtors shall fully fund—both with their own receivables and cash (which constitute G6's collateral) and with a substantial new infusion of cash from G6—immediate payments on the Effective Date of the Plan, which will ensure (a) payment in full to all administrative expense holders, taxing authorities, and other priority claimants and (b) a guaranteed fund for each Debtor reserved exclusively for each's general unsecured creditor class. Specifically, and as set forth in more detail below, the general unsecured creditors of each Debtor *other than Destin Platinum* shall receive a guaranteed pool of $30,000.00. The unsecured creditors of Destin Platinum shall receive a guaranteed pool of $325,000.00 due to the negotiated Destin Waterfall specifically reserved in the DIP Orders.

This Plan removes the uncertainty of recovery to administrative expense claimants, priority creditors, and general unsecured creditors. It guarantees a definite and immediate payment rather than a speculative potential recovery—one that the Debtors' professionals confirm would almost certainly not occur under any other scenario, whether conversion, third-party sale, or foreclosure following stay relief. The Debtors provide additional information to confirm why this Plan is in the best interest of all creditors through their Liquidation Analysis below.

        D.     <u>Liquidation Analysis</u>. To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such Claim and equity interest holders would receive in a chapter 7 liquidation. As this Plan calls for a sale and liquidation of substantially all of the Debtors' assets without incurring broker or auctioneer costs, or any additional Chapter 7 related costs, this Plan meets that test. The Debtors refer creditors to the Liquidation Analysis attached hereto as **Exhibit 1**, which provides additional clarity and support for the Debtors' position that this Plan is in the best interest of creditors.

The Debtors' assets fall within four broad categories: Hotel Assets, effective date cash, miscellaneous Causes of Action (including any Avoidance Actions), and certain unimproved real estate owned by Lebanon Platinum.

        **i.**        **Hotel Asset Analysis**

The largest and most significant asset of the Debtors is their hotel assets, which include the real estate upon which each hotel sits, the hotel improvements themselves, and the personalty located within the hotels (collectively, the "Hotel Assets"). The Hotel Assets are secured by the G6 claims, which are cross-collateralized against each Debtor's Hotel Assets (subject to the Destin Waterfall discussed below).

Pursuant to appraisals completed by LW Hospitality Advisors as of November 2023, which SummitBridge provided to G6 upon its transfer of the G6 Claims thereto (the "Hotel Appraisals"), the Debtors' Hotel Assets have the following liquidation values and the following associated cross-collateralized debt *excluding* the first-position lien on all of the Debtors' assets that secures the DIP Facility (the "Prepetition G6 Claims") and the various liens and priority claims arising from unpaid hotel use and occupancy taxes and real property taxes:[1]

---

[1] As set forth in the Liquidation Analysis, any personalty on site at each of the Debtor's hotels has no material liquidation value. Under the terms of the Debtors' respective franchise agreements, each Debtor is required to use the branded goods of the particular franchise partner. Any purchaser of any hotel property would not have any use for the personalty presently located thereon—such buyer would be required to furnish the hotel with new furniture and other design requirements pursuant to the franchisor's required property improvement plan, or "PIP."

**Platinum Gateway:**

      Liquidation Value:    $3,330,000.00
      Prepetition G6 Claim:    $4,743,967.46

**Murfreesboro Platinum:**

      Liquidation Value:    $2,070,000.00
      Prepetition G6 Claim:    $4,495,450.45

**Lebanon Platinum**:

      Liquidation Value:    $5,600,000.00
      Prepetition G6 Claim:    $6,286,545.85

**Cookeville Platinum:**

      Liquidation Value:    $6,300,000.00
      Prepetition G6 Claim:    $5,402,929.11

**VMV:**

      Liquidation Value:    $2,200,000.00
      Prepetition G6 Claim:    $4,207,687.64

**Destin Platinum:**

      Liquidation Value:    $7,400,000.00
      Prepetition G6 Claim:    $7,036,527.69

Thus, the total liquidation value of the Debtors' real estate and hotel assets is $28.5 million, excluding the costs of a sale and satisfaction of priming tax liens, priority tax claims, and administrative expenses to any Chapter 7 trustee and other professionals. Pursuant to the Proofs of Claim filed by SummitBridge, as assigned to G6, the total pre-petition amount due to G6 on a senior secured basis is $27.9 million. After adding in the accrued post-petition interest on the Prepetition G6 Claims, the balance as of June 28, 2024 exceeds $32.1 million. When considering the costs of sale and satisfaction of priority claims, no unsecured creditor would receive any distribution in a liquidation of the Hotel Assets.

    **ii.**      **Effective Date Cash Analysis**

All of the Debtors' cash and accounts receivable are proceeds generated from the operation of the Hotel Assets and constitute G6's cash collateral. Moreover, to the extent this cash could be deemed not to constitute G6's cash collateral, the DIP Order expressly grant G6 a superpriority administrative expense claim thereagainst. All of the Effective Date cash—which the Debtors estimate totaling approximately $1,350,000.00—is fully encumbered by the G6 Claims and therefore will provide no distribution to any other creditors, and certainly not (a) payment in full of all secured and priority creditors and (b) $475,000.00 collectively to the general unsecured creditors other than G6 as a deficiency unsecured creditor.

### iii.    Cause of Action Analysis

The third relevant asset of the Debtors is the potential Avoidance Actions that each may have against the other, or against non-debtor Platinum Management Services ("PMS") arising from the Debtors' pre-petition Zero Balance Accounts ("ZBAs") managed by PMS. These causes of action have no value to the estate.

First, the estate is administratively insolvent. It lacks the ability to fund the pursuit of speculative Avoidance Actions. Any post-petition cash on hand that could otherwise be used to fund such avoidance actions is cash collateral of G6 and cannot be used by the estate to pursue such claims. As such, a chapter 7 trustee would not pursue these claims given each estate's administrative insolvency.

Second, the relevant transferees have several possible defenses, to include that each was an intermediary/not a beneficiary of the transfers, that the transfers occurred in the ordinary course of business, and that the transfers were in exchange for new value, among others. Moreover, PMS—one of the potential Avoidance Action defendants—was not merely a ZBA clearing house account. It was the entity responsible for hotel management, and it was compensated accordingly. The Debtors have serious concerns that any avoidance action lawsuit would be successful against any relevant transferee.[2]

Third, the Debtors have reason to believe that the ability to collect from PMS or any other potential avoidance action defendant is relatively low under the circumstances. The financial and insolvency issues facing the Debtors are not unique to the other hotels within Platinum family. All of the hotels with common ownership to the Debtors are struggling to pay their debts as they come due. The Debtors do not anticipate any recovery even if a trustee could procure a judgment against a defendant.

Fourth, any recovery on any avoidance actions would first have to satisfy all priority claims, including administrative expenses and unpaid use and occupancy taxes, then would have to be shared amongst the entire class of unsecured creditors, which G6 would swallow via its unsecured deficiency on the cross-obligated Prepetition G6 Claims and the outstanding DIP Facility liability. Any money collected on any avoidance actions would result in a nominal distribution to any general unsecured creditor other than G6 as a deficiency unsecured creditor.

### iv.    Unimproved Land (the Vacant Lebanon Lot)

The fourth relevant asset belongs exclusively to Lebanon Platinum. While the only real estate owned by the other Debtors is the land upon which each's Hotel Asset sits, Lebanon Platinum is the titled owner of two adjacent unimproved vacant parcels of land (collectively, the "Vacant Lebanon Lots"). The Hotel Appraisal performed by LW Hospitality Advisors values the Vacant Lebanon Lots at $1,600,000.00.

The Vacant Lebanon Lots are underwater, however. Pursuant to the DIP Orders, G6 holds a superpriority first position lien against the Vacant Lebanon Lots for the full balance of the DIP Facility— which totals not less than $560,000.00.[3] Growth Capital, LLC holds a subordinate secured claim against

---

[2] As set forth in each Debtor's *Amended Statement of Financial Affairs* (Cookeville Doc. No. 67; Destin Doc. No. 65; Murfreesboro Doc. No. 63; Gateway Doc. No. 69; VMV Doc. No. 63; Lebanon Doc. No. 355), NHCG—the Debtors' independent restructuring advisory firm—has concluded that the information derived from the Debtors' general ledgers is facially and mathematically impossible, and it should not be relied upon in conducting any avoidance action analysis.

[3] The Debtors are presently unaware of the present balance of the DIP Facility. However, the DIP Facility provided a principal advance of $410,000.00. When considering the 15% contract interest rate, the 24% default interest rate, the

the Vacant Lebanon Lots for $1,000,000.00. Given the costs of sale and other administrative expenses required to adequately protect these lienholders, and the fact that any equity that could conceivably exist would be promptly eroded by the unpaid and accruing interest on these claims, the Vacant Lebanon Lots would be abandoned in any chapter 7 case as burdensome or inconsequential. They will not provide any recovery to any creditors other than the lienholders provided for herein.

For the foregoing reasons, the Debtors contend that the best interests of creditors test under 11 U.S.C. § 1129(a)(7) is met by this Plan.

**ARTICLE II**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

2.01    Class 1. This class shall consist of all Allowed Claims entitled to priority under §507(a) of the Code (except administrative expense Claims under § 507(a)(2), and priority tax Claims under § 507(a)(8)).

2.02    Class 2. This class shall consist of the Prepetition G6 Claims with respect to each Hotel Asset to the extent Allowed as a Secured Claim under § 506 of the Code. This Class is Impaired under the Plan.

2.03    Class 3. This class shall consist of the secured claim of G6 arising from the superpriority lien securing the DIP Facility to the extent Allowed as a Secured Claim under § 506 of the Code (the "DIP Claim"). This Class is Impaired under the Plan.

2.04    Class 4. This class shall consist of the Claim of TaxCore against VMV to the extent Allowed as a Secured Claim under § 506 of the Code. This Class is not Impaired under the Plan.

2.05    Class 5. This class shall consist of the Claims of the various other property tax creditors of each Debtor, including but not limited to the City of Cookeville (Cookeville Platinum, POC 9), Wilson County Trustee (Lebanon Platinum, POC 5-8), Rutherford County Trustee, City of Murfreesboro (Murfreesboro Platinum, POC 7-9, 11; Platinum Gateway, POC 7-10), and any other claimant asserting a claim to any real or personal property tax liability secured on any of the Debtors' assets by operation of law. This Class is not Impaired under the Plan.

2.06    Class 6. This class shall consist of the Claim of Growth Capital, LLC against certain assets of Lebanon Platinum. This Class is not Impaired under the Plan.

2.07    Class 7. This class shall consist of the Claims of holders of unsecured Claims against Destin Platinum, pursuant to the "Carve-Out" set forth in Page 18, Paragraph 16 of the Order approving the DIP Facility [Doc. No. 289]. This class is Impaired under the Plan.

2.08    Class 8. This class shall consist of the allegedly secured Claims of Z-Modular, LLC alleged against Lebanon Platinum and Cookeville Platinum. This class is Impaired under the Plan.

2.09    Class 9. This class shall consist of the allegedly secured Claim of First National Bank of Tennessee against Platinum Gateway. This Class is Impaired under the Plan.

---

commitment fee, the exit fee, and the attorney's fees incurred—all of which remain unpaid—the balance could not reasonably be less than $560,000.00 (and is likely substantially greater).

2.10    Class 10. This class shall consist of the Claims of all non-priority unsecured creditors of the Debtors not expressly included in the definition of any other class. This Class is Impaired under the Plan. This class includes, without limitation, Claims arising out of the rejection of any executory contract or unexpired lease, each Allowed Claim secured by a lien on property in which the Debtors have an interest to the extent that such Claim is determined to be unsecured pursuant to 11 U.S.C. § 506(a), or unsecured by way of avoidance pursuant to 11 U.S.C. § 522(f), and each such Claim of the class described in 11 U.S.C. § 507(a), to the extent that the Allowed amount of such Claim exceeds the amount which such Claim may be afforded priority thereunder.

2.11    Class 11. This class consists of the equity interests in the Debtors and the Claims of insiders against Debtors. This class is Impaired under the Plan.

## ARTICLE III
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND, AND COURT FEES

3.01    Unclassified Claims. Pursuant to § 1123(a)(1), administrative expense Claims Allowed under §507(a)(2) and priority tax Claims under § 507(a)(8) are not in a class.

3.02    Administrative Claims. Except as otherwise provided under the Plan, each holder of an administrative expense Claim Allowed under § 503 of the Code will be paid in full for any approved administrative expense Claims on the later of the Effective Date or the date on which the applicable administrative expense Claim becomes Allowed. All applications for payment of administrative Claims must be filed within ninety (90) days after the Effective Date, including all Claims for professional fees for approved professionals in this case. Notwithstanding the above, the post-petition pre-termination fees owed to the Licensors (defined in Section 7.02 below) shall be paid in full and in the ordinary course, and the Licensors shall not be required to file any application for their administrative claims.

3.03    Priority Tax Claims. With respect to a Claim of a kind specified in § 507(a)(8), the holder of such Claim will receive payment in full on the Effective Date. These Priority Tax Claims include the following:

    a.      Cookeville Platinum – Tennessee Department of Revenue [POC 1];
    b.      Destin Platinum – Florida Department of Revenue [POC 9 and 10].
    c.      Lebanon Platinum – Tennessee Department of Revenue [POC 4];
    d.      Murfreesboro Platinum – Tennessee Department of Revenue [POC 1];
    e.      Platinum Gateway - Tennessee Department of Revenue [POC 1].

3.04    Post-Confirmation Tax Claims. All tax Claims that are incurred after Confirmation shall be payable when due under applicable non-bankruptcy law.

## ARTICLE IV
## TREATMENT OF CLAIMS, LIENS AND INTERESTS UNDER THE PLAN

4.01    Class 1 - Priority Claims Other Than Priority Tax Claims. Each person or entity holding a Class 1 Claim shall be paid the Allowed Amount of such Claim in cash, in full, on the latest of: (i) the Effective Date; (ii) the date such Claim is Allowed by Final Order; or (iii) the date such payment is due under applicable law. Each Contested Priority Claim shall become an Allowed Priority Claim only upon entry of, and only to the extent such Claim is Allowed by, a Final Order. If any Allowed Priority Claims are not paid in cash in full on the latest of (i) the Effective Date; (ii) the date a Contested Priority Claim is Allowed in whole or in part by Final Order; or (iii) the date such payment is due under applicable law, then

the unpaid portion of such Allowed Priority Claims shall bear interest from the Effective Date until the date of payment at the Legal Rate. The Debtor is not aware of any Claimants in this class.

4.02    **Class 2 – Secured Prepetition Claim of G6.** The Class 2 Claim shall be deemed fully satisfied by the titled transfer of the Hotel Assets to G6 on the Effective Date pursuant to 11 U.S.C. § 1142 as the indubitable equivalent of the G6 Claims pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), which transfer shall include all of the protections of 11 U.S.C. §§ 363(f) and (m) and be free and clear of any and all liens, claims, encumbrances, and interests to the fullest extent permitted by applicable bankruptcy law, and specifically including any tax liens or claims and any successor liability claims. The transfer of the Hotel Assets provided under this Plan shall be in lieu of foreclosure on the Hotel Assets by G6 and is in excess of the amount which G6 would be authorized to credit bid at any sale, foreclosure or otherwise. As set forth in Section 1(D) above, the Prepetition G6 Claims are in excess of the value of the Hotel Assets, but the Prepetition G6 Claims shall otherwise be deemed Allowed in full and fully satisfied by the transfer called for by the Plan, such that the Prepetition G6 Claims shall not be considered a part of any other class under this Plan. This Class shall *not* include, however, any portion of Debtors' collective liability on the DIP Claim, which treatment shall be separately classified under the Plan. The Debtors and G6 may execute such documents post-confirmation as may be necessary to effect the transfer of title to the Hotel Assets in satisfaction of the Class 2 Claim, including but not limited to asset purchase agreements, deeds, bills of sale, or other instruments, without further approval of the Court.

4.03    **Class 3 – Secured Post-Petition DIP Claim.** The Class 3 Claim shall be paid by a single, lump-sum payment of all principal, interest, fees, charges, and other sums due thereunder in accordance with the DIP Orders or any other documents executed to memorialize the DIP Facility on or before September 1, 2025 in full satisfaction of the Debtors' liability thereunder. The Class 3 Claim shall retain its super-priority first-position secured status on the Debtors' assets as provided under the DIP Orders to secure the Debtors' performance of its obligations hereunder, including but not limited to its first position lien against the Vacant Lebanon Lots.

4.04    **Class 4 – Secured Claim of TaxCore.** The Class 4 Claim consists of the Secured priority Claim of TaxCore against VMV. The Class 4 Claim shall be paid, in full, on the Effective Date. For clarity, the Class 4 Claim shall include all post-petition fees, interest, and charges owed thereon, and the Class 4 Claimant shall retain its lien rights against the Debtors' property in the same manner, extent, and priority as it existed prior to the Petition Date pending payment of the Class 4 Claim.

4.05    **Class 5 – Secured Claims of Property Tax Creditors.** The Class 5 Claims consist of the Secured priority Claims of the various property tax creditors of each Debtor, including but not limited to the City of Cookeville (Cookeville Platinum, POC 9), Wilson County Trustee (Lebanon Platinum, POC 5-8), Rutherford County Trustee, City of Murfreesboro (Murfreesboro Platinum, POC 7-9, 11; Platinum Gateway, POC 7-10), and any other claimant asserting a claim to any real or personal property tax liability secured on any of the Debtors' assets by operation of law. The Class 5 Claims shall be paid, in full, on the Effective Date.

4.06    **Class 6 – Secured Claim of Growth Capital.** The Class 6 Claim consists of the Claim of Growth Capital, LLC against Lebanon Platinum, which amount was secured pre-petition by a lien on Vacant Lebanon Lots. The Growth Capital lien was primed by application of the DIP Orders. Lebanon Platinum shall continue to service the Class 6 Claim under non-bankruptcy terms in the ordinary course of business, which shall be interest-only payments until maturity in August 2025 via contributed funds from Lebanon Platinum's equity holders or other unsecured lenders in the ordinary course of business post-petition.

4.07     Class 7 – Allowed Unsecured Claims against Destin Platinum. This Class consists of the holders of Allowed Unsecured Claims against Destin Platinum. The Class 7 Claimants shall be entitled to a *pro rata* payment of $325,000 on the Effective Date, of which no portion shall be allocable or recoverable to pay for any portion of the G6 Claims, including any liability arising under the DIP Facility.

4.08     Class 8 – Allowed Secured Claim of Z-Modular. This class shall consist of the disputed Claims of Z-Modular asserted against certain real property owned by Lebanon Platinum and Cookeville Platinum to the extent Allowed as a secured Claim under § 506 of the Bankruptcy Code. The Class 8 Claimant has filed proofs of Claim against Lebanon Platinum and Cookeville Platinum alleging a lien in certain assets of the Debtors. However, the Class 8 Claimant specifically released its ostensible lien against the assets of Lebanon Platinum via instruments of record with the Wilson County, Tennessee Register of Deeds, Instrument Nos. 20734875 (12/30/2020) and 23101988 (02/02/2023) and against the assets of Cookeville Platinum via instrument of record with the Putnam County, Tennessee Register of Deeds, Instrument No. 250729 (12/30/2020). Moreover, and notwithstanding the fact that Z-Modular does not have a perfected lien, the assets of Debtors have no value to support a secured Claim pursuant to 11 U.S.C. § 506. Therefore, while the Debtors dispute the validity of the liability ostensibly giving rise to the Class 8 Claim and the secured status of the Class 8 Claim, the Class 8 Claimant will be treated as a secured creditor under the Plan in the amount of **$0.00**. Any Allowed Claim of the Class 8 Claimant will be treated in the general unsecured class under this Plan. Confirmation of the Plan shall act as an avoidance of any lien rights held by Z-Modular pursuant to 11 U.S.C. § 506(d).

4.09     Class 9 – Allowed Secured Claim of First National Bank of Tennessee. This class shall consist of the Claims of First National Bank of Tennessee to the extent Allowed as a secured Claim under § 506 of the Bankruptcy Code. The Class 9 Claimant has filed a proof of Claim against Platinum Gateway [POC No. 3] alleging a lien in certain assets of the Debtor. However, based on the proof of claim filed by the Class 9 Claimant, the lien ostensibly securing the Class 9 Claim is against real property owned by a non-debtor, Platinum Gateway I, LLC—the notation on the proof of claim indicates that property owned by Platinum Gateway has been released as collateral securing the Class 9 Claim. This alone renders the Class 9 Claim wholly unsecured. Furthermore, and notwithstanding the fact that the Class 9 Claimant has recorded a release of said lien, the assets of Debtors have no value to support a secured Claim pursuant to 11 U.S.C. § 506 even if the Class 9 Claim were secured on property of Platinum Gateway's bankruptcy estate. Therefore, the Class 9 Claimant will be treated as a secured creditor under the Plan in the amount of **$0.00**. Any Allowed Claim of the Class 9 Claimant will be treated in the general unsecured class under this Plan. Confirmation of the Plan shall act as an avoidance of any lien rights held by First National Bank of Tennessee pursuant to 11 U.S.C. § 506(d).

4.10     Class 10 – General Unsecured Claims against all Debtors other than Destin Platinum. This Class consists of all Allowed Unsecured Claims against any of the Debtors, other than those Claims that are separately classified. On the Effective Date, each Class 10 Claimant shall be entitled to a *pro rata* distribution of $30,000.00 from each applicable Debtor against whom it holds a Claim. For clarity, no portion of the funds for distribution on the Class 10 Claims shall be allocable or recoverable to pay for any portion of the G6 Claims, including any liability arising under the DIP Facility.

The Class 10 Claimants shall be entitled to payment only after their Claim becomes an Allowed Claim. Upon entry of a Final Order creating an Allowed Claim from a Disputed Claim, the Class 10 Claimants shall be paid promptly the total amount of installment payments that would have been due on their Claims if they had been Allowed as of the Effective Date.

4.11     Class 11 – Ownership Interests. This Class consists of all Claims held by insiders of the Debtors, which Claims shall be Allowed in full. Debtors shall make no distributions to any holders of Claims in this Class. This Class further consists of the ownership interests in Debtors held as of the Petition

Date. In consideration of retention of these ownership interests, the Debtors' current equity holders shall waive all affirmative rights to payment on all member loans and other amounts that might be due from Debtors.

4.12    Proof of Claim Controls Over Amount Scheduled by Debtor. The amount listed on a timely filed proof of Claim (subject to allowance of the Claim) shall control over any contrary amount listed in the Debtor's schedules and deemed filed pursuant to 11 U.S.C. § 1111(a).

4.13    Classes 1 and 4 through 6 are not Impaired under the Plan. All other classes are Impaired.

4.14    Classes 2, 3, and 7 through 9 are entitled to cast ballots on this Plan.

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Objection to Claims. The Debtors or any party in interest may file an objection to any Claim in any class on or before the later of (a) 90 days after the entry of a Confirmation Order, or (b) the date on which the Debtor files a Motion for Final Decree pursuant to 11 U.S.C. § 350. Objections not filed within such time will be deemed waived. If any Claim or portion thereof is challenged by an objection, the Claim shall be treated as a disputed Claim.

5.02    Disputed Claim. A disputed Claim is Claim that has not been Allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of Claim has been filed or deemed filed, and the Debtor, or another party in interest has filed an objection; or (ii) no proof of Claim has been filed, and the Debtor has scheduled such Claim as disputed, contingent, or unliquidated.

5.03    Delay of Distribution on Disputed Claims. No distribution will be made on account of a disputed Claim unless such Claim is Allowed by a final non-appealable order. Notwithstanding this delay of distribution on disputed Claims, distribution may, in the Debtor's sole discretion, be made on any portion of such disputed Claim which is undisputed, pending resolution of the Claim allowance as a whole.

5.04    Settlement of Disputed Claims. The Debtor will have the power and authority to settle and compromise a disputed Claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. Following Confirmation and closing of the case, the Debtor shall retain the authority to settle and compromise Claims with consent of the settling Claimholder, and without the need for Court intervention or approval.

5.05    Distribution Address and Mailing Method. Any distribution or payment to a creditor shall be sent by first class mail to the creditor's address indicated on the proof of Claim filed by that creditor in these Bankruptcy Cases or, if no proof of Claim has been filed, to that creditor's most recent address indicated on Debtors' Schedules or known to Debtors. If a creditor holds an Allowed Claim by virtue of a transfer of such Claim pursuant to Rule 3001 of the Federal Rules of Bankruptcy Procedure, then distributions to the holder of such Claim shall be sent to the address set forth in evidence of the transfer filed with the Bankruptcy Court. Claimants may change the address to which distributions are sent through amendment of their proof of Claim or written notice delivered to Debtor's counsel. Claimants are responsible for keeping Debtor (and Trustee, where applicable) informed of their current address for receipt of distributions or other payments under this Plan.

5.06    Claims Subject to Insurance Coverage. With respect to any Claim for which Debtors have insurance coverage, the Claim will be treated as an Allowed Claim only to the extent that the holder of the

Claim can establish that such Claim is not recoverable to any extent under the applicable Debtor's insurance. Unless the holder obtains a Final Order establishing that the Claim is not recoverable to any extent under such Debtor's insurance, such Claim is automatically disallowed and will be entitled to no distribution.

        5.07    <u>Precluded Distributions</u>. No distribution shall be made in violation of Bankruptcy Code § 502(d) to an Entity or transferee liable for recoverable property for an avoidable transfer. Debtors shall notify each affected creditor of any contention that Bankruptcy Code § 502(d) prohibits any distribution to such creditor. If such notice is given, the Claim held by such creditor will be treated as a Disputed Claim hereunder.

        5.08    <u>Treatment of Contingent or Unliquidated Claims</u>. Until such time as a contingent Claim becomes fixed and Allowed, such Claim shall be treated as a Disputed Claim for purposes related to voting, allowance, and distributions under this Plan. Upon request of Debtor or any other party in interest, the Bankruptcy Court shall, in a summary proceeding for each such contingent Claim or unliquidated Claim, by estimation determine the allowance of each such contingent or unliquidated Claim for purposes of voting on this Plan.

        5.09    <u>Payment Dates</u>. Unless specifically stated otherwise herein, with respect to any treatment under this Plan that provides for installment payments, the first such installment shall commence on or before the first business day of the calendar month commencing with the Effective Date. Whenever any payment or distribution to be made under this Plan (installment or otherwise) shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the next business day.

        5.10    <u>No Tax or Filing Fee</u>. No governmental entity may tax any transfer of property pursuant to or in furtherance of this Plan or charge any tax or fee for the recording of, any release, deed, transaction, or other document executed pursuant to or in furtherance of this Plan.

        5.11    <u>No Interest or Attorney's Fees</u>. Except as expressly provided for in this Plan, or Allowed by the Court, no interest, penalty, late charge, or attorney's fees is to be Allowed on any Claim subsequent to the Petition Date.

        5.12    <u>Voiding of Liens</u>. Except for liens otherwise specifically provided to be retained under this Plan, Confirmation will void pursuant to § 506(d) all liens in excess of the Allowed Secured Claims

**ARTICLE VI**
<u>CONFIRMATION AND DISCHARGE</u>

        6.01    <u>Confirmation.</u> Confirmation of this Plan shall not occur unless the Court determines that it satisfies 11 U.S.C. § 1129.

        6.02    <u>Final Decree.</u> At such time as this case has been fully administered, that is, when all administrative matters or issues requiring action or resolution by the Court have been completed or resolved, the Confirmation Order has become a Final Order, and the Court authorizes the disbursement of any net proceeds in connection with a sale of the Property, the case may be closed. To close the case, the Debtor shall file a Motion for Final Decree as soon as practicable following Consummation. The Debtor shall continue to pay U.S. Trustee quarterly fees until the Final Decree is entered.

        6.03    <u>Effective Date.</u> The Effective Date of this Plan shall be September 1, 2024, or such other date as the Court may order under any amendment or modification to this Plan.

# ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE PLAN

      7.01    <u>Executory Contracts and Unexpired Leases</u>. Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the Effective Date or expressly assumed under this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the Effective Date. Any creditors that believe they hold Claims with respect to contracts rejected hereunder shall file a proof of Claim on or before thirty (30) days following the Effective Date. Any such timely filed Allowed Claims will participate in the distribution for unsecured creditors set out within the Plan.

      7.02    <u>De-Identification Procedures Following Rejection of Franchise Agreements</u>.

          a.    <u>Effective Date Rejection and Termination</u>. In conjunction with the rejection of all executory contracts on the Effective Date, the franchise agreements (each a "License Agreement" and collectively, the "License Agreements") between the Debtors and their respective hotel flag franchisors, Holiday Hospitality Franchising, LLC, Marriott International, Inc., Hilton Franchise Holding, LLC, and HLT Existing Franchise Holding LLC (each a "Licensor" and collectively, the "Licensors") shall be deemed automatically terminated as of 12:01 a.m. Central Time on the Effective Date, or such other date as mutually agreed upon by each applicable Licensor and the Debtors, with such termination additionally subject to, and governed by, the terms of a separate termination agreement, if so elected and required by the applicable Licensor, in a form mutually acceptable to the Debtors and the applicable Licensor. Through 12:01 a.m. Central Time on the Effective Date, the Debtors shall comply with all monetary and non-monetary post-petition obligations imposed under the License Agreements, and the Debtors shall pay each Licensor all amounts which are or will become due by the Debtors under the applicable License Agreement from the Petition Date through the Effective Date.

          b.    <u>Temporary License Agreement</u>. Notwithstanding the foregoing, following the acquisition of the Hotel Assets on the Effective Date by G6 or its designee (the "Hotel Asset Transferee") as set forth herein, the Hotel Asset Transferee may, at its sole cost an expense, make application to the applicable Licensor for approval to continue to operate any or all of the Hotel Assets under either any of the existing License Agreements on a temporary basis, or under new license agreements (both being defined herein as a "New License Agreement"), pursuant to an agreement with the applicable Licensor thereof, which New License Agreement the applicable Licensor may either accept or reject in its sole discretion. If the Hotel Asset Transferee elects to apply for such approval from a Licensor, the Hotel Asset Transferee agrees to timely provide all applications, documents, fees and charges reasonably requested by the Licensor to consider whether or not to approve the New License Agreement in Licensor's sole and absolute discretion.

          c.    <u>De-Identification</u>. On the Effective Date, the Hotel Asset Transferee—in conjunction with its acquisition of the Hotel Assets—shall perform and satisfy all post-termination

non-monetary obligations, including de-identification obligations, of each Debtor under the respective License Agreements with each respective Licensor (the "De-Identification Obligations") in the event the Hotel Asset Transferee does not obtain a New License Agreement to become effective contemporaneously with the Effective Date or such other date as mutually agreed upon pursuant to Section 7.02(a). The Hotel Asset Transferee shall be solely responsible for all expenses and liabilities incurred in connection with the De-Identification Obligations. Notwithstanding the foregoing, nothing in the Plan or in any order confirming the Plan shall prevent or limit any Licensor from enforcing all de-identification obligations of the Debtors pursuant to any License Agreement, nor shall it operate to modify, waive, or release the Debtors from (i) any de-identification or other obligations under the applicable License Agreement, or (ii) any continuing or surviving obligations and post-termination monetary obligations of the applicable Debtor or any continuing or surviving rights of the applicable Licensor under the applicable License Agreement or any termination agreement with the applicable Licensor, including but not limited to any and all indemnification obligations. Moreover, to the extent the terms of the Plan or any order confirming the Plan and the terms of any License Agreement with any Licensor, including any de-identification provisions, are inconsistent, the terms of the relevant License Agreement shall control and govern. Nothing in the Plan or any order confirming the Plan shall limit, impair or otherwise affect the applicable Licensor's rights to pursue damages against the Debtor, the Hotel Asset Transferee, or any other third-party, arising from any unauthorized use of such Licensor's intellectual property related to the applicable Hotel Asset.

d.  <u>For any Hotel Asset to which it is determined, by the applicable Licensor in its sole discretion, that there will be no New License Agreement, then upon the earlier of (i) the confirmation of this Plan, or (ii) such determination by the applicable Licensor, the current Licensor on that respective Hotel Asset may (a) stop taking reservations for any date that is on or after the estimated Effective Date of the Plan (i.e. September 1, 2024), and (b) may, as of 2:00 p.m. Central Time on the last business day before the Effective Date, terminate the reservation system for the relevant Hotel Asset(s) and perform all other actions that are taken by the respective Licensor in the ordinary course of a hotel license termination.</u>

    <u>7.03</u>    <u>Payments by G6.</u> As consideration for G6's acquisition of the Debtors' collective Causes of Action, including the Avoidance Actions (as further described herein), G6 shall fund all payments (or consent to the Debtor's use of G6's collateral—including cash collateral—to partially or fully fund payments) called for or arising out of out of this Plan, including all payments of Allowed Administrative Expense Claims, all payments on account of Priority Tax Claims, and all payments due to Classes 4, 5, 7, and 10 as set forth herein. The Debtors submit that, in light of the administrative insolvency of the estates, G6's undersecured status, the possible defenses to be raised by Avoidance Action defendants, and the low likelihood of meaningful recovery, G6's agreement to fund the Plan is fair and reasonable to all parties in interest and should be Allowed pursuant to, among other Code provisions, 11 U.S.C. § 363(b) and 1142.

    <u>7.04</u>    <u>Transfer of Hotel Assets to G6.</u> On the Effective Date, the Debtor shall transfer the Hotel Assets to the Class 2 Claimant as the indubitable equivalent of, and in full satisfaction of, the Class 2 Claims and shall promptly thereafter execute such documents deemed necessary for the Class 2 Claimant to exercise its rights therein, including but not limited to deeds, asset purchase agreements, bills of sale, or other instruments reasonably required by G6 to effect the Plan. The transfer of the Hotel Assets as set forth in this Plan shall be free and clear of all liens, encumbrances, and interests, without recourse against the Debtor or any Secured Claimant, to include their members, officers, agents, employees, agents, assigns,

representatives, and professionals. G6 shall be entitled to all of the protections of 11 U.S.C. §§ 363(f) and (m). In the alternative, the Class 2 Claimant shall have the option, at its sole discretion, of proceeding with a foreclosure sale and/or pursuing other remedies available to it under the operative loan documents and/or applicable state law. In the event the Class 2 Claimant elects to proceed with a foreclosure sale or other remedy available to it under the loan documents and/or applicable state law, the Debtors agree to execute such documents as deemed necessary for the Class 2 Claimant to proceed with foreclosing on or obtaining title to the Property, including stipulating to the entry of a summary judgment of foreclosure.

       7.05    <u>Employment of Professionals</u>. In the period after the Effective Date but before closing of the case, the Debtors may continue to incur reasonable and necessary costs to preserve the value of their respective estates, administer its assets, and pay professionals (to expressly include tax professionals) as needed to wind-down its affairs and make provisions for the payments of Claims arising in connection with this Chapter 11 Case.

       7.06    <u>Post-Confirmation Matters</u>. In the period after the Confirmation Date but before closing of the case, the Debtors may continue to incur reasonable and necessary costs to preserve the value of the Property, administer Debtors' assets, and pay professionals as needed to wind-down its affairs, obtain necessary tax clearances, and make provisions for the payments of Claims arising in connection with this Chapter 11 Case.

       7.07    <u>Transfer and Conveyance of Causes of Action</u>.  All causes of action, including without limitation, actions for the avoidance and recovery pursuant to § 550 of the Bankruptcy Code of transfers avoidable by reason of §§ 544, 545, 547, 548, 549 or 553(b) of the Bankruptcy Code, or otherwise, and whether or not such actions have been commenced prior to the Effective Date of the Plan, shall be transferred and conveyed to G6 as consideration of the G6 payments called for by Section 7.03 of this Plan. This expressly includes, but is not limited to, all causes of action identified by the Debtor in its Statement of Financial Affairs, as well as all causes of action that arose prior to and after the Petition Date.

<div align="center">

**ARTICLE VIII**
<u>GENERAL AND MISCELLANEOUS PROVISIONS</u>

</div>

       8.01    <u>Definitions and Rules of Construction</u>. The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the below listed definitions. Therefore, the following terms, when used in this Plan, shall have the following meanings:

    a.    An "<u>Allowed</u>" Claim means (1) any pre-petition Claim listed on a Debtor's Schedules filed in the Chapter 11 Case as undisputed, liquidated and non-contingent; (2) any Claim specifically Allowed in this Plan; (3) any Claim arising before the Petition Date that has been timely filed with the Clerk of the Court by the holder of the Claim and to which no written objection to the allowance thereof has been stated in this Plan; (4) any Claim arising following the Petition Date to which no written objection is timely raised as set forth within the time period for objections provided by this Plan; and (5) any Claim determined to be Allowed as against Debtor, in whole or in part, by a Final Order of the Court.

    b.    "<u>Avoidance Actions</u>" means any and all Causes of Action arising under Chapter 5 of the Bankruptcy Code, including without limitation any and all actions to avoid and recover overpayments, preferential transfers, fraudulent transfers, and any and all turnover actions to recover money or property due to Debtor, regardless of whether they arise pre-Petition or after the Petition Date.

    c.    "<u>Bankruptcy Code</u>" or "<u>Code</u>" means title 11 of the United States Code, as amended.

d.	"<u>Causes of Action</u>" means all Claims or causes of action that belong to Debtor and/or that were or could have been brought by a Debtor under state or federal law, including the Bankruptcy Code, but not including any actions released under the Plan. Such Claims and causes of actions include, but are not limited to, any Claim or cause of action under a policy of insurance, Avoidance Actions, and any and all Claims, causes of action, counterclaims, demands, controversies, against third parties on account of costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, and executions of any nature, type, or description which either Debtor has or may come to have, including, but not limited to, negligence, gross negligence, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, interference with contractual or business relationships, concealment, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies (both civil and criminal), deceptive trade practices, breach or abuse of fiduciary duty, breach of any alleged special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, and obligation of good faith and fair dealing, at law or in equity, in contract in tort, or otherwise, known or unknown, suspected or unsuspected.

e.	"<u>Claim</u>" means: (i) right of payment, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether such right to payment or an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, Secured or unsecured.

f.	"<u>Claimant</u>" means the holder of a Claim.

g.	"<u>Confirmation</u>" shall mean the entry by the Court of an order confirming this Plan.

h.	"<u>Court</u>" shall mean the United States Bankruptcy Court for the Middle District of Tennessee and the Judge assigned to this case.

i.	"<u>Debtor's Professionals</u>" means attorneys, accountants, or other professional persons hired by Debtor and whose employment is approved by the Court pursuant to § 327 of the Bankruptcy Code or whose services are utilized by Debtor(s) in the ordinary course of Debtor's business.

j.	"<u>Effective Date</u>" shall mean **September 1, 2024**. However, the Debtors may at any time designate an earlier Effective Date by filing written notice thereof with the Court and serving such notice on all creditors and parties in interest.

k.	"<u>Final Order</u>" means: (i) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing, shall then be pending; or (ii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order may be appealed, or certiorari has been denied, and the time to take any further appeal, petition for certiorari or move for re-argument or rehearing shall have expired; provided, however, that the Confirmation Order may be treated as a Final Order at the option of the Debtor if no stay pending appeal has been obtained.

l.	"<u>Impaired</u>" means the treatment of an Allowed Claim under this Plan unless, with respect to such Claim, either: (i) this Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim entitles the holder of such Claim; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or

receive accelerated payment of such Claim after occurrence of a default, Debtor (A) cures any default that occurred before, on or after the commencement of the Chapter 11 Case other than default of the kind specified in Section 365(b)(2) of the Bankruptcy Code; (B) reinstate the maturity of such Claim as such maturity existed before such default; (C) compensate the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim or Interest.

m.    "Interests" shall mean the ownership interests held by the Debtors in Property.

n.    "Plan" shall mean this Chapter 11 Plan as the same may be modified from time to time in accordance herewith or pursuant to applicable law.

o.    "Secured" means an Allowed Claim that is secured by a properly perfected, enforceable lien on or security interest in property in which the Debtor or the estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of a Claimant's interest in the Debtor's or estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be.

8.02    Severability. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.03    Binding Effect. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

8.04    Liquidation. As set forth above, the Plan is intended to provide more to parties in interest than a liquidation pursuant to Chapter 7 because the implementation hereof (i) avoids all commissions and costs associated with the appointment of a Chapter 7 trustee, and (ii) avoids all attorney fees in connection with a Chapter 7 trustee's retention of counsel.

8.05    Captions. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.06    Retention of Jurisdiction of the Court. In addition to the continued jurisdiction after plan Confirmation that is provided for as a matter of law by the Code and Bankruptcy Rules, the Court shall retain exclusive jurisdiction for the following:

(a)    To determine any and all objections to the allowance, extent, priority or nature of any Claims, the amount and proper classification of the Claim of any holder and the determination of such objections as may be filed to any Claims;

(b)    To determine any and all applications for compensation and reimbursement pursuant to §§ 330 or 331 of the Bankruptcy Code;

(c)    To determine any and all applications for the assumption or rejection of executory contracts and unexpired leases, and the allowance of any Claims resulting from rejection thereof;

(d)    To determine any and all applications, adversary proceedings and litigated matters that may be filed in this Court;

(e) To interpret, enter Final Orders relating to, and otherwise act upon or in regard to the terms and provisions of the Plan;

(f) To cause the correction of any defect, the curing of any omission or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(g) To consider the modification of this Plan after the Confirmation Date as Allowed pursuant to the Federal Rules of Bankruptcy Procedure and the Bankruptcy Code;

(h) Except as otherwise provided in this Plan, to make any determinations and to issue any Final Orders to enforce, interpret or effectuate the Plan;

(i) To enter a Final Order concluding and terminating this case; and

(j) To determine such other matters as may be provided for in the Confirmation Order.

8.07    Withdrawal of Plan. At the option of the Debtor, this Plan may be withdrawn at any time prior to Confirmation. Such option shall be exercised by filing with the Court a notice of withdrawal and mailing a copy of such notice to all creditors, equity security holders and persons specially requesting all notices in this case.

8.08    Continued Reporting Requirements. Pursuant to Fed. R. Bank. P. 2015, the Debtor is required to file monthly operating reports until Confirmation. After Confirmation, the Debtor shall continue to file quarterly reports as required.

8.09    Exemptions from Transfer Tax. The issuance, transfer or exchange of a security or the recording of any instrument evidencing the transfer of assets contemplated under the Plan, including the post-Confirmation sale of any property, shall not be taxed under any law imposing a stamp tax or similar tax pursuant to § 1146(c) of the Code.

8.10    Modification of the Plan. The Debtor may propose amendments or modifications of this Plan at any time prior to Confirmation with leave of the Court. After Confirmation, the Debtor, with approval of the Court, and so long as they do not materially or adversely affect the interests of creditors, may remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the order of confirmation in such a manner as may be necessary to carry out the purposes and effect of this Plan. The foregoing provisions of this paragraph do not limit the Debtor's ability to modify the Plan under § 1193 and applicable rules.

8.11    Default Under Plan. Confirmation shall effect a cure of any existing default under a debt, and notwithstanding the provision of any lease or loan document that may survive the Confirmation, an event of default as to any Claim after Confirmation shall exist only if the Debtor (i) fails to make monetary payment when due under the Plan and that default is not cured within ten (10) days following delivery of written notice to counsel for Debtor of that default, (ii) fail to insure the property securing the creditor's Claim for the value of the property, or (iii) dispose of the property securing the Claim, normal wear and tear excepted, without either the consent of the creditor holding the Claim, the satisfaction of the lien on that property, or the payment of the net proceeds to that creditor.

8.12    Automatically Disallowed Claims. With respect to any Claim for which Debtor has insurance coverage, the Holder of such a Claim will be treated as an Allowed Claim only to the extent that the Holder of the Claim can establish that such Claim is not recoverable under the Debtor's insurance.

Unless the Holder obtains a Final Order establishing that the Claim is not recoverable under the Debtor's insurance, such Claim is automatically disallowed and will be entitled to no distribution.

## ARTICLE IX
### EFFECT OF CONFIRMATION, DISCHARGE AND INJUNCTION

9.01    Vesting of Property. Except as otherwise expressly provided in the Plan, Confirmation of the Plan shall vest all the property of the Debtor's estate in the Reorganized Debtor.

9.02    Property Free and Clear. Except as otherwise provided in the Plan, all property shall be free and clear of all Claims, liens and interests of any party as of the Confirmation of the Plan. This Plan will evidence the release of any and all liens or encumbrances against all property, unless such lien or encumbrance is specifically retained in the Plan.

9.03    Legal Binding Effect. The provisions of this Plan shall bind all Claimants, whether or not they accept this Plan or whether or not their Claim is Impaired.

9.04    Exculpation. Except as otherwise provided in the Plan or Confirmation order, the Debtor and the professionals for the Debtor shall neither have nor incur any liability to any entity or person for any act taken or omitted to be taken (exclusive of an act constituting fraud, gross negligence or intentional misconduct) in connection with or related to this Chapter 11 case, including, without limitation, actions related to the formulation, preparation, dissemination, implementation, administration, Confirmation or consummation of the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan.

9.05    Effect on Third Parties. Nothing contained in the Plan or in the documents to be executed in connection with the Plan shall affect any Claimant's rights against any third party, except as otherwise expressly provided in this Plan and except that any creditor or party in interest may only recover from any third-party guarantor or co-obligor the amount owed to it in excess of the amount to be paid on the underlying obligation pursuant to the Plan.

9.06    Release of Claims. Intentionally Omitted.

9.07    Conflict; Plan Controls. To the extent that any provisions of this Plan conflict with any of the terms or conditions of any note, security agreement, loan agreement, deed of trust or similar instrument, the provisions of this Plan shall control.

9.08    Consent to Jurisdiction. By accepting any distribution or payment under or in connection with this Plan, by filing any proof of Claim, by filing any Cure Claim or objection to the assumption or assignment of any assumed contract, by voting on this Plan, or by entering an appearance in the case, all creditors and other parties in interest have consented, and will be deemed to have expressly consented to the jurisdiction of the Court for all purposes with respect to any and all matters relating to, arising under or in connection with this Plan or the case, including the matters and purposes set forth in this Plan.

9.09    Destruction of Records. After the Effective Date, the Debtor shall have the right to destroy or cause to be destroyed records that it determines to no longer be needed in its business judgment. Any objection to the destruction of such records must be raised as an objection to Confirmation of this Plan or shall be deemed to be waived.

9.10    Due Authorization. Each and every Claimant who elects to participate in the distributions provided for herein warrants that such Claimant is authorized to accept, in consideration of such Claim

against the Debtor, the distributions provided for in this Plan and that there are not outstanding commitments, agreements, or understandings, expressed or implied, that may in any way modify the rights conveyed or obligations undertaken by such Claimant under this Plan.

        9.11    Conflict; Plan Controls. To the extent that any provisions of this Plan conflict with any of the terms or conditions of any note, security agreement, loan agreement, deed of trust or similar instrument, the provisions of this Plan shall control.

        9.12    Setoff. Except as specifically provided in the Plan, no Creditor shall retain any contractual or statutory right to set off any asset in which Debtor has an interest in satisfaction of that Creditor's prepetition Claim.

        9.13    Applicable Law. Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the internal laws of the State of Tennessee without reference to the laws of other jurisdictions.

        9.14    Temporary Injunction. Except as otherwise expressly provided in, or permitted under, this Plan, and expressly subject to the Debtors' obligations under Section 7.02, the Confirmation order shall provide, among other things, that all Claimants and persons who have held, hold or may hold Claims that existed prior to the Effective Date, are temporarily enjoined on and after the Effective Date against the: (i) commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor(s) on account of Claims against the Debtor(s), or on account of Claims released pursuant to the Plan; (ii) enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor(s) or any property; or (iii) creation, perfection or enforcement of any encumbrance of any kind against the Debtor(s) arising from a Claim. The temporary injunction provided herein shall remain in place pending the complete liquidation of each Debtor's property, at which point it shall terminate automatically. This provision does not enjoin the prosecution of any Claims that arise on or after the Effective Date nor does it enjoin the determination in the Bankruptcy Court of the amount of any Claims that arose prior to the Effective Date. Claimants and parties asserting entitlement to payment of administrative Claims incurred prior to the date of Confirmation shall be temporarily enjoined from asserting any Claim against the Debtor or their retained assets based upon any act or omission, transaction or other activity that occurred prior to the Confirmation date, except as otherwise provided in the Plan, whether or not a proof of Claim or interest was filed and whether or not such Claim or interest is Allowed under Section 502 of the Code.

DATED: August 15, 2024          Respectfully Submitted,

                           /s/ Henry E. ("Ned") Hildebrand IV
                           Henry E. "Ned" Hildebrand, IV
                           R. Alex Payne
                           Gray Waldron
                           DUNHAM HILDEBRAND PAYNE WALDRON, PLLC
                           9020 Overlook Blvd, Ste 316
                           Brentwood, TN 37027
                           615.933.5851
                           ned@dhnashville.com
                           *Counsel for the Debtors*

<p style="text-align: center; color: red;">**EXHIBIT B**</p>

<p style="text-align: center;">**Property Description of Vacant Lebanon Lots**</p>

Land in Wilson County, Tennessee and being Lot Nos. 15.01 and 15.03 on the Plan Hari Platinum Subdivision Final Plat, as shown on a map of record in Plat Book P26, Page 270, in the Register's Office for Wilson County, Tennessee, to which reference is hereby made for a more complete legal description.

Being a portion of the same property conveyed to Lebanon Platinum, LLC, a Tennessee Limited Liability Company, by Warranty Deed from Tops Property, a Tennessee General Partnership, dated March 7, 2007 and filed March 12, 2007 of record in Book 1235, Page 1701, in the
Register's Office of Wilson County, Tennessee.

Property Address:  1065 Franklin Road, Lebanon, TN 37087
Parcel Number:  081 015.00 Parent Parcel

In the event of a discrepancy between the property address or the tax parcel number and the legal  description, the legal description shall control.